UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA

- v. -

MICHAEL CARROLL and
MICHAEL PAPPAGALLO,

        Defendants.

- - - - - - - - - - - - - - - - - x



ORIGINAL

SEALED INDICTMENT

19 Cr.

JUL 3 0 2019

19 CRIM  545

## COUNT ONE
### (Conspiracy to Commit Securities Fraud and to Make False Filings with the SEC)

The Grand Jury charges:

### Relevant Persons and Entities

1.    At all times relevant to this Indictment, Brixmor Property Group ("Brixmor") was a publicly-traded real estate investment trust ("REIT") headquartered in New York, New York. Brixmor's securities traded under the symbol "BRX" on the New York Stock Exchange ("NYSE").

2.    At all times relevant to this Indictment, MICHAEL CARROLL, the defendant, was the Chief Executive Officer ("CEO") of Brixmor.

3.    At all times relevant to this Indictment, MICHAEL PAPPAGALLO, the defendant, was the President and Chief Financial Officer ("CFO") of Brixmor.

4.    At all times relevant to this Indictment, Steven Splain was the Chief Accounting Officer ("CAO") of Brixmor, and reported to MICHAEL PAPPAGALLO, the defendant.

5.    At all times relevant to this Indictment, Michael Mortimer held the position of Senior Vice President, Management Accounting at Brixmor, and reported to Splain.

## Public Company Reporting Requirements

6.    At all times relevant to this Indictment, Brixmor was required to comply with the federal securities laws, which are designed to ensure that a publicly-traded company's financial information is accurately recorded and disclosed to the investing public.  Specifically, at all times relevant to this Indictment, pursuant to the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, Brixmor was required to: (a) file with the United States Securities and Exchange Commission (the "SEC") annual financial statements (on SEC Form 10-K) that had been audited by independent certified public accountants; (b) file with the SEC quarterly financial reports (on SEC Form 10-Q); and (c) make and keep books, records and accounts that accurately and fairly reflected Brixmor's business transactions.

7.    At all times relevant to this Indictment, MICHAEL CARROLL and MICHAEL PAPPAGALLO, the defendants, signed Brixmor's quarterly and annual financial reports.  Additionally, Brixmor

filed with each of its quarterly and annual financial reports

certifications entitled "Certification of Periodic Report Under

Section 302 of the Sarbanes-Oxley Act of 2002" in which both

CARROLL and PAPPAGALLO certified, in part:

> 1.   I have reviewed this [quarterly or annual] report [] of Brixmor Property Group;
>
> 2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report; . . .

In these certifications, CARROLL and PAPPAGALLO also certified

that they had disclosed to Brixmor's auditor and the audit

committee of its board of directors (or persons performing the

equivalent functions):  "Any fraud, whether or not material,

that involves management or other employees who have a

significant role in the registrant's internal control over

financial reporting."

8.   In conjunction with each of its quarterly and annual

financial reports, Brixmor included a second set of

certifications entitled "Certification Pursuant to 18 U.S.C.

Section 1350 As Adopted Pursuant to Section 906 of the Sarbanes-

Oxley Act of 2002," in which MICHAEL CARROLL and MICHAEL

PAPPAGALLO, the defendants, both further certified, in part, that the quarterly or annual financial report:

> [F]ully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, and all information contained in this quarterly report fairly presents, in all material respects, the financial condition and results of operations of the Company for the periods presented therein.

### Brixmor's Use of Same Store Net Operating Income to Report Company Performance to the Investing Public

9.   Because Brixmor, like many REITs, generated profit and shareholder returns based on the performance of underlying real estate assets, at all times relevant to this Indictment, Brixmor measured its performance through metrics besides, or in addition to, traditional measurements of company performance calculated using Generally Accepted Accounting Principles ("GAAP").

10.   For example, Brixmor, like many REITs, measured its performance through a non-GAAP measurement known as Same Store (or Same Property) Net Operating Income ("SS-NOI"). While SS-NOI can be expressed as an absolute number, it was also often expressed as a percentage to describe the relative increase (or decrease) in SS-NOI between the current reported period (the "Current Period") and the same period during the prior year (the "Comparison Period"), solely with respect to any properties owned by the REIT in both periods (i.e., the "Same Property Pool"). This growth metric is referred to herein as "SS-NOI Growth." Because SS-NOI Growth is calculated based solely on

this Same Property Pool, it measures a REIT's success in generating growth through existing properties, as distinguished from growth resulting from the acquisition of new properties.

11.   Each of Brixmor's 10-Qs and 10-Ks during the years 2013 through 2015 included a definition regarding how Brixmor calculated SS-NOI.  This definition, which was also included in supplemental disclosures accompanying each 10-Q and 10-K, specifically excluded from the SS-NOI calculation lease termination, or lease settlement income ("LSI"), which are one-time payments a tenant makes for early termination of a lease.

12.   While REITs such as Brixmor are not required to calculate or report non-GAAP metrics such as SS-NOI or SS-NOI Growth, Brixmor nonetheless reported SS-NOI Growth in its periodic filings with the SEC and in related public disclosures to investors, as did other REITs.  Indeed, SS-NOI Growth was a key metric used by analysts and investors to evaluate a REIT's financial performance, including Brixmor's performance specifically.

13.   In addition to reporting SS-NOI Growth performance results, Brixmor also released to the investing public forward-looking forecasts of its expected annual SS-NOI Growth for each calendar year, known as guidance.

14.   As set forth in more detail below, Brixmor executives, including MICHAEL CARROLL and MICHAEL PAPPAGALLO, the

defendants, routinely touted to the investing community
Brixmor's steady and consistent performance with respect to SS-
NOI Growth and Brixmor's ability to deliver SS-NOI Growth
performance results that were consistently within the company's
guidance.

### Overview of the Accounting Fraud Scheme

15.   From at least in or about 2013 through at least in or
about 2015, MICHAEL CARROLL and MICHAEL PAPPAGALLO, the
defendants, Splain, Mortimer, and others known and unknown,
participated in an accounting fraud scheme in which they caused
Brixmor to report, in public filings with the SEC and to the
investing public, fraudulently "smoothed," that is, falsely
inflated and deflated, SS-NOI Growth figures.   Through the
scheme, CARROLL, PAPPAGALLO, and others caused Brixmor to report
these fraudulently smoothed SS-NOI Growth figures to the
investing public for the third quarter of 2013, and for each
subsequent quarter up to and including the third quarter of 2015
(together, the "Implicated Quarters").   CARROLL, PAPPAGALLO and
others caused Brixmor to report these fraudulently smoothed SS-
NOI Growth figures to the SEC and the investing public in order
to ensure that the reported figures consistently fell within
Brixmor's publicly announced SS-NOI Growth guidance for the
calendar year in which they were announced, and to fraudulently
convey to the investing public that Brixmor was accomplishing

predictable, consistent and stable growth quarter after quarter, as CARROLL and PAPPAGALLO had falsely and publicly touted.

## Brixmor's Issuance of SS-NOI Growth Guidance and Reporting of SS-NOI Growth Performance Results

16. In conjunction with its quarterly and annual filings with the SEC during the Implicated Quarters (together, "Brixmor's SEC Filings"), Brixmor also issued supplemental disclosures (the "Supplemental Disclosures"). The Supplemental Disclosures provided Brixmor's guidance with respect to Brixmor's anticipated annual SS-NOI Growth performance results. The guidance was expressed in terms of an anticipated range in which Brixmor's SS-NOI Growth performance figures would fall. As a given year progressed, Brixmor often tightened its guidance for annual SS-NOI Growth results, meaning the predicted range became narrower. Specifically, Brixmor issued the following guidance in its Supplemental Disclosures:

| Full Year 2013 SS-NOI Growth Guidance | |
|---|---|
| Date of Guidance | Guidance Range |
| December 3, 2013 | 3.9% to 4.0% |

| Full Year 2014 SS-NOI Growth Guidance | |
|---|---|
| Date of Guidance | Guidance Range |
| December 3, 2013 | 3.7% to 4.1% |
| October 27, 2014 | 3.8% to 4.0% |

| Full Year 2015 SS-NOI Growth Guidance | |
|---|---|
| Date of Guidance | Guidance Range |
| February 9, 2015 | 3.0% to 3.7% |
| October 26, 2015 | 3.5% to 3.7% |

17.   In each of Brixmor's SEC Filings and Supplemental Disclosures for the Implicated Quarters, Brixmor also reported its quarterly and/or annual SS-NOI Growth performance results, which from the fourth quarter of 2013 onward, as a result of the accounting fraud scheme, consistently fell within Brixmor's annual guidance:

| Reporting Period | Reported SS-NOI Growth | Applicable Guidance |
|:---:|:---:|:---:|
| Q4 2013 | 3.9% | 3.9% to 4.0% |
| Full Year 2013 | 4.0% | 3.9% to 4.0% |
| Q1 2014 | 3.8% | 3.7% to 4.1% |
| Q2 2014 | 3.8% | 3.7% to 4.1% |
| Q3 2014 | 3.9% | 3.7% to 4.1% |
| Q4 2014 | 3.9% | 3.8% to 4.0% |
| Full Year 2014 | 3.9% | 3.8% to 4.0% |
| Q1 2015 | 3.4% | 3.0% to 3.7% |
| Q2 2015 | 3.6% | 3.0% to 3.7% |
| Q3 2015 | 3.6% | 3.0% to 3.7% |

### The Defendants Tout Brixmor's Consistent
### SS-NOI Growth Performance Results

18.   MICHAEL CARROLL and MICHAEL PAPPAGALLO, the
defendants, regularly touted the consistency, stability and
predictability of Brixmor's SS-NOI Growth performance results
from quarter to quarter, and highlighted that Brixmor routinely
delivered SS-NOI Growth performance results that fell within the
company's previously issued guidance.  For example:

a. On March 3, 2014, CARROLL spoke at an industry
conference and described Brixmor's consistent SS-NOI Growth as
its "secret sauce" that was "unlike a lot of other people in
this space."

b. On August 6, 2014, CARROLL and PAPPAGALLO participated in a quarterly earnings call for the second quarter of 2014. During that call, CARROLL said, "[w]hen Brixmor went public last year I communicated the vision for the Company to be clean, straightforward, and transparent. . . . The guidance range we provided for same property NOI [was] . . . the narrowest in this section at 40 basis points. . . . We don't believe in an under-promise and over-deliver approach. By having wholly owned assets with contractual leases we can forecast earnings accurately. . . . We have a steady state portfolio with a large same property pool that is delivering consistent organic growth. . . . As I said, we are consistent, transparent and easy to understand."

c. On April 28, 2015, CARROLL and PAPPAGALLO participated in a quarterly earnings call for the first quarter of 2015. During that call PAPPAGALLO said, "Same property NOI grew nicely at 3.4% right down the middle of our full year guidance range."

d. On July 28, 2015, CARROLL and PAPPAGALLO participated in a quarterly earnings call for the second quarter of 2015. During that call, PAPPAGALLO said, "[c]onsistency is fast becoming the operative word in describing our financial performance, as this quarterly report provided another round of strong organic NOI growth. . . . We are pleased with the trend

line of where the same property NOI has gone the first half of
the year in light of that initial guidance."

e. On September 17, 2015, PAPPAGALLO spoke publicly at an
industry conference in New York, New York.  During those
remarks, PAPPAGALLO stated:  "[S]ame-property NOI, which is
certainly a metric which is looked at very, very carefully by
REIT investors, it's been at or above 3.4% for 12 quarters.
Very consistent same-property NOI growth coming from our primary
drivers."

f. On October 28, 2015, CARROLL and PAPPAGALLO
participated in a quarterly earnings call for the third quarter
of 2015.  During that call, PAPPAGALLO said, "[l]ast quarter, I
began my prepared remarks using the word consistency to describe
our financial results and I'm pleased to be able to use that
word again.  Our same property NOI growth remains strong,
resilient and consistent."

19.  Brixmor's purported success in meeting SS-NOI Growth
guidance and in producing consistent SS-NOI Growth performance
results during the Implicated Quarters was also closely followed
by investors and heralded by market analysts.

**The Defendants Manipulate SS-NOI Growth Performance Results in**
**Order to Stay Within Guidance and Convey Consistent Results**

20.  The SS-NOI Growth performance results reported by
Brixmor for the Implicated Quarters did not reflect the reality

11

of Brixmor's business operations.  Rather, MICHAEL CARROLL and
MICHAEL PAPPAGALLO, the defendants, and others manipulated these
reported figures in order to convey to the investing public the
false impression that Brixmor was consistently delivering
steady, consistent performance results, within its guidance,
quarter after quarter.

21.  In order to carry out the scheme, MICHAEL CARROLL and
MICHAEL PAPPAGALLO, the defendants, and others closely monitored
the status of SS-NOI Growth over the course of a given quarter.
At the close of each quarter, CARROLL and PAPPAGALLO, Splain,
Mortimer, and others manipulated the quarterly SS-NOI Growth
results in order to ensure that the reported numbers were
consistent with annual guidance.  CARROLL, PAPPAGALLO, Splain,
Mortimer, and others employed three principal means of
manipulating SS-NOI Growth performance figures in this manner:

a. First, in quarters in which Brixmor generated more
than enough income to meet the bottom, or in some cases middle,
of its guidance range, it "stored" certain income instead of
immediately recognizing it, a deceptive practice often referred
to as "cookie jar" accounting.  CARROLL, PAPPAGALLO and others
illicitly stored income in a particular account of Brixmor's
general ledger (the "2617 Account").  In fact, the 2617 Account
was referred to within Brixmor as, among other things, the
"cookie jar" account and the income within it was referred to

12

as, among other things, "boosts" and "stuff."  When CARROLL and
PAPPAGALLO needed additional income to manipulate Brixmor's
quarterly SS-NOI Growth results, they would recognize income
that previously had been illicitly stored in the 2617 Account.

b. Second, notwithstanding CARROLL's and PAPPAGALLO's
representations in Brixmor's SEC Filings and Supplemental
Disclosures that LSI was not included in the calculation of SS-
NOI, CARROLL, PAPPAGALLO, and others fraudulently included LSI
in calculating SS-NOI in order to manipulate Brixmor's quarterly
SS-NOI Growth results.

c. Third, CARROLL, PAPPAGALLO and others fraudulently
removed and discussed removing income and/or properties from SS-
NOI in the prior relevant Comparison Period.  Because SS-NOI
Growth is essentially a measure of the growth in revenue for a
given set of properties between the Comparison Period and the
Current Period, reducing the SS-NOI for the Comparison Period or
removing an underperforming property from the Same Property Pool
has the impact of making the SS-NOI Growth in revenue for the
Current Period appear larger.

### Illicit Storage and Use of Income in the 2617 Account

22.  Brixmor maintained the 2617 Account and various sub-
accounts as part of its general ledger.  The function of the
2617 Account was to hold deferred revenue of uncertain status.
For example, when Brixmor billed tenants for unusually old

expenses, it held those billed amounts in the 2617 Account because it recognized that tenants might dispute such amounts and might never make payment on the old bills. If and when such payments were made, that income would be included within SS-NOI as well as other reported GAAP metrics, such as net income. Pursuant to GAAP, income in the 2617 Account was to be recognized as income in the quarter in which it was collected. However, MICHAEL CARROLL and MICHAEL PAPPAGALLO, the defendants, and others stored income in the 2617 Account for extended periods, even after it was actually collected by Brixmor, and then selectively recognized that income in subsequent quarters to manipulate Brixmor's quarterly SS-NOI Growth results to fall within Brixmor's annual guidance. The illicit use of this stored income was typically accomplished by reclassifying amounts from the 2617 Account to either the "other income" or the "miscellaneous income," general ledger accounts which were included in the calculation of SS-NOI and thereby changed SS-NOI growth. In addition, CARROLL, PAPPAGALLO, and others sometimes changed their estimate of the amount of billings that might not be paid back, and which income was therefore being stored in the 2617 Account, for the sole purpose of increasing SS-NOI Growth.

23.  The illicit storage and subsequent recognition of income was frequently and explicitly utilized by MICHAEL CARROLL and MICHAEL PAPPAGALLO, the defendants, to smooth Brixmor's SS-

NOI Growth. For example, on or about July 17, 2014, Brixmor financial planning and reporting personnel circulated to PAPPAGALLO, Splain, Mortimer, and others a "July Recast" of Brixmor's budget, forecasting third quarter SS-NOI Growth of 3.64% "with the Boost of $950K." As the quarter progressed, on or about September 9, 2014, PAPPAGALLO emailed CARROLL and noted that there was about $950,000 of "meltdown" related to rent losses and bad debt that would negatively impact SS-NOI Growth for that quarter. PAPPAGALLO told CARROLL that these losses would be offset by, among other things, "the 900 k or so already in there as 'boost.'" Similarly, on or about September 12, 2014, PAPPAGALLO emailed CARROLL concerning SS-NOI Growth and stating that "lower top line income," namely rent, would be offset by, among other things, "the previously planned 'boosts.'" Ultimately, as a result of these "boosts," Brixmor reported SS-NOI Growth of 3.9% for the third quarter of 2014 -- a number that was squarely within the middle of Brixmor's annual guidance.

24. Discussion of illicitly storing and using income continued at Brixmor into 2015. For example, on or about April 6, 2015, MICHAEL PAPPAGALLO, the defendant, emailed Splain, Mortimer and others to schedule a meeting "regarding same property NOI planning" the "objective" of which was "to try to

make decisions on 1Q number – push a little or squirrel away stuff for 2Q & 3Q."

25.   Once MICHAEL CARROLL and MICHAEL PAPPAGALLO, the defendants, directed the manipulation of SS-NOI Growth, subordinates, including Splain, Mortimer, and others, made the necessary accounting entries to implement the scheme.  For example, in or about February 2015, Brixmor received an $81,000 common area maintenance fee ("CAM") from a tenant ("Tenant-1"), which should have been immediately recognized as income and been incorporated into the calculation of SS-NOI for that quarter. On or about February 24, 2015, a Brixmor employee emailed Mortimer asking if the $81,000 payment should be recognized in its entirety in February.  Mortimer responded:  "We were going to see where results shake out and take it in if we have too. Most likely this will be a 1st quarter event most likely either way."  The $81,000 payment from Tenant-1, however, was not taken into income that quarter. Rather, the amount was stored in the 2617 Account.

26.   On or about October 2, 2015, Splain emailed MICHAEL PAPPAGALLO, the defendant, and said "I spoke to Mike C [MICHAEL CARROLL, the defendant] yesterday and he indicated he wanted to keep the same store down a little this qtr and wants to show a 40 bp increase (3.8%) next qtr."  Consistent with this directive, on October 21, 2015, Mortimer emailed his

subordinates: "I need to see how much unrecognized PYCM-PYRT [prior year CAM and tax payments] each region has left on the balance sheet that could be income in 4Q. I only need the amounts that are collected and not yet recognized." In response, Mortimer was told that approximately $263,000 was available, including the $81,000 payment from Tenant-1.

27. On or about October 21, 2015, Mortimer emailed Splain, "just confirmed with the 3 VP's – we are good for $263K of collected PYCM that can be recognized in 4Q." Finally, on or about October 29, 2015, Mortimer emailed Splain about both Brixmor's intention to utilize funds from the 2617 Account to increase SS-NOI Growth for the fourth quarter of 2015 and about efforts to forecast SS-NOI Growth numbers for 2016. Splain told Mortimer that Splain would "rather go in with the lower [forecasted] number [for 2016] since we are emptying the cookie jar to get to the SS for this qtr [i.e., the fourth quarter of 2015]."

28. The fraud orchestrated by MICHAEL CARROLL and MICHAEL PAPPAGALLO, the defendants, and others was uncovered in early February 2016, prior to Brixmor's filing of its 10-K for 2015. Accordingly, the manipulated SS-NOI Growth figures for the fourth quarter of 2015 were never reported in filings with the SEC.

## The Illicit Use of Lease Settlement
## Income to Smooth SS-NOI Growth

29.   In Brixmor's SEC Filings and its Supplemental Disclosures, MICHAEL CARROLL and MICHAEL PAPPAGALLO, the defendants, represented that Brixmor did not include LSI in the calculation of SS-NOI.  Notwithstanding these representations, CARROLL, PAPPAGALLO, and others manipulated Brixmor's quarterly reported SS-NOI Growth results by including LSI in Brixmor's SS-NOI figures.  CARROLL and PAPPAGALLO did this in two principal ways.

a. First, in some instances, LSI payments, in whole or in part, were immediately and improperly reclassified as "other income," which resulted in an immediate increase to SS-NOI Growth for the period at issue.  For example, on or about September 12, 2014, PAPPAGALLO emailed CARROLL, noting that some of the LSI payment from a particular tenant ("Tenant-2") was going to be included in SS-NOI Growth, but that there might be opportunity to reclassify even more of it as other income.  In fact, Brixmor improperly included over $290,000 of LSI from Tenant-2 in SS-NOI for the fourth quarter of 2014 thereby increasing SS-NOI Growth for that period.

b. Second, in many instances, after LSI payments were received, these payments were amortized over a longer period and the amortized amounts were directly included within SS-NOI.

Amortizing LSI payments in this fashion, instead of including LSI payments as a lump sum within SS-NOI, avoided big spikes in Brixmor's SS-NOI Growth calculations, thereby furthering the goal of smoothing the company's reported SS-NOI Growth results.

### Illicit Alterations of Prior Comparison Periods to Smooth SS-NOI Growth

30. MICHAEL CARROLL and MICHAEL PAPPAGALLO, the defendants, and others also removed and discussed removing income and/or properties from a particular Comparison Period to artificially boost SS-NOI Growth in the corresponding Current Period. For example:

### First Quarter of 2015

31. In or about April 2015, MICHAEL CARROLL and MICHAEL PAPPAGALLO, the defendants, and others manipulated Brixmor's quarterly SS-NOI Growth results for the first quarter of 2015 by reducing SS-NOI in the Comparison Period of the first quarter of 2014. More specifically:

a. On or about April 13, 2015, Splain emailed PAPPAGALLO attaching an internal Brixmor spreadsheet entitled "Same Store Rec by Line Item." The spreadsheet permitted a user to easily observe how a change to revenue in a Comparison Period would affect the Current Period's SS-NOI Growth.

b. On or about April 14, 2015, PAPPAGALLO emailed Splain telling Splain only to "call." PAPPAGALLO attached two versions

of the spreadsheet to the email.  The first version, labeled "Version A," was the version initially provided by Splain, which projected SS-NOI Growth of 3.27%.  The second version, labeled, "Version B," had been altered by PAPPAGALLO to remove $250,000 that had been recognized in the first quarter of 2014.  The removal of the $250,000 of income from the first quarter of 2014 resulted in an increase in SS-NOI Growth for the Current Period to 3.39%.

c. Later that day, PAPPAGALLO emailed Splain and Mortimer informing them that they were "Going with 3.4" SS-NOI Growth and that "MC [CARROLL] [was] looking at [the] spreads file one more time tonight."  In fact, Brixmor removed the $250,000 from the first quarter of 2014 and reported SS-NOI Growth of 3.4% for the first quarter of 2015.

<u>Third Quarter of 2015</u>

32.  In or about October 2015, MICHAEL CARROLL and MICHAEL PAPPAGALLO, the defendants, Splain, Mortimer, and others discussed manipulating, and manipulated, SS-NOI Growth for the third quarter of 2015 by excluding properties from the Same Property Pool as well as by reducing SS-NOI for the third quarter of 2014 Comparison Period by excluding certain income that had previously been included.  More specifically:

a. On or about October 5, 2015, Splain emailed PAPPAGALLO and Mortimer informing them that "Mike C [CARROLL] asked that we

review 3Q to see if we can exclude any properties from Same

Store." Splain then went on to propose a property that could be

removed (the "Removal Property") as well as a payment, a "$300K

good faith fee" that had been included in SS-NOI in 2014, that

could be excluded for calculating SS-NOI Growth for the third

quarter of 2015 ("Excluded Fee-1"). Splain concluded that

removing the Removal Property and excluding Excluded Fee-1 would

"move same store to 3.6%."

b. After Splain proposed the Removal Property, Splain was

contacted by a Brixmor investor relations employee questioning

the basis for removing properties from the Same Store Pool.

Splain forwarded the question to PAPPAGALLO and CARROLL,

prompting PAPPAGALLO to state, "How did she find out we took out

[the Removal Property]? She must not be given access to how we

make the sausage." Ultimately, Brixmor did not remove any

properties from the Same Store Pool that quarter. Instead,

CARROLL, PAPPAGALLO, and Splain removed Excluded Fee-1 from SS-

NOI in the Comparison Period.

c. On or about October 6, 2015, in an effort to further

manipulate SS-NOI Growth, PAPPAGALLO emailed Splain and Mortimer

about increasing SS-NOI Growth to a number at or exceeding 3.55%

so that it would round up to 3.6%, stating that "MC [CARROLL]

agrees,,,,, Find the 5-0, round it up, and call it a day."

Accordingly, Mortimer emailed Splain and another Brixmor

21

employee, asking the latter to exclude another payment for
$98,000 ("Excluded Fee-2") from SS-NOI in the Comparison Period
in order to adjust SS-NOI Growth to "3.59%."  A few minutes
later, Mortimer emailed Splain and PAPPAGALLO explaining that
they had removed Excluded Fee-2 and therefore "SS for Q3 is a
solid 3.6% (3.59%)."  PAPPAGALLO responded: "[Splain] and
[Mortimer] LLC Bratwurst at its Finest," to which Mortimer
responded with an image of a man holding a batch of sausage.

      d. After further discussions, Brixmor did not remove
Excluded Fee-2 from SS-NOI in the Comparison Period.  Instead,
on or about October 7 and 8, 2015, CARROLL contacted Splain with
additional proposals to alter SS-NOI Growth by, among other
things, removing additional properties from the Same Store Pool,
adjusting the amount of LSI included, and excluding other
payments from the Comparison Period.  For example, on or about
October 7, 2015, Splain emailed PAPPAGALLO stating, "Give me a
call on same store.  Mike C [CARROLL] called and wants to make a
few changes."  Ultimately, CARROLL, PAPPAGALLO, and Splain
settled on excluding another $56,000 payment from the Comparison
Period in addition to Excluded Fee-1.  All of this resulted in
Brixmor reporting SS-NOI Growth of 3.6% for the third quarter.

## Impact of the Fraudulent Manipulation of SS-NOI Growth

     33.  The efforts of MICHAEL CARROLL and MICHAEL PAPPAGALLO,
the defendants, and others to manipulate Brixmor's quarterly SS-

NOI Growth results caused Brixmor to report fraudulent SS-NOI Growth numbers in eight out of the nine Implicated Quarters, representing alterations to the SS-NOI Growth numbers as high as 50% for certain quarters.  More specifically:

| Reporting Period | Reported SS-NOI Growth | Actual SS-NOI Growth | % Alteration to Reported SS-NOI Growth vs. Actual SS-NOI Growth |
|---|---|---|---|
| Q1 2013 | 3.5% | 4.3% | (18.6)% |
| Q2 2013 | 3.9% | 2.8% | 39.3% |
| Q1 2014 | 3.8% | 3.8% | 0.0% |
| Q2 2014 | 3.8% | 3.5% | 8.6% |
| Q3 2014 | 3.9% | 2.6% | 50.0% |
| Q4 2014 | 3.9% | 4.8% | (18.8)% |
| Q1 2015 | 3.4% | 3.3% | 3.0% |
| Q2 2015 | 3.6% | 4.2% | (14.3)% |
| Q3 2015 | 3.6% | 3.5% | 2.9% |

34.  The end result of the fraudulent smoothing, as shown below, was to keep Brixmor's reported SS-NOI Growth consistently within its guidance in the Implicated Quarters:



35.   In truth, Brixmor's actual quarterly SS-NOI Growth results were frequently outside of the reported guidance, as shown  below:



## Statutory Allegations

36.   From at least in or about 2013 through at least in or about 2015, in the Southern District of New York and elsewhere, MICHAEL CARROLL and MICHAEL PAPPAGALLO, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, to commit securities fraud in connection with the purchase and sale of

securities issued by Brixmor, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; and to make and cause to be made false and misleading statements of material fact in applications, reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, in violation of Title 15, United States Code, Sections 78m(a) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, and 244.100(b).

### Objects of the Conspiracy

37. It was a part and an object of the conspiracy that MICHAEL CARROLL and MICHAEL PAPPAGALLO, the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and of the facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes, and artifices to defraud; (b) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons;  and (c) making untrue statements of material fact

and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

38.   It was a further part and an object of the conspiracy that MICHAEL CARROLL and MICHAEL PAPPAGALLO, the defendants, and others known and unknown, willfully and knowingly would and did make and cause to be made statements in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, in violation of Title 15, United States Code, Sections 78m(a) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, and 244.100(b).

## Overt Acts

39.   In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about August 6, 2014, MICHAEL CARROLL, the defendant, stated during a quarterly earnings call in the Southern District of New York, "As I said, we are consistent, transparent and easy to understand."

b.    On or about April 6, 2015, MICHAEL PAPPAGALLO, the defendant, emailed Splain and Mortimer in order to schedule a meeting regarding "same property NOI planning," and suggesting that they "push a little or squirrel away stuff for 2Q & 3Q."

c.    On or about October 7, 2015, Splain emailed CARROLL and PAPPAGALLO about manipulating Brixmor's quarterly SS-NOI Growth results.

d.    On or about December 23, 2015, Mortimer sent an email directing a subordinate to use stored income from the 2617 Account in order to meet SS-NOI Growth guidance.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Securities Fraud)

The Grand Jury further charges:

40.    The allegations contained in paragraphs 1 through 35 and paragraph 39 of this Indictment are repeated and realleged as if fully set forth herein.

41.    Between in or about 2013 and in or about 2015, in the Southern District of New York and elsewhere, MICHAEL CARROLL and MICHAEL PAPPAGALLO, the defendants, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and of the facilities of national securities exchanges, used and employed, in connection with the purchase and sale of

securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons; and (c) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, to wit, CARROLL and PAPPAGALLO engaged in a scheme to mislead the shareholders of Brixmor and the investing public by fraudulently manipulating the reported figures for SS-NOI Growth in order to provide a false impression that Brixmor was accomplishing predictable, consistent, and stable growth from quarter to quarter.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5 and 244.100(b); and Title 18, United States Code, Section 2.)

### COUNTS THREE AND FOUR
### (False Statements in Filings with the SEC)

The Grand Jury further charges:

42. The allegations contained in paragraphs 1 through 35 and paragraph 39 of this Indictment are repeated and realleged as if fully set forth herein.

43. On or about the dates set forth below, in the Southern District of New York and elsewhere, MICHAEL CARROLL and MICHAEL

PAPPAGALLO, the defendants, willfully and knowingly made and caused to be made statements in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit, CARROLL and PAPPAGALLO caused to be submitted to the SEC the filings listed below which omitted material facts and contained materially misleading statements:

| Count: | Approximate Date of Filing: | Filing: |
|---|---|---|
| Three | November 4, 2014 | Brixmor 10-Q for the Third Quarter of 2014 |
| Four | July 27, 2015 | Brixmor 10-Q for the Second Quarter of 2015 |

(Title 15, United States Code, Sections 78m(a) and 78ff; Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-13, and 244.100(b); and Title 18, United States Code, Section 2.)

## COUNTS FIVE AND SIX
### (False Certifications of Disclosure Filed with the SEC)

The Grand Jury further charges:

44.  The allegations contained in paragraphs 1 through 35 and paragraph 39 of this Indictment are repeated and realleged as if fully set forth herein.

45.  On or about the dates set forth below, in the Southern District of New York and elsewhere, MICHAEL CARROLL and MICHAEL PAPPAGALLO, the defendants, willfully and knowingly certified in written statements accompanying periodic reports containing

financial statements filed by an issuer with the SEC pursuant to section 13(a) and 15(d) of the Securities Exchange Act of 1934, to wit, Brixmor's 10-Q for the third quarter of 2014 and Brixmor's 10-Q for the second quarter of 2015, that, inter alia, CARROLL and PAPPAGALLO had disclosed to Brixmor's auditor and the audit committee of Brixmor's board of directors (or persons performing the equivalent functions) any fraud, whether or not material, that involved management or other employees who had a significant role in Brixmor's internal control over financial reporting despite the fact that CARROLL and PAPPAGALLO knew that those representations, among others, were false and misleading:

| Count: | Approximate Date of Filing: | Certification Concerning Filing: |
|---|---|---|
| Five | November 4, 2014 | Brixmor 10-Q for the Third Quarter of 2014 |
| Six | July 27, 2015 | Brixmor 10-Q for the Second Quarter of 2015 |

(Title 15, United States Code, Sections 78m(a) and 78ff; Title 17, Code of Federal Regulations, Section 240.13a-14; and Title 18, United States Code, Section 2.)

## FORFEITURE ALLEGATION

46.   As a result of committing one or more of the offenses charged in Counts One through Six of this Indictment, MICHAEL CARROLL and MICHAEL PAPPAGALLO, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section

2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses that the defendants personally obtained.

<u>Substitute Assets Provision</u>

47.  If any of the above-described forfeitable property, as a result of any act or omission by either of the defendants:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code Section 2461, to seek forfeiture of any other property of the

defendants up to the value of the forfeitable property described above.

        (Title 18, United States Code, Section 981(a)(1)(C);
           Title 21, United States Code, Section 853(p);
           Title 28, United States Code, Section 2461.)


_____
GRAND JURY FOREPERSON

_____
AUDREY STRAUSS
Attorney for the United
States, Acting Under Authority
Conferred by 28 U.S.C. § 515

32

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

MICHAEL CARROLL and
MICHAEL PAPPAGALLO,

Defendants.

### SEALED INDICTMENT

19 Cr. _____

(Title 15, United States Code, Sections
78j(b),78m(a), and 78ff; Title 17, Code of
Federal Regulations, Sections 240.10b-5,
240.12b-20, 240.13a-1, 240.13a-11, 240.13a-
13, 240.13a-14; 244.100(b); Title 18,
United States Code, Sections 2 and 371.)

_____
Foreperson

AUDREY STRAUSS
Attorney for the
United States
Acting Under
  Authority
Conferred by
28 U.S.C. § 515

7/30/2019  Indictment Filed under seal
U.S.M.J. Wang

33