UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

UNITED STATES OF AMERICA, :

                                      :

             -v.- :           19 Cr. 545 (CM)

                                        :

MICHAEL CARROLL and :

MICHAEL PAPPAGALLO, :

                                        :

             Defendants. :

-----------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF BRIXMOR PROPERTY GROUP, INC.'S MOTION TO QUASH CERTAIN REQUESTS IN DEFENDANTS' RULE 17 SUBPOENAS

HOGAN LOVELLS US LLP

Robert B. Buehler

390 Madison Avenue
New York, NY 10017
Telephone: (212) 918-3261
Fax:  (212) 918-3100

Douglas A. Fellman

555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5714
Fax: (202) 637-5910
*(Pro Hac Vice* Motion Pending)

*Attorneys for non-party witness
Brixmor Property Group, Inc.*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ...................................................................................................... 2

THE RULE 17 SUBPOENAS ................................................................................. 5

ARGUMENT ........................................................................................................... 8

I.      APPLICABLE LAW ....................................................................................... 9

II.     DISCUSSION ............................................................................................... 10

      A.     The Objectionable Requests fail to meet the *Nixon* standard ............................... 11

      B.     Brixmor has already produced to the government much of the relevant material sought by the defendants ........................................................... 14

      C.     Compliance with the requests poses an enormous burden on the Company ......... 15

      D.     Each of the Objectionable Requests should be quashed ....................................... 16

            1.     Carroll Request 1 ....................................................................................... 16

            2.     Pappagallo Request 1 ................................................................................. 18

            3.     Pappagallo Request 2 ................................................................................. 18

III.    CONCLUSION ............................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Bowman Dairy Co. v. United States*,
341 U.S. 214, 220 (1951).........................................................................................9

*In re Cardinal Health, Inc. Sec. Litig.*,
No. C2 04 575, 2007 WL 495150 (S.D.N.Y. Jan. 26, 2007)...................................13

*United States v. Barnes*,
No. S9 04 Cr. 186, 2008 WL 9359654 (S.D.N.Y. Apr. 1, 2008) ...........................12

*United States v. Brown*,
1995 WL 387698 (S.D.N.Y. June 30, 1995) .........................................................12

*United States v. Burger*,
773 F.Supp. 1419 (D. Kan. 1991)..........................................................................12

*United States v. Carton*,
No. 17 CR 680, 2018 WL 5818107 (S.D.N.Y. Oct. 19, 2018).............................10, 11, 13, 17

*United States v. Cherry*,
876 F. Supp. 547 (S.D.N.Y. 1995) .....................................................................9, 12

*United States v. Crosland*,
821 F. Supp. 1123 (E.D. Va. 1993) ......................................................................13

*United States. v. James*,
No. 02 CR 0778, 2007 WL 1579980 (E.D.N.Y. May 31, 2007)...........................13

*United States v. Khan*,
No. 06-CR-255, 2009 WL 152582 (E.D.N.Y. Jan. 20, 2009) ..................................9

*United States v. Leave*,
358 F.Supp.2d 273 (S.D.N.Y. 2005)......................................................................18

*United States v. Louis*,
No. 04–CR–203, 2005 WL 180885 (S.D.N.Y. Jan. 27, 2005) ...............................11

*United States v. Marchisio*,
344 F.2d 653 (2d Cir. 1965)...................................................................................12

*United States v. Nixon*,
418 U.S. 683 (1974).......................................................................................... *passim*

*United States v. Rich*,
    No. S 83 CR. 579, 1984 WL 845 (S.D.N.Y. Sept. 7, 1984) ..............................................12, 13

*United States v. Roach*,
    164 F.3d 403 (8th Cir. 1998) ...................................................................................................15

*United States v. RW Prof'l Leasing Servs. Corp.*,
    228 F.R.D. 158 (E.D.N.Y. 2005) ..............................................................................................14

*United States v. Skelos*,
    No. 15-CR-317, 2018 WL 2254538 (S.D.N.Y. May 17, 2018) ...........................................10

*United States v. Treacy*,
    2008 WL 5082884 (S.D.N.Y. Dec. 1, 2008) ..........................................................................11

*United States v. Ulbricht*,
    858 F.3d 71 (2d Cir. 2017)......................................................................................................10

*United States v. Weisberg*,
    No. 08-CR-347, 2010 WL 5027537 (E.D.N.Y. Dec. 3, 2010) ................................................19

*United States v. Weissman*,
    No. 01 CR. 529, 2002 WL 31875410 (S.D.N.Y. Dec. 26, 2002) .....................................10, 11

**Other Authorities**

Federal Rule of Criminal Procedure 17(c)(2) ...............................................................................1

Federal Rule of Criminal Procedure 17 ............................................................................. *passim*

Pursuant to Federal Rule of Criminal Procedure 17(c)(2), Brixmor Property Group, Inc. ("Brixmor" or "the Company"), a non-party witness in this matter, respectfully submits this memorandum of law in support of its motion to quash three specific document requests in subpoenas served on it by defendants Michael Carroll and Michael Pappagallo.

## PRELIMINARY STATEMENT

The subpoenas served on Brixmor by Carroll and Pappagallo contain three document requests that constitute precisely the kind of fishing expeditions that are prohibited by Rule 17(c). Both subpoenas include broad and indiscriminate requests for e-mails that are unbounded by any reasonable subject matter limitations.  Despite the fact that the indictment is focused on the alleged manipulation of a specific non-GAAP accounting metric, the requests at issue seek vast amounts of documents that will not be relevant to the discrete accounting issues in this case. Further, the requests seek the production of documents from years that are outside the scope of the charges contained in the indictment.  As such, the requests plainly run afoul of Rule 17(c)(2), as the Company's compliance with them "would be oppressive and unreasonable."  Fed. R. Crim. P. 17(c)(2).

The requests made by Carroll and Pappagallo are plainly improper under *United States v. Nixon*, 418 U.S. 683 (1974), because they do not target relevant, admissible evidence with the requisite specificity.  Instead of requesting specific evidence that would tend to prove or disprove the offenses charged in the indictment, defendants' requests are phrased like civil discovery requests, seeking broad categories of e-mails in a blatant attempt to fish for documents.  Simply put, this is not permitted under Rule 17(c).  Furthermore, over the course of the three years that the government spent investigating this case, Brixmor produced tens of thousands of documents, including much of the relevant material sought by the defendants in their subpoenas.  Brixmor understands that the government has already produced all of these documents to the defense in

discovery.

The objectionable requests made by Carroll and Pappagallo seek either all e-mails from certain individuals' e-mail folders or all e-mails referring to certain broad topics. The vast majority of these e-mails will have no relevance to the core issue in this case, namely whether the defendants smoothed a specific non-GAAP metric. The requests made by the defendants will, however, require the Company to undertake extensive efforts to search for, review, and produce the documents in question. Significantly, Brixmor has already agreed to produce responsive documents to all of the other requests contained in the subpoenas issued by Carroll and Pappagallo. For these reasons, the three document requests at issue should be quashed in their entirety.

## BACKGROUND

On Friday, December 23, 2015, Brixmor's Audit Committee received an anonymous complaint through the Company's internal whistleblower hotline concerning certain accounting improprieties. The Audit Committee immediately retained Sullivan & Cromwell LLP to assist in the conduct of a thorough investigation of the whistleblower's allegations. Sullivan & Cromwell hired the forensic accounting firm, Marks Paneth LLP, to assist with the investigation. At the time, Carroll and Pappagallo were serving as Brixmor's Chief Executive Officer and Chief Financial Officer, respectively.

As part of its comprehensive investigation, Sullivan & Cromwell conducted an extensive document collection effort with the help of the Company, collecting thousands of documents from the e-mail accounts of relevant Brixmor employees, including Carroll and Pappagallo. The investigation team reviewed approximately 19,000 documents, which consisted of all e-mails sent between certain key custodians, again including Carroll and Pappagallo, for relevant date ranges as well as certain other e-mails containing one or more relevant search terms. In total,

2

approximately 19,000 documents reviewed as part of the internal investigation were produced to the government by Brixmor.

Following the conclusion of the Audit Committee investigation, Brixmor self-reported its findings to the Securities and Exchange Commission ("SEC"), which commenced an investigation.  The U.S. Attorney's Office for the Southern District of New York subsequently began a separate investigation of the same accounting issues.  Over the next three years, the Company cooperated extensively with these parallel investigations, producing tens of thousands of additional relevant documents.

On August 1, 2019, the indictment in this case was filed, charging Carroll and Pappagallo with two counts of securities fraud.  The indictment alleges that Carroll and Pappagallo manipulated, or "smoothed," Brixmor's reported same property net operating income ("SP NOI") and SP NOI growth rate in order to report consistent quarterly numbers that hit the Company's publicly announced annual guidance.  The indictment alleged that Brixmor's actual SP NOI numbers were far more volatile than the reported numbers.  On the same date, the SEC filed a complaint that charged Brixmor, as well as Carroll and Pappagallo, with securities fraud on the basis of the same alleged conduct.  Without admitting or denying the allegations, the Company agreed to pay a $7 million penalty and comply with certain undertakings, including retaining an independent consultant to review and assess controls relating to the calculation and presentation of non-GAAP measures including SP NOI.

As part of its cooperation with the parallel criminal and civil investigations, Brixmor produced a large volume of documents and other materials that were requested by either the SEC or the government.  (Virtually all of the documents produced by Brixmor were provided to both the SEC and the government.)  Specifically, the Company made more than two dozen

productions in response to a host of document requests over the course of the investigation

conducted by the government and the SEC.  Some of the documents produced by Brixmor

include:

1)      Documents involving Carroll and Pappagallo, or any of five other relevant
Company employees, relating to "net operating income," "NOI," "same property
NOI," "same store NOI," or general ledger account 2617 (including all sub-
accounts);

2)      Documents and communications relating to lease settlement income, lease
terminations, and general ledger account 3099 (miscellaneous revenue) for Carroll
and Pappagallo, as well as eight other relevant Company employees;

3)      Documents and communications concerning a $300,000 "good faith" fee
relating to the Liberty Plaza property, including agreements and correspondence
between Walmart and Brixmor concerning that fee, for Carroll, Pappagallo, and
six other relevant Brixmor employees;

4)      Documents and communications concerning a $56,000 "rent adjustment"
related to the Roundtree property for Carroll and Pappagallo, as well as four other
relevant Brixmor employees;

5)      Work papers for the two forensic accounting firms retained by counsel for
Brixmor and its Audit Committee, Marks Paneth and Alvarez & Marsal;

6)      Documents relating to any analysis of the materiality of any recorded
adjustments or unrecorded adjustments regarding the Company's financial results
or NOI calculations, including but not limited to SAB 99 analyses;

7)      Correspondence with analysts regarding same property NOI for key
custodians, including Carroll, Pappagallo, and ten other relevant Company
employees;

8)      Documents and communications relating to public statements made by
Brixmor regarding same property NOI, including but not limited to during
earnings calls and meetings with investors and/or analysts for Carroll and
Pappagallo, as well as nine other relevant Brixmor employees;

9)      Transcripts of teleconferences and meetings, including with analysts and
investors, in which "net operating income," "NOI," "same property NOI," or
"same store NOI" was discussed;

10)     All exhibits used during internal investigation interviews of Carroll and
Pappagallo, as well as six other relevant Brixmor employees; and,

11)     Documents relating to compensation for Carroll and Pappagallo, as well as five other relevant Company employees.

In total, including the documents produced to the SEC by counsel for the Audit Committee, the Company produced more than 88,000 documents comprising more than a half million pages to the government.  The documents already produced by Brixmor include many of the documents that would be responsive to the requests that are contained in the three document requests that are the subject of this motion.  The Company understands that all of the materials that it produced to the government and the SEC have been produced to the defendants.

## THE RULE 17 SUBPOENAS

Carroll served Rule 17(c) subpoenas on Brixmor and Sullivan & Cromwell on November 6, 2019, and on Simpson Thacher & Bartlett on November 13, 2019.  Pappagallo served Rule 17(c) subpoenas on Brixmor, Marks Paneth, Alvarez & Marsal, and PricewaterhouseCoopers ("PWC") on November 14, 2019.[1]  The other subpoenaed entities are all law firms or accounting firms that were engaged by Brixmor or its counsel.  Accordingly, Brixmor or its Audit Committee possesses the attorney-client privilege as to all of the subpoenaed materials.

Following service of these subpoenas, counsel for Brixmor engaged in calls and other communications with counsel for Carroll and Pappagallo in an attempt to narrow the scope of the document requests and avoid filing motions to quash or, at least, limit the issues to be decided on such a motion.  After consulting with attorneys from the other subpoenaed entities, counsel for Brixmor took the lead in negotiations with counsel for Carroll and Pappagallo.  The parties were successful in resolving some, but not all, of the disputed issues.

Carroll's subpoena to Brixmor seeks, for the period from January 1, 2011 to December

---

[1] The Carroll and Pappagallo Rule 17 subpoenas directed to Brixmor are set forth as Exhibits 1 and 2 respectively to the declaration of Robert B. Buehler.

31, 2016, defined as the Relevant Period, the following documents:

Request 1: All Documents and Communications contained in Michael Carroll's Brixmor e-mail account, including, but not limited to all attachments to any Communications, sent or received during the Relevant Period.

Request 2: All entries from the electronic calendar maintained by Michael Carroll at Brixmor during the Relevant Period.

Request 3: All Documents reviewed or prepared by PricewaterhouseCoopers in connection with creating Brixmor's historical financial records prior to its initial public offering in 2013.

Request 4: All Documents relied upon by the Board in deciding that Michael Carroll, Michael Pappagallo, Steven Splain, and Michael Mortimer should resign from Brixmor.

Request 5: All Documents and Communications contained in Stacy Slater's Brixmor e-mail account that were exchanged with any Analyst covering Brixmor, including but not limited to all attachments to any Communications, sent or received during the Relevant Period.

Notwithstanding the extremely broad scope of these requests, Brixmor agreed to comply with Carroll's Request 2 and Request 5 as written. Brixmor has also informed counsel for Carroll that, after conferring with PWC, the Company has not yet identified documents responsive to Request 3. Brixmor has also agreed to produce a limited amount of materials in response to Carroll Request 4. However, the parties were unable to reach an agreement on Carroll Request 1, which is overly broad and makes no effort to identify relevant, admissible documents with specificity, as required under Rule 17(c).

In addition, the relevant parties reached an agreement on the subpoena to Simpson Thacher & Bartlett, which seeks, "All drafts of the Forms S-11 or drafts of amendments to Forms S-11 prepared or revised by Simpson Thacher for Brixmor" and "All Communications . . . between Simpson Thacher and Brixmor or Brixmor's outside auditors regarding the definition of same store net operating income ("SS-NOI") or same property net operating income ("SP-NOI") for the Forms S-11, drafts of Forms S-11, amendments to Forms S-11, or drafts of amendments

to Forms S-11 prepared or revised by Simpson Thacher for Brixmor."

Pappagallo's subpoena to Brixmor seeks:

Request 1:  Communications sent or received between January 1, 2012 and May 19, 2013 from the e-mail accounts of Steven Splain and Michael Mortimer.

Request 2:  Communications concerning eight broad subject matters, including lease settlement income and the 2617 account, from the e-mail accounts of Michael Mortimer, Steven Splain, Jeong (John) Chang, Ralph Lalli, Daniel Reilly, William Gribbin, John Mobley, Rachel Shopf, Gregory Berger, and Terry Weiler.

Request 3:  Documents reflecting the internal control framework, testing, and procedures concerning the 2617 Account and the LSI Account.

Request 4:  Documents relied upon by the Board in deciding that Carroll, Pappagallo, Splain, and Mortimer should resign from Brixmor.

Request 5:  Stacy Slater's notes recording discussions at meetings with analysts and investors from October 1, 2013 through December 31, 2015.

Request 6:  Documents from January 1, 2012 through May 19, 2013 providing Brixmor's definition of Same Store Net Operating Income or Same Property Net Operating Income.

Request 7:  Quarterly compliance certificates signed by 21 individuals in connection with the preparation of Brixmor's 10-Q and/or 10-K reports and similar certificates signed in connection with the preparation of Brixmor's quarterly supplemental reporting package, for each of the quarterly year end periods from July 2013 through December 2015.

Notwithstanding its concerns about the breadth of some of these requests, Brixmor has

agreed to comply with Pappagallo's Request 3, Request 5, Request 6, and Request 7, as written.

Brixmor also agreed to produce a limited amount of materials in response to Pappagallo Request

4, which is virtually identical to Carroll Request 4.  However, Brixmor was unable to reach an

agreement on Pappagallo Request 1 and Request 2, as the requests are overbroad and production

would be overly burdensome to the Company.

Pappagallo's subpoenas to Alvarez & Marsal and Marks Paneth, forensic accounting

firms that were retained by counsel to Brixmor, seek documents and communications that set

forth the basis of the conclusions and adjustments reached by both firms regarding certain

identified accounting matters, as well as documents and communications that reflect disagreement with, or alternative accounting treatments to, these adjustments.  Alvarez & Marsal and Marks Paneth have represented to counsel for Brixmor that all of the non-privileged documents responsive to these requests were produced to the government.  Brixmor understands that the government has already produced these documents to the defendants in discovery.

Pappagallo's subpoena to PWC requests documents reflecting internal control framework, testing, and procedures concerning the 2617 account and the LSI account.  Brixmor understands that PWC will be producing any responsive, non-privileged documents to Pappagallo pursuant to this subpoena.

Finally, in light of Brixmor's agreement to produce certain limited materials to Carroll and Pappagallo in response to Request 4 in both of their subpoenas to Brixmor, Carroll's subpoena to Sullivan & Cromwell, which sought additional materials related to the internal investigation, will be deemed to be satisfied.

Accordingly, in the instant motion, Brixmor is moving to quash Carroll Request 1, Pappagallo Request 1, and Pappagallo Request 2 in defendants' subpoenas to Brixmor (collectively, the "Objectionable Requests").

## ARGUMENT

The subpoenas served upon Brixmor by Carroll and Pappagallo each contain document requests that are beyond the scope of Rule 17 and should be quashed.  These requests not only seek documents that are outside the time period covered by the charged conspiracies, but they also contain no meaningful restrictions or other limiting factors.  As such, they would require the Company to collect, process, review, and produce hundreds of thousands of documents to the defendants, without regard to relevance or admissibility.  One of the requests contains so many broad sub-parts that it would place an undue burden on the Company to conduct searches, review

the documents, and screen for privilege.  The requests can best be characterized as fishing expeditions, which the Court well knows are prohibited by Rule 17.

It is also impossible to claim that Brixmor is being unreasonable in its refusal to comply with the broadest of the defendants' requests.  To the contrary, as outlined in the preceding section, the Company has agreed to produce documents in response to all of the other requests in the subpoenas, even though some of those requests are also quite extensive.  Thus, Brixmor is moving to quash only the most egregious and abusive of the defendants' requests.

## I.    APPLICABLE LAW

Federal Rule of Criminal Procedure 17(c) governs the issuance of trial subpoenas seeking documents in criminal cases.  The Supreme Court has explained that a Rule 17(c) subpoena "[is] not intended to provide a means of discovery for criminal cases."  *Nixon*, 418 U.S. at 698 (citations omitted); *see also United States v. Cherry*, 876 F. Supp. 547, 553 (S.D.N.Y. 1995) ("Rule 17(c) can be contrasted with the civil rules which permit the issuance of subpoenas to seek production of documents or other materials which, although not themselves admissible, could lead to admissible evidence.").  Rather, "the purpose of Rule 17 is to avoid unnecessary delay at trial by providing a mechanism for pre-trial production and inspection of certain material."  *United States v. Khan*, No. 06-CR-255, 2009 WL 152582, at *1 (E.D.N.Y. Jan. 20, 2009) (citing *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951)).  Accordingly, "[c]ourts must be careful that [R]ule 17(c) is not turned into a broad discovery device, thereby undercutting the strict limitation of discovery in criminal cases[.]"  *Cherry*, 876 F. Supp. at 552 (quotations omitted).

To obtain a Rule 17(c) subpoena, the moving party must show:

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such

9

> production and inspection in advance of trial and that the failure to obtain
> such inspection may tend unreasonably to delay the trial; and (4) that the
> application is made in good faith and is not intended as a general 'fishing
> expedition.'

*Nixon*, 418 U.S. at 699–700.  Although *Nixon* did not decide whether this four-part test applies to

subpoenas served on third-parties in particular, courts in the Second Circuit have almost

unanimously applied the "strict standard" set forth in *Nixon* to subpoenas served on third-parties.

*See, e.g.*, *United States v. Skelos*, No. 15-CR-317, 2018 WL 2254538, at *1 (S.D.N.Y. May 17,

2018) (collecting cases); *United States v. Carton*, No. 17 CR 680, 2018 WL 5818107, at *1

(S.D.N.Y. Oct. 19, 2018) (citing *Nixon*, 418 U.S. at 700).

In sum, in order to comply with the requirements of Rule 17(c), a defendant must

demonstrate that the materials he or she seeks are (1) relevant; (2) admissible; and (3) specific.

*United States v. Weissman*, No. 01 CR. 529, 2002 WL 31875410, at *1 (S.D.N.Y. Dec. 26, 2002)

(citing *Nixon*, 418 U.S. at 700); *see also United States v. Ulbricht*, 858 F.3d 71, 109 (2d Cir.

2017) (Rule 17 "subpoena must meet three criteria:  (1) relevancy; (2) admissibility; [and] (3)

specificity") (quotations omitted).

## II.   DISCUSSION

This Court should quash the Objectionable Requests for three independent reasons.  First,

the requests fail to meet the *Nixon* standard because they are exactly the type of broad fishing

expeditions that courts, including this one, have repeatedly found improper in the Rule 17

context, and because these requests do not seek relevant and admissible evidence.  Second,

Carroll and Pappagallo have not demonstrated that the requests are necessary because, to the

extent they seek specific and relevant material, much of that material has already been produced

to the government.  Third, compliance with the requests would be overly burdensome to Brixmor.

A.       **The Objectionable Requests fail to meet the *Nixon* standard**

The Objectionable Requests lack the specificity required by Rule 17(c).  "If the moving

party cannot reasonably specify the information contained or believed to be contained in the

documents sought but merely hopes that something useful will turn up," then "the specificity

requirement is not met and the requests will be denied."  *United States v. Treacy*, 2008 WL

5082884, at *3 (S.D.N.Y. Dec. 1, 2008) (citations omitted).  Where, as here, a defendant asks for

"any" and "all" documents, and otherwise describes the subpoenaed materials in general terms,

the defendant likely is using the subpoena to fish for discovery.  *See Weissman*, 2002 WL

31875410 at *1; *see also United States v. Louis*, No. 04–CR–203, 2005 WL 180885, at *5

(S.D.N.Y. Jan. 27, 2005) (rejecting as too broad a Rule 17(c) subpoena requesting "any and all"

documents relating to several categories of subject matter).

This Court directly addressed the specificity requirement for Rule 17(c) subpoenas in

*United States v. Carton*, 2018 WL 5818107 at *1.  There, the defendant sought, *inter alia*, from a

Sports and Entertainment company "all communications" over a three-year period between the

defendant or a third-party Hedge Fund and the Sports and Entertainment Company.  *Id*. at *2.

The subpoena also sought all "internal communications" among employees of the Sports and

Entertainment Company concerning the defendant and the "sale of event tickets to [defendant] or

any related entity."  *Id*.  This Court found that "the nearly three-year temporal breadth of these

requests alone shows that they are broad fishing expeditions, not narrowly targeted subpoenas."

*Id*. at *3.  The Court further explained that "[s]uch . . . blanket request[s] implicate[ ] all of the

problems associated with a classic 'fishing expedition'."  *Id*.  (citing *United States v. Barnes*, No.

S9 04 Cr. 186, 2008 WL 9359654, at *4 (S.D.N.Y. Apr. 1, 2008)).

The same conclusion is warranted here, as the Objectionable Requests ignore altogether

the requirement of specificity.  Instead of targeting specific information, the requests seek to

examine general compilations or categories of documents spanning multiple years with the apparent hope that they contain information that is somehow helpful to the defense of Carroll and Pappagallo.  For example, Carroll Request 1 requests literally "[a]ll Documents and Communications contained in Michael Carroll's Brixmor e-mail account" for a six-year period, which includes two full years that predate the allegations in the indictment.  Similarly, Pappagallo Request 1 asks for all "[c]ommunications sent or received between January 1, 2012 and May 19, 2013 from the e-mail accounts of: Steven Splain and Michael Mortimer," a period that includes an entire year that predates the charges in this case.  These broad and indiscriminate requests are improper.  *See Barnes*, 2008 WL 9359654 at *4 (describing a Rule 17(c) subpoena seeking "'all' documents and recordings that fall into several categories for an approximate 23-month period rather than identifiable pieces of evidence" as a "classic 'fishing expedition'").

The Objectionable Requests also fail to overcome the *Nixon* hurdles of relevance and admissibility.  The defendants "[have] the burden of specifically identifying the materials sought, and showing that they are relevant and admissible."  *United States v. Brown*, 1995 WL 387698, at *9 (S.D.N.Y. June 30, 1995).  Significantly, as opposed to document requests in a civil case, the materials sought in a Rule 17 subpoena "cannot be potentially relevant or admissible, they must meet the test of relevancy and admissibility at the time they are sought."  *United States v. Burger*, 773 F. Supp. 1419, 1425 (D. Kan. 1991) (citing *United States v. Marchisio*, 344 F.2d 653, 669 (2d Cir. 1965)).  Thus, Rule 17(c) is different from the civil rules, which permit subpoenas that seek the production of documents or materials which, although themselves not admissible, may lead to admissible evidence.  *See Cherry*, 876 F. Supp. at 552.  "[A] mere hope that the documents, if produced, may contain evidence favorable to the defendant's case will not

suffice." *United States v. Rich*, No. S 83 CR. 579, 1984 WL 845, at *3 (S.D.N.Y. Sept. 7, 1984) (internal quotations and citations omitted).

Here, Carroll and Pappagallo plainly fail to meet their heavy burden.  As an initial matter, the defendants fail to satisfy the relevance standard as their requests are simply too broad.  Because of the "indeterminate nature of the documents" requested by Carroll and Pappagallo, the Court "is in no position to make a ruling on [their] relevancy or admissibility[.]"  *United States v. Crosland*, 821 F. Supp. 1123, 1130 (E.D. Va. 1993).  Moreover, the subpoenas' broad catch-all requests for "all" documents and communications necessarily encompass many documents that will prove to be irrelevant; indeed, given the breadth of these three requests, it is likely that the vast majority of responsive documents will be completely irrelevant to the narrow charges in this case.  These requests are, therefore, facially improper under Rule 17(c).  Absent a request for specific documents that are shown to be relevant and admissible at the time they are sought, the defendants are not entitled to the production of the requested documents pursuant to Rule 17(c).

Furthermore, given their broad scope, the Objectionable Requests will capture materials that are covered by the attorney-client privilege, which would render them inadmissible.  Materials that are protected by privilege are not producible.  *See Carton*, 2018 WL 5818107 at *6; *United States. v. James*, No. 02 CR 0778, 2007 WL 1579980, at *2 (E.D.N.Y. May 31, 2007); *In re Cardinal Health, Inc. Sec. Litig.*, No. C2 04 575, 2007 WL 495150, at *9 (S.D.N.Y. Jan. 26, 2007).

As discussed in more detail below with respect to each of the Objectionable Requests, the defendants, in violation of Rule 17(c), want to cast an extremely broad net in an attempt to catch unknown and unspecified documents that might somehow help them, as opposed to properly requesting specific information for the purpose of obtaining relevant documents that are

admissible at trial.

**B.     Brixmor has already produced to the government much of the relevant material sought by the defendants**

Even assuming that the defendants could establish that any of the Objectionable Requests seek specific, relevant, and admissible evidence, they would still be unable to meet their burden under *Nixon*.  In particular, *Nixon* explained that a Rule 17(c) subpoena may only seek materials that are not otherwise procurable in the exercise of due diligence.  418 U.S. at 699–700.  Where, as here, materials could be more easily obtained from the government than from non-party Brixmor, such requests should be quashed.  *See, e.g.*, *United States v. RW Prof'l Leasing Servs. Corp.*, 228 F.R.D. 158, 164 (E.D.N.Y. 2005) (finding it was unreasonable to require non-party to re-produce documents, explaining "the information sought is apparently in the possession of the Government, it should therefore be readily obtained in the usual manner" and, as such, the request was "unreasonable and unnecessary").

As discussed above, Brixmor produced nearly 90,000 documents to the government during the course of the parallel criminal and SEC investigations.  Many of these documents consisted of e-mails involving the defendants, as well as other individuals who are identified in the documents requests, including Steve Splain, Mike Mortimer, and members of the Brixmor accounting department.  In addition, many of these e-mails dealt with the broad topics that are identified in the defendants' document requests, such as lease settlement income, account 2617, and CAM payments.  Brixmor further understands that the government has already produced these documents to the defendants in discovery.

Accordingly, pursuant to *Nixon*, Carroll and Pappagallo should not be permitted to use Rule 17(c) to seek materials that they have already obtained from the government.

### C.       Compliance with the requests poses an enormous burden on the Company

In addition to failing to satisfy the various *Nixon* requirements, the document requests

should be quashed for yet another reason:  They are overbroad and unduly burdensome to

Brixmor.  Rule 17(c) explicitly provides that "the court may quash or modify the subpoena if

compliance would be unreasonable or oppressive."  Fed. R. Crim. P. 17(c).  Thus, the Court may,

in its discretion, determine whether "the burden of producing subpoenaed records greatly

outweighs any relevance they may have to the case."  *See United States v. Roach*, 164 F.3d 403,

412 (8th Cir. 1998).

Here, the broad and largely unbounded Objectionable Requests would impose an

enormous burden on Brixmor.  For example, Carroll Request 1—which seeks "[a]ll Documents

and Communications contained in Michael Carroll's Brixmor email account" for a six-year

period—captures more than 450,000 different e-mail communications.  This request would

require Brixmor to undertake a lengthy and costly process to collect, process, and review for

responsiveness and for privilege an enormous volume of documents.  While the vast majority of

the requested documents would be indisputably irrelevant and inadmissible, the burden of

reviewing and producing them would be substantial.

The Pappagallo requests are similarly oppressive.  For example, Pappagallo Request 2

seeks all communications from the e-mail accounts of ten Brixmor employees related to eight

separate topics for a four-year period.  The topics themselves are also extremely broad, such as

"Lease settlement income" and "2617 account and related sub-accounts."  The volume of

potentially responsive documents would be significant and would require the Company to

undertake a time-consuming and expensive review.  This same request would pose substantial

logistical and technical challenges for the Company if it were ordered to comply with it.  For

example, the request seeks communications related to the "aggregation and accounting from

January 1, 2012 through December 31, 2015 for the unvouched or stale purchase orders that were recorded in account 2617." In order to comply with this particular request, Brixmor would need to undertake a complicated search and manual review of the e-mail accounts of ten employees, as the topic at issue is not easily searchable and any responsive documents would be difficult to target and identify.

Moreover, many of the e-mails that Brixmor would be required to produce would not only be irrelevant to the case, but would also contain proprietary or commercially-sensitive information, such as internal communications regarding corporate strategy, lease negotiations, acquisitions and dispositions of properties, compensation, and personnel issues. It would be unreasonable for the Company to be compelled to produce such sensitive, not to mention irrelevant, material to its former employees.

### D.  Each of the Objectionable Requests should be quashed

In addition to the aforementioned reasons why the Objectionable Requests are improper as a general matter, each of these requests should be quashed for the following reasons.

#### 1.  Carroll Request 1

Simply put, Carroll Request 1 seeks every single e-mail that Carroll sent or received from January 1, 2011, two full years before the charged conspiracy is alleged to have begun, until December 31, 2016.[2] Carroll Request 1 is entirely open-ended and makes no attempt to limit the scope of the request in any way. It is the embodiment of a fishing expedition.

As an initial matter, Carroll Request 1 fails to meet the specificity requirement under *Nixon*. Even taking into account the fact that Carroll left Brixmor in February 2016, the relevant time period of the request is more than five years. Not surprisingly, as the chairman of the board

---

[2] Because Carroll stopped working at Brixmor in early February 2016, the relevant period for this request would end on February 7, 2016, notwithstanding the subpoena's attempt to define the relevant period as extending to December 31, 2016.

and the CEO of the Company, Carroll sent and received a massive number of e-mails.  A preliminary assessment of Carroll's e-mail account at Brixmor indicates that it contains more than 450,000 e-mails over that time period.  The sheer breadth of this request, along with the absence of any reasonable time or subject matter restrictions, reveals an obvious lack of specificity.  *See Carton*, 2018 WL 5818107 at *3 ("the nearly three-year temporal breadth of these requests alone shows that they are broad fishing expeditions, not narrowly targeted subpoenas").

This request would also plainly require the production of a large volume of irrelevant documents.  The vast majority of the documents responsive to this request—namely, the contents of Carroll's entire e-mail account—would not be relevant to the narrow issues charged in the indictment.  The indictment is focused on the alleged manipulation by Carroll and Pappagallo of a single non-GAAP accounting measure, same property NOI.  It cannot be seriously disputed that all but a small number of Carroll's e-mails would have absolutely nothing to do with this topic.  To the contrary, most of the e-mails in Carroll's account would address matters that are entirely irrelevant to this case, including confidential or sensitive matters related to Brixmor's operations.

Moreover, while Carroll requests all documents and communications contained in his Brixmor e-mail account beginning on January 1, 2011, the indictment does not allege that Carroll engaged in any criminal behavior prior to 2013.  The issue at the trial will be whether Carroll committed securities fraud during the time period alleged in the indictment.  Documents that predate that time period are not relevant to those issues.

Finally, compliance with this request would be unduly burdensome to Brixmor.  The Company would be required to review each of Carroll's e-mails to identify the many privileged

communications that are contained in the e-mail account of the CEO of a public company.

To permit Carroll to use Rule 17(c) to obtain literally every e-mail in his Brixmor account for a period in excess of five years "would be to extend the rule far beyond its limits, transforming it from a carefully circumscribed device to expedite trials and hearings into an effectively unlimited tool for discovery and investigation." *United States v. Leave*, 358 F.Supp.2d 273, 276 (S.D.N.Y. 2005).

### 2. Pappagallo Request 1

Pappagallo Request 1 is almost identical in structure and substance to Carroll Request 1 and should be quashed for the same reasons. Pappagallo Request 1 seeks all "[c]ommunications sent or received between January 1, 2012 and May 19, 2013 from the e-mail accounts of: Steven Splain and Michael Mortimer." Like Carroll Request 1, this request would require Brixmor to produce the entire contents of employee e-mail accounts without any reasonable subject matter limitations. Like Carroll Request 1, it seeks documents that predate the time period charged in the indictment. And, like Carroll Request 1, this request would result in the production of voluminous amounts of documents that have no relevance whatsoever to the allegations in the case. Finally, as with Carroll Request 1, compliance with this request would require Brixmor to conduct a time-consuming and expensive privilege review.

Pappagallo Request 1 should be quashed because it clearly violates Rule 17(c).

### 3. Pappagallo Request 2

Although it is presented as a single request for documents, Pappagallo Request 2 is actually eight separate document requests, none of which comply with Rule 17(c). As constructed, Pappagallo Request 2 seeks e-mail from ten different employees in the accounting department of Brixmor concerning eight different substantive accounting topics. Significantly, each of the enumerated topics are themselves broad subjects and not discrete or isolated matters.

18

For this reason, Pappagallo Request 2 will result in the production of large numbers of e-mail that bear no relevance to the narrow accounting measure that is at issue in this case.

As with the other Objectionable Requests, Pappagallo Request 2 does not satisfy the specificity requirement under *Nixon*.  The request is overbroad and seeks the collection and production of documents related to wide-ranging and expansive accounting subjects.  Far from specifying particular documents, Pappagallo Request 2 asks for sweeping categories of material in the e-mail accounts of the ten Brixmor employees.  For example, Pappagallo Request 2 seeks all e-mails from the ten employees concerning lease settlement income, which is a category of revenue for Brixmor that arises in numerous different circumstances for a large number of tenants and is discussed in many contexts by accounting personnel at Brixmor.  Similarly, Pappagallo Request 2 asks for all e-mails from the ten employees concerning the "2617 account and related sub-accounts."  Account 2617 was a multi-purpose deferred income account in the general ledger at Brixmor that was regularly utilized by the Company's accounting department. While both lease settlement income and account 2617 were used as part of the alleged conspiracy to smooth same property NOI, they are also items that are discussed and addressed in countless ways that have nothing to do with same property NOI.  As a result, Pappagallo Request 2 does not seek the "sharply defined groups of documents" which Rule 17 permits, *see United States v. Weisberg*, No. 08-CR-347, 2010 WL 5027537, at *2 (E.D.N.Y. Dec. 3, 2010) (citations omitted), but instead resembles a classic civil discovery request.

In addition, Brixmor has already produced to the government numerous e-mails involving these topics and their impact on same property NOI.  In other words, the Company has previously conducted searches that were intended to locate relevant documents that addressed lease settlement income and account 2617 in the context of same property NOI.  Brixmor

understands that these e-mails have all been produced to the defendants.  Pappagallo's desire to have the Company conduct additional searches for these accounting topics that are unbounded by any connection to same property NOI is exactly the type of unreasonable or oppressive requests that Rule 17(c) prohibits.

Further, as with the other Objectionable Requests, Pappagallo Request 2 seeks documents that predate the charges in the indictment.  Here, Pappagallo Request 2 begins on January 1, 2012, a full year before the indictment alleges that the conspiracy began.

Finally, compliance with this request would be unduly burdensome and would require a massive substantive review of the requested e-mail accounts for a four-year period.  Moreover, Pappagallo Request 2 seeks the e-mails from ten Brixmor employees, only one of whom directly reported to Pappagallo.  Such a large number of custodians only multiplies the number of e-mails that would be subject to a search.  And, of course, the Company has already produced relevant documents related to most, if not all, of the identified broad accounting topics.

## III.  CONCLUSION

For the reasons set forth above, the Court should quash in their entirety Carroll Request 1,

Pappagallo Request 1, and Pappagallo Request 2 in the Carroll and Pappagallo Rule 17

subpoenas served upon Brixmor.

HOGAN LOVELLS US LLP


By: /s/ Robert B. Buehler
       Robert B. Buehler

390 Madison Avenue
New York, NY 10017
Telephone: (212) 918-3261
Fax: (212) 918-3100

Douglas A. Fellman

555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5714
Fax: (202) 637-5910
*(Pro Hac Vice* Motion Pending)

*Attorneys for non-party witness
Brixmor Property Group, Inc.*