**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     v.<br><br>MICHAEL CARROLL and,<br>MICHAEL PAPPAGALLO<br><br>                    Defendants. | No. 19-cr-545 (CM)<br><br>December 13, 2019<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANT PAPPAGALLO'S MEMORANDUM OF LAW IN OPPOSITION**
**TO BRIXMOR PROPERTY GROUP'S MOTION TO QUASH SUBPOENA**

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ...................................................................... 1

II.     STATEMENT OF FACTS ........................................................................... 2

III.    LEGAL STANDARD .................................................................................. 4

IV.     ARGUMENT ............................................................................................... 7

      A.      The Proposed Search Terms, Date Ranges, and Custodians are as
            Narrowly Tailored as Possible to Identify Emails with Factual Information
            Directly Related to the Government's Adjustments to Accounting Entries
            in Account 2617. ...........................................................................................7

            1.      Unvouched or Stale Purchase Orders .........................................8
            2.      Common Area Maintenance Retro Project ................................9
            3.      FM Global Insurance Refund.....................................................10
            4.      Westview Tax Dispute...............................................................10
            5.      Tenant Credits ...........................................................................10
            6.      Security Deposits .......................................................................11
            7.      Other Adjustments to Account 2617..........................................12

      B.      The Proposed Search Terms and Custodians are as Narrowly Tailored as
            Possible to Identify Emails with Factual Information Directly Related to
            the Government's Claims Concerning Lease Settlement Income. .......................12

      C.      Mr. Splain's and Mr. Mortimer's Inboxes Contain Evidence Relevant to
            Mr. Pappagallo's Defense. ...........................................................................13

      D.      Brixmor's Remaining Arguments Are Unavailing. ...............................................13

V.      CONCLUSION ......................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bowman Dairy Co. v. United States*,
    341 U.S. 214 (1951) ................................................................................................9

*United States v. Binday*,
    2013 WL 4494659 (S.D.N.Y. Aug. 15, 2013) ......................................................8

*United States v. Nachamie*,
    91 F. Supp. 2d 552 (S.D.N.Y. 2000) ................................................................8, 9

*United States v. Nixon*,
    418 U.S. 683 (1974) ...........................................................................................7, 8

*United States v. Nosal*,
    291 F.R.D. 403 (N.D. Cal. 2013) ...........................................................................9

*United States v. Rajaratnam*,
    753 F. Supp. 2d 317 (S.D.N.Y. 2011) ....................................................................9

*United States v. Stein*,
    488 F. Supp. 2d 350 (S.D.N.Y. 2007) ................................................................8, 9

*United States v. Tucker*,
    249 F.R.D. 58 (S.D.N.Y. 2008) ..............................................................................8

**Other Authorities**

Fed. R. Civ. P. 26(b)(1) ...................................................................................................10

Fed. R. Crim. P. 16(a)(1)(E) ..............................................................................................9

Fed. R. Crim. P. 17(c) ..........................................................................................4, 7, 8, 9

Fed. R. Crim. P. 17(c)(1) ...................................................................................................7

U.S. CONST. amend. VI .....................................................................................................7

Michael V. Pappagallo submits this Memorandum of Law in opposition to Brixmor Property Group's ("Brixmor") Motion to Quash his subpoena issued pursuant to Rule 17(c) of the Federal Rules of Criminal Procedure.

## I.   PRELIMINARY STATEMENT

The indictment alleges various improper accounting by Brixmor's accounting staff purportedly to smooth Brixmor's quarterly same store net operating income ("SSNOI"), one of the many non-GAAP metrics Brixmor reported in its quarterly reports.  To be able to properly respond to the Government's claims, Mr. Pappagallo needs access to documents reflecting how and why the accounting staff accounted for the various matters at issue, virtually none of which Mr. Pappagallo had any involvement in or even knew about when the accounting decisions were made. Those documents reside in the mailboxes of Steven Splain (Brixmor's Chief Accounting Officer), his direct report Michael Mortimer, and their accounting staff.

Mr. Pappagallo has proposed searches of the mailboxes of Mr. Splain, Mr. Mortimer, and their senior accounting staff using narrowly tailored search terms focused directly on what he understands to be the accounting matters at issue. To minimize Brixmor's burden, on November 26, 2019, Mr. Pappagallo offered to limit Brixmor's search such that the search terms he proposed would be run only on cover emails, thereby excluding voluminous potential search term hits on the routine reports, schedules, spreadsheets, and other documents that may contain one or more of the search terms.  The emails are critically important because they presumably will reflect the real-time communications among the accounting staff of the facts and the factors they considered in making the accounting decisions they did.

Brixmor seeks to quash the subpoena as overbroad, even though it cannot deny that the proposed search terms focus directly on the accounting matters at issue and the proposed custodians will have relevant and likely exculpatory emails.  Brixmor apparently has not even

bothered to run the proposed search terms to determine the number of hits and the relevance of the results despite having run numerous searches requested by the Government during its investigation that were far broader than the searches Mr. Pappagallo now proposes.  Mr. Pappagallo's liberty is at stake; that Brixmor does not want to be burdened with having to produce documents is no excuse to deprive Mr. Pappagallo access to facts critical to his defense.

## II.    STATEMENT OF FACTS

Michael Pappagallo joined Brixmor as its President and Chief Financial Officer on May 20, 2013.  From April 1997 to April 2010, Mr. Pappagallo was the Chief Financial Officer and from May 2010 to May 2013 was the Chief Operating Officer of Kimco Realty Corporation, another publicly held real estate investment trust ("REIT").  Mr. Pappagallo was brought in to Brixmor by its then majority owner, The Blackstone Group, to take Brixmor public.  From his arrival until Brixmor's public offering on October 29, 2013, Mr. Pappagallo's time was devoted almost entirely to preparing for the public offering.  Long before Mr. Pappagallo arrived on the scene at Brixmor in May 2013 and throughout his tenure, the Government's cooperating witnesses, Messrs. Splain and Mortimer, ran Brixmor's accounting department.

In December 2015, Brixmor received a whistleblower complaint from an individual in Brixmor's accounting department complaining about the department's use of account 2617, which is a deferred income account in Brixmor's general ledger.  Brixmor retained outside counsel to conduct an internal investigation.  The law firm retained Marks Paneth, an accounting firm, to conduct a forensic audit of account 2617.  Marks Paneth concluded the timing of certain entries in account 2617 were incorrect and adjusted the timing of those entries.  Marks Paneth then recalculated Brixmor's SSNOI using the adjustments for each quarter from Q3 of 2013 through Q4 of 2015.  Based on the adjustments, Brixmor speculated the accounting department must have timed the original entries to smooth Brixmor's quarterly SSNOI growth.

On February 8, 2016, Brixmor reported its revised quarterly SSNOI growth percentages based on the Marks Paneth review. Brixmor reported it "believes the amounts involved were not material to non-GAAP same property NOI or the Company's GAAP financial results," that "it will not be required to restate historical financial results," and the "matter will not impact the Company's compliance with the financial covenants in its debt agreements," all of which were later confirmed. In response to questions from analysts, Brixmor stated the SSNOI growth percentages that had been reported had no impact on Mr. Carroll's and Mr. Pappagallo's compensation and bonuses. Neither Mr. Carroll nor Mr. Pappagallo sold any Brixmor stock at any time before the February 8 announcement.

Stock analysts expressed concern that there must be another shoe to drop because the forced resignations of the highly respected CEO and CFO based on these immaterial adjustments seemed draconian. When no other shoe dropped, Brixmor's stock price recovered completely and rose to new all-time highs by the summer of 2016.

The Government's indictment was unsealed on July 30, 2019. The indictment alleges that Mr. Pappagallo participated in a scheme to falsely convey that "Brixmor was consistently delivering steady, consistent performance results" in its quarterly SSNOI. Indictment ¶ 20. It alleges three ways SSNOI was manipulated: the timing of recognition of revenue items from the 2617 account; inappropriate inclusion in SSNOI of some amount of lease termination or lease settlement income ("LSI"); and inclusion or exclusion of certain properties in the pool of Brixmor properties in calculating SSNOI. *Id*. ¶ 21. However, virtually all of the accounting adjustments resulting in the Government's allegation of the "Actual SS-NOI Growth," as reflected in the Government's chart in paragraph 33 of the indictment, were to account 2617. Nevertheless, except for a small amount in 2015 related to receipts for common area maintenance charges, *see id.* ¶ 25,

the indictment does not identify any of those accounting adjustments or, obviously, the rationale for those adjustments.

While the indictment alleges the aggregate impact of adjustments the Government contends were required to correct the faulty accounting, it does not identify the numerous individual adjustments involving account 2617.  As a result, Mr. Pappagallo has been left to comb through the many documents the Government produced just to try to identify the particular accounting matters at issue.  Instead, the indictment cites several emails involving Mr. Pappagallo that may contain imperfect language, but which relate to indisputably inconsequential amounts in controversy and are completely unrelated to account 2617.  Mr. Pappagallo's review of certain work papers produced in discovery by the Government generally identify several individual accounting adjustments made by Marks Paneth that appear to be encompassed within the aggregate "corrected" accounting entries in the indictment.   These include adjustments to Brixmor's accounting treatment of unvouched or stale purchase orders, old common area maintenance amounts, a specific insurance refund, old tenant credits and security deposits, and LSI.  These are the topics of the narrowly tailored Rule 17(c) subpoena to Brixmor (the "Subpoena") at issue.

## III.    LEGAL STANDARD

The Sixth Amendment guarantees that "the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." U.S. CONST. amend. VI. Rule 17(c) implements that guarantee, permitting a party to request the production in advance of trial of, among other things, "books, papers, documents, data, or other objects the subpoena designates." Fed. R. Crim. P. 17(c)(1); *see also United States v. Nixon*, 418 U.S. 683, 698-99, 711 (1974) (observing that the "chief innovation [of Rule 17(c)] was to expedite the trial by providing a time and place before trial for the inspection of subpoenaed materials").

Under Rule 17(c), a party seeking the pre-trial production of documents must demonstrate: "(1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general fishing expedition." *Nixon*, 418 U.S. at 699-700 (footnote omitted) (internal quotation marks omitted); *see also United States v. Stein*, 488 F. Supp. 2d 350, 366 (S.D.N.Y. 2007) ("The text of Rule 17(c) alone strongly suggests the conclusion that the subpoena should be enforced unless compliance would be unreasonable or oppressive."); *United States v. Nachamie*, 91 F. Supp. 2d 552, 562 (S.D.N.Y. 2000) ("The text of Rule 17(c) provides that '[t]he court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive.' Fed. R. Cr. P. 17(c). The Rule itself provides no other basis to quash a subpoena."). Courts permit Rule 17 subpoenas when the requests are "reasonably targeted to ensure the production of material evidence." *United States v. Tucker*, 249 F.R.D. 58, 66 (S.D.N.Y. 2008). As explained in detail below, the subpoenas sought here plainly meet the *Nixon* standard.

Moreover, as several courts in this circuit have recognized, there is a "real question . . . as to whether it makes sense to require a defendant's use of Rule 17(c) to obtain material from a non-party to meet" the *Nixon* standard. *Nachamie*, 91 F. Supp. 2d at 562. Although we recognize that this Court has applied *Nixon* in this context, *see United States v. Binday,* 2013 WL 4494659, at *1 (S.D.N.Y. Aug. 15, 2013), and we believe the requested subpoenas easily meet the *Nixon* standard, we respectfully preserve for appeal the argument that *Nixon* is not the correct standard for evaluating subpoenas served by a defendant on a third party. *See Stein*, 488 F. Supp. 2d at

5

365 (declining to apply *Nixon* to quash a defendant's subpoena). Instead, the proper standard is whether a subpoena is "(1) reasonable, construed using the general discovery notion of material to the defense; and (2) not unduly oppressive for the producing party to respond." *Nachamie*, 91 F. Supp. 2d at 563 (internal quotation marks omitted); *see also United States v. Nosal*, 291 F.R.D. 403, 409 (N.D. Cal. 2013) (applying *Nachamie* standard in assessing defendant's Rule 17(c) subpoena to third party).

This more lenient threshold for Rule 17 subpoenas served by defendants on third parties carries out the Rule's "purpose of establishing *a more liberal policy* for the production, inspection and use of materials at the trial," since Rule 17 was not intended "to exclude from the reach of process of the defendant any material that . . . could be used at the trial." *United States v. Rajaratnam*, 753 F. Supp. 2d 317, 320 n.1 (S.D.N.Y. 2011) (internal quotation marks omitted) (quoting *Bowman Dairy Co. v. United States*, 341 U.S. 214, 221 (1951)). "It is extraordinarily difficult for a defendant, who has limited ability to investigate, to know enough about the discovery he is seeking such that he can comply with the *Nixon* requirements." *Id.* (citation omitted). Applying a "materiality standard" would ensure "that the defendant has a right to obtain evidentiary material from a third party that is no broader—but also no narrower—than the defendant's right to obtain such material from the government" and "would resolve that puzzle at great benefit to the rights of defendants to compulsory process and at little cost to the enforcement of the criminal law, since Rule 17(c) permits the government to issue subpoenas as well." *Id.* (citing Fed. R. Crim. P. 16(a)(1)(E)); *see also id.* (noting that "it remains ironic that a defendant in a breach of contract case can call on the power of the courts to compel third-parties to produce any documents 'reasonably calculated to lead to the discovery of admissible evidence,' Fed. R.

Civ. P. 26(b)(1), while a defendant on trial for his life or liberty does not even have the right to obtain documents 'material to his defense' from those same third-parties.").

## IV.    ARGUMENT

### A. The Proposed Search Terms, Date Ranges, and Custodians are as Narrowly Tailored as Possible to Identify Emails with Factual Information Directly Related to the Government's Adjustments to Accounting Entries in Account 2617.

The internal investigation at Brixmor that ultimately led to this indictment stemmed from a whistleblower complaint alleging the improper use of Brixmor's deferred income account 2617. The Government alleges the account was used as a "cookie jar" to store income until it was needed to meet a predetermined quarterly SSNOI growth target.   To respond to the Government's allegations, it is critically important for Mr. Pappagallo to obtain the facts surrounding the accounting matters at issue and the factors considered by the accounting staff to account for those matters as they did.  That information resides in the accounting staff's emails.  Mr. Pappagallo has proposed a search for Mr. Splain's, Mr. Mortimer's, and the senior accounting staff's emails using search terms focused on the Government's most significant adjustments to entries in account 2617.[1]

In its Motion to Quash, Brixmor has not even acknowledged Mr. Pappagallo's efforts to tailor his search terms to the specific allegations he is facing, and to limit the search for these terms to the cover emails, efforts which will substantially curtail the number of documents returned.  We have tested the search terms Mr. Pappagallo requests across the database of documents provided by the Government, and only one of the search term proposals yielded more than 400 responsive

---

[1] Because Mr. Pappagallo does not know which accounting personnel were involved in each of the matters at issue he has asked that Brixmor search the emails of the nine accounting personnel he believes most likely to have the relevant information.   If Brixmor would agree to identify the individuals involved in each of the matters at issue, Mr. Pappagallo would be amenable to limiting the searches to those individuals for those matters.

emails.  Nor has Brixmor apparently run any of Mr. Pappagallo's proposed searches, which likely would have eliminated Brixmor's ability to speculate as to the volume and content of the documents returned.

### 1.  Unvouched or Stale Purchase Orders

From the documents the Government produced, by far the largest Government alleged adjustment to account 2617 relates to a project that was initiated before Mr. Pappagallo even joined Brixmor.  Apparently, the project was to remove unvouched or stale purchase orders ("unvouched POs") from Brixmor's general ledger.  The indictment does not identify the adjustment but it is reflected in the actual vs. reported amounts in the Government's chart in paragraph 33 of the indictment (the "Government Chart") in Q3 and Q4 of 2013 (the chart incorrectly reads Q1 and Q2 of 2013).  The change in the quarterly growth rate percentage in Q3 and Q4 of 2014 as compared to Q3 and Q4 of 2013 resulted almost entirely from the Government's adjustments to Q3 and Q4 of 2013.

These unvouched POs apparently related to work orders dating as far back as 2003 that were recorded as payables in Brixmor's ledger but were not reversed when they were paid or the work was cancelled. The accounting staff appears to have aggregated the POs (totaling $2,055,598) some time prior to July 2013, recorded them in account 2617 on July 1, 2013, and moved $1,293,266 of them out of account 2617 during the fourth quarter of 2013.  Without any explanation, the Government seems to take the position that the full amount of the aggregated POs should have been booked as income in the third quarter of 2013.  There is no allegation that Mr. Pappagallo had any knowledge of the PO project or the accounting related to it.

To be able to respond to the Government's claim that Brixmor's accounting for the unvouched POs was improper, Mr. Pappagallo needs access to the emails of the individuals who were involved in aggregating and reviewing the unvouched POs and recording entries in and out

of account 2617 and other accounts concerning those purchase orders.  Such emails will likely provide the rationale for Brixmor's accounting treatment and may also provide exculpatory information concerning Mr. Pappagallo's lack of knowledge or involvement.  In satisfaction of Subpoena Request Number 2, bullet point 7, he has asked Brixmor to search the mailboxes of the nine accounting personnel most likely to have been involved in those activities for emails using the narrowly tailored search terms "purchase orders," "POs," and "PO's" during 2013 and 2014.

### 2. Common Area Maintenance Retro Project

Another project Brixmor's accounting staff initiated in early 2013 (or before) was to work with its consultants at Accenture to identify old common area maintenance charges that should have been, but had not been, billed to tenants.  This was known as the CAM retro project.  When the charges were identified, they were billed to the tenants but were recorded in the 2617 account and not income because they were aged and it was likely many of the tenants would refuse to pay the charges.  In accordance with the Company's accounting policies for this specific project, any payments received should have been recorded as income and removed from the 2617 account.  The Government appears to claim that at least some of the payments received were recorded in account 2617 instead of being recorded as income.  The adjustments reflecting when the Government claims the payments should have been recorded as income are not identified in the indictment but are presumably reflected in the actual vs. reported amounts in the Government Chart beginning in Q3 of 2013 and continuing through 2015.

To be able to address this issue, Mr. Pappagallo needs access to the emails of individuals who were involved in the CAM retro project and the recording of the payments received.  He has asked Brixmor to search the mailboxes of the nine accounting personnel most likely to have been involved in the project and accounting decisions using search terms "CAM w/5 (project OR retro)" and "CAM and Accenture" in order to satisfy Subpoena Request 2, bullet 3.

9

### 3. FM Global Insurance Refund

Brixmor received an insurance credit of $899,356 from FM Global in Q2 of 2015 that the accounting staff apparently recorded as income over the remainder of the year.  The Government appears to take the position that the full amount of the refund should have been booked when it was received.  The adjustment is not identified in the indictment but presumably is reflected in the actual vs. reported amounts in the Government Chart beginning in Q2 of 2015.

To be able to respond to the Government's claim, Mr. Pappagallo needs access to the emails of the individuals who were involved in deciding how much and when the credit was recorded as income.  To satisfy Subpoena Request 2, bullet 4, Mr. Pappagallo has asked Brixmor to search the mailboxes of the nine accounting personnel most likely to have been involved in the decision using the search terms "FM Global" and "insurance w/5 refund" during 2015.

### 4. Westview Tax Dispute

Based on discovery produced by the Government, it appears Brixmor's accounting staff recorded charges in Q4 of 2013 related to a tax dispute at a Brixmor-owned property named Westview in conjunction with the accounting for unvouched POs.  In order to determine the correct accounting, Mr. Pappagallo needs access to the emails of the individuals who were involved with the Westview tax dispute and the accounting for it.  He has asked Brixmor to search the mailboxes of the nine accounting personnel most likely to have been involved in the decision using the search term "Westview" during 2012 and 2013 in satisfaction of Subpoena Request 2, bullet 8.

### 5. Tenant Credits

There is evidence that in 2012, Brixmor's accounting staff aggregated the tenant credits of former tenants whose leases had expired and were no longer at the relevant property and recorded the credits in account 2617.  In the third and fourth quarters of 2013, Brixmor's accounting staff apparently reversed approximately $725,000 of those credits, which had the effect of increasing

income.  The Government appears to take the position that these credits should not have been reversed into income.  The adjustment is not identified in the indictment but appears to be reflected in the actual vs. reported amounts in the Government Chart in the third and fourth quarters of 2013.

While the project to identify old tenant credits predated Mr. Pappagallo, and there is no allegation he was aware of it, he needs access to the emails of the individuals who were involved with the aggregation of the credits and the reversal of them into income to be able to understand the correct accounting treatment.  In satisfaction of Subpoena Request 2, bullet 5, he has asked Brixmor to search the mailboxes of the nine accounting personnel most likely to have been involved in the project and the accounting using the search term "tenant w/5 credit" during 2012 and 2013.

### 6.  Security Deposits

These, like the tenant credits discussed above, are security deposits abandoned by former tenants.  The Government appears to claim that some should have been recorded as income in the first and second quarter of 2015 and some that were recorded as income in the third and fourth quarters of 2015 should not have been recorded as income.   The adjustments are not identified in the indictment but appear to be reflected in the actual vs. reported amounts in the Government Chart in each quarter of 2015.

Mr. Pappagallo needs access to the emails of the individuals who were involved with the aggregation of the credits and the reversal of them into income to be able to understand the correct accounting treatment.  He has asked Brixmor to search the mailboxes of the nine accounting personnel most likely to have been involved in the project and the accounting using the search term "security deposit*" during 2015, in satisfaction of Subpoena Request 2, bullet 6.

### 7.  Other Adjustments to Account 2617

There are other smaller adjustments to account 2617 reflected in the aggregate adjustment figures of the Government Chart, but again none of those adjustments are identified in the indictment.  Moreover, as discussed above, account 2617 existed at Brixmor long before Mr. Pappagallo arrived at the company.  He is entitled to learn how Mr. Splain, Mr. Mortimer, and their accounting staff used that account before Mr. Pappagallo could have theoretically "directed" anything.  Therefore, Mr. Pappagallo has asked Brixmor to search the mailboxes of the nine accounting personnel most likely to have been involved in recording entries in account 2617 using the search term "2617*" from January 2012 to February 1, 2016, which is intended to satisfy Subpoena Request 2, bullet 2.

### B.  The Proposed Search Terms and Custodians are as Narrowly Tailored as Possible to Identify Emails with Factual Information Directly Related to the Government's Claims Concerning Lease Settlement Income.

One of the three areas the Government alleges was used to smooth SSNOI was lease settlement income (or LSI), which is typically a lump sum payment by a tenant to cancel its lease before the lease expiration.  The Government objects to Brixmor's inclusion of a small portion of the payment in SSNOI and its allocation in some cases of a portion of the payment to cover items other than early lease termination (such as repairs to premises).

To respond to the Government's claim, Mr. Pappagallo needs to obtain the facts regarding the accounting staff's rationale for allocating portions of the early termination payment to other items that were included in SSNOI.  This information would be available in email communications between and among the accounting staff.  Therefore, Mr. Pappagallo has asked Brixmor to search the mailboxes of the nine accounting personnel most likely to have knowledge of the termination payments and their allocation using the terms "lease settlement," "lease termination," and "LSI"

during the period January 1, 2012 through February 1, 2016, in satisfaction of Subpoena Request 2, bullet 1.

### C. Mr. Splain's and Mr. Mortimer's Inboxes Contain Evidence Relevant to Mr. Pappagallo's Defense.

Mr. Pappagallo will vehemently contest the Government's allegations that he directed Mr. Splain and Mr. Mortimer to make incorrect accounting entries to smooth SSNOI. Indeed, the largest projects that generated funds in account 2617 which the Government alleges were used to smooth SSNOI (unvouched POs and tenant credits) began before Mr. Pappagallo's arrival at Brixmor. Thus, it appears that Mr. Splain's and Mr. Mortimer's use of account 2617 predated Mr. Pappagallo.

Mr. Pappagallo could not know what Mr. Splain and Mr. Mortimer may have been doing before he joined Brixmor, whether on the large projects that appear in the Government's discovery identified above, or on accounting treatments for other topics. Accordingly, he has asked Brixmor to produce Messrs. Splain and Mortimer's emails from January 1, 2012 to May 19, 2013. Brixmor has objected to this request on the grounds that it would result in the production of a voluminous number of irrelevant documents and would require Brixmor to undertake a time-consuming and expensive privilege review. However, as these accountants were junior to Brixmor's prior CFO, they are unlikely to have significant documents implicating privilege. In any event, the burden is outweighed by the relevance of the documents of these two cooperators who have admitted to engaging in accounting fraud.

### D. Brixmor's Remaining Arguments Are Unavailing.

Brixmor is a multi-billion-dollar company that can easily run the requested searches without being overburdened. In fact, as described by Brixmor in pages 3-5 in its Memorandum in Support of its Motion to Quash (Dkt. 36), Brixmor has been willing and able to run far broader

searches not limited to email communications and involving more custodians when requested to do so by the Government on many different occasions. Brixmor concedes that it has provided more than 88,000 documents. *See id.* at 5.

However, Brixmor's suggestion that Mr. Pappagallo should be required to rely on a targeted set of documents cherry-picked by the Government is patently unfair. The Government used search terms specifically designed to bolster its case against the defendants, including such loaded terms as "cookie jar," without a corresponding effort to locate exculpatory emails. Targeting inflammatory emails without an appropriate effort to collect the related emails that place the communication in context prevents a fair defense. As described above, obtaining the emails that provide the context for the central disputed accounting issues are critical to Mr. Pappagallo's case.

Brixmor's speculation that it will be overburdened by having to review documents for privilege is unfounded as it is highly unlikely that lawyers will be present on numerous emails concerning specific general ledger accounts and related terms. Indeed, very few of the documents Mr. Pappagallo has received from the Government have been redacted for privilege. And if any privileged documents are inadvertently produced, Mr. Pappagallo would return them.

Brixmor's argument that most of the custodians did not report directly to Mr. Pappagallo is of no moment. One of Mr. Pappagallo's defenses against many of the allegations is that they concern accounting in which he had no involvement or knowledge. Similarly, because many of the accounting practices that form the basis of criminal accusations against Mr. Pappagallo were in effect prior to his hiring, Brixmor has no basis for excluding the pre-Pappagallo hiring time period from its production.

## V.      CONCLUSION

Based upon the foregoing, the Court should deny Brixmor's motion to Quash Mr. Pappagallo's Subpoena Request Numbers One and Two.


Dated: December 13, 2019                    By:      s/ Gregory W. Kehoe
                                                     Gregory W. Kehoe
                                                     Daniel P. Filor
                                                     Robert A. Horowitz

                                                     GREENBERG TRAURIG, LLP
                                                     200 Park Avenue
                                                     New York, NY 10166
                                                     Telephone: (212) 801-9200
                                                     Facsimile: (212) 801-6400

                                                     *Attorneys for Defendant Michael Pappagallo*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 13, 2019, the foregoing document was electronically filed and served on all counsel of record via CM/ECF.

s/ Gregory W. Kehoe      