UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
UNITED STATES OF AMERICA,      :

          -v.-          :        19 Cr. 545 (CM)

MICHAEL CARROLL and      :
MICHAEL PAPPAGALLO,

           :
         Defendants.
------------------------------------------------------x


**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS**


AUDREY STRAUSS
Attorney for the United States, Acting
Under Authority Conferred by
28 U.S.C. § 515
Southern District of New York
One St. Andrews Plaza
New York, New York 10007


Martin S. Bell
Daniel Tracer
Drew Skinner
Assistant United States Attorneys
- Of Counsel -

## Table of Contents

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND .................................................................................................... 2

ARGUMENT ............................................................................................................................ 5

   I.     DEFENDANTS' MOTION TO DISMISS THE INDICTMENT SHOULD BE DENIED 5

      A.  Applicable Law ............................................................................................................ 5

         1.  Legal Sufficiency of Indictments ......................................................................... 5

         2.  Materiality ............................................................................................................ 7

      B.  Discussion ................................................................................................................. 10

         1.  The Indictment Is Legally Sufficient and Materiality Is a Jury Issue ........................ 10

         2.  The SS-NOI Growth Misrepresentations Are Not Immaterial as a Matter of Law.... 11

   II.   THE MOTIONS FOR A BILL OF PARTICULARS SHOULD BE DENIED ............... 19

      A.  Applicable Law .......................................................................................................... 20

      B.  Discussion ................................................................................................................. 24

         1.  The Indictment, Discovery, and Accounting Work Papers Provide Sufficient
Particularity................................................................................................................. 24

         2.  The Case Law Provides No Support for the Defendants' Requests ........................... 34

         3.  Pappagallo's Request for the Government's Theories Should Be Denied................ 37

         4.  Carroll's Request for the Government to Preview and Limit Its Trial Evidence Should
Be Denied ................................................................................................................. 39

   III.  CARROLL'S MOTION FOR INFORMATION CONCERNING GOVERNMENT
WITNESS STEVEN SPLAIN SHOULD BE DENIED ......................................................... 40

      A.  Background ................................................................................................................ 40

      B.  Discussion ................................................................................................................. 42

   IV.  CARROLL'S MOTIONS FOR PURPORTED *BRADY* MATERIALS SHOULD BE
DENIED ................................................................................................................................... 46

      A.  The Request for Review of SEC Files ....................................................................... 47

1.   Factual Background........................................................................................... 47

2.   Law Applicable to the Brady Requests ...................................................... 47

3.   Discussion........................................................................................................ 50

B.   Request for Materials from the Separate *United States* v. *Block* Case ......................... 53

1.   Factual Background........................................................................................... 53

2.   Discussion........................................................................................................ 54

CONCLUSION.................................................................................................................... 56

## Table of Authorities

**Cases**

*Ashcroft* v. *Iqbal,* 129 S. Ct. 1937 (2009)................................................................................. 6

*Basic Inc.* v. *Levinson,* 485 U.S. 224 (1988) ............................................................................ 7

*Bell Atl. Co.* v. *Twombly*, 550 U.S. 544 (2007) ........................................................................ 6

*Boyce Motor Lines, Inc.* v. *United States*, 342 U.S. 337 (1952)............................................. 5, 11

*Costello* v. *United States*, 350 U.S. 359 (1956) ........................................................................ 5

*Ganino* v. *Citizens Utilities Co.*, 228 F.3d 154, (2d Cir. 2000) ........................................ 8, 9, 18, 19

*In re BioScrip Inc. Sec. Litig.*, No. 13-cv-6922 (AJN), 2015 WL 1501620, (S.D.N.Y. Mar. 31, 2015)...................................................................................................................................... 20

*Litwin* v. *Blackstone Group, L.P.*, 634 F.3d 706 (2d Cir. 2011)........................................... 9, 17

*New Orleans Employees Retirement Systems* v. *Celestica, Inc.*, 455 F. App'x 10 (2d Cir. 2011)19

*Powers* v. *Coe*, 728 F.2d 97, (2d Cir. 1984) ........................................................................... 47

*S.E.C.* v. *Dresser Industries*, Inc., 628 F.2d 1368, (D.C. Cir. 1980) ........................................ 53

*S.E.C.* v. *Escala Group, Inc.*, No. 09 Civ. 2646 (DLC), 2009 WL 2365548, (S.D.N.Y. July 31, 2009)...................................................................................................................................... 18

*S.E.C.* v. *Leslie*, No. 5:07-CV-03444-JF PSG, 2012 WL 116562, (N.D. Cal. Jan. 13, 2012)...... 18

*S.E.C. v. Stanard*, No. 06 Civ. 7736 (GEL), 2007 WL 1834709, (S.D.N.Y. June 26, 2007). 54, 56

*Securities and Exchange Commission* v. *Michael Carroll*, 19 Civ. 7199 (AT) ........................ 50

*Strougo* v. *Barclays PLC*, No. 14-cv-5797 (SAS), 2015 WL 1883201, (S.D.N.Y. Apr. 24, 2015) ................................................................................................................................................ 20

*Takara Tr.* v. *Molex Inc.*, 429 F. Supp. 2d 960, (N.D. Ill. 2006)................................................ 18

*TSC Industries, Inc.* v. *Northway, Inc.,* 426 U.S. 438 (1976)................................................... 7

*United States* v. *Alfonso*, 143 F.3d 772 (2d Cir. 1998)............................................................ 11

*United States* v. *Bellomo*, 263 F. Supp. 2d 561, (E.D.N.Y. 2003).............................................. 25

*United States* v. *Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) ........................................................ 8

*United States* v. *Blaszczak*, 308 F.Supp.3d 736, (S.D.N.Y. 2018) ..................................... 54, 56

*United States* v. *Block*, 16 Cr. 595 (JPO), 2017 WL 1608905 (Apr. 28, 2017).......... 12, 37, 39, 59

*United States* v. *Bonventre*, 646 F. App'x, (2d Cir. 2016) ................................................... 37, 41

*United States* v. *Bortnovsky*, 820 F.2d 572, (2d Cir. 1987) ............................................ 22, 23, 39

*United States* v. *Carroll*, 510 F.2d 507, (2d Cir. 1975) ........................................................... 36

*United States v. Causey*, No. CRIM. H-04-025-SS, 2005 WL 2647976 (S.D. Tex. Oct. 17, 2005) ................................................................................................................................................ 7

*United States* v. *Chow*, No. 17 Cr. 667 (GHW), ECF No. 69, (S.D.N.Y. Feb. 9, 2018) ............. 54

*United States* v. *Collins*, 409 F. Supp. 3d 228, (S.D.N.Y. 2019)........................................... 54, 57

*United States* v. *Connolly*, No. S1 16-CR-00370 (CM), 2017 WL 2537808 (S.D.N.Y. May 24, 2017)...................................................................................................................................... 29

*United States v. Contorinis*, 09 Cr. 1083 (RJS), 2010 U.S. Dist. LEXIS 74739, (S.D.N.Y. May 5, 2010)...................................................................................................................................... 38

*United States* v. *Coppa*, 267 F.3d 132, (2d Cir. 2001) ........................................................... 50

*United States* v. *Cuti*, No. 08 Cr. 972 (DAB), 2009 WL 3154310, (S.D.N.Y. 2009) ........... 22, 39

*United States* v. *D'Amico*, 734 F. Supp. 2d 321, (S.D.N.Y. 2010)............................................. 25

*United States* v. *Davis*, 2018 WL 4373998, (S.D.N.Y. Sept. 13, 2018)..................................... 51

*United States* v. *De La Pava*, 268 F.3d 157 (2d Cir. 2001) ...................................................... 7

iii

*United States* v. *Diallo*, No. 09 Cr. 858 (SHS), 2009 WL 4277163 (S.D.N.Y. Nov. 24, 2009) .... 6

*United States* v. *Dien*, 609 F.2d 1038, (2d Cir. 1979) ................................................................ 45

*United States* v. *Douglas*, 525 F.3d 225, (2d Cir. 2008)........................................................... 51

*United States* v. *Earls*, No. 03 Cr. 364 (NRB), 2004 WL 350725, (S.D.N.Y. 2004).................. 23

*United States* v. *Elson*, 968 F. Supp. 900, (S.D.N.Y. 1997) ........................................................ 6

*United States* v. *Feola*, 651 F. Supp. 1068, (S.D.N.Y. 1987).............................................. 35, 42

*United States* v. *Ferrarini*, 9 F Supp. 2d 284, (S.D.N.Y. 1998) ................................................ 27

*United States* v. *Finnerty*, 411 F. Supp. 2d 428, (S.D.N.Y. 2006) (Chin, J.) ............................. 52

*United States* v. *Gallo*, 1999 WL 9848, (S.D.N.Y. Jan. 11, 1999)............................................. 52

*United States* v. *Gambino*, 809 F. Supp. 1061, (S.D.N.Y. 1992) ................................................ 6

*United States* v. *Gibson*, 175 F. Supp. 2d 532, (S.D.N.Y. 2001)............................................... 22

*United States* v. *Ginsberg*, 758 F.2d 823, (2d Cir. 1985) ......................................................... 45

*United States* v. *Gleason*, 616 F.2d 2 (2d Cir. 1979) ................................................................ 7

*United States* v. *Goffer*, No. 10 Cr. 56 (RJS), (S.D.N.Y. July 29, 2010), (Dkt. No. 90)............. 56

*United States* v. *Goldberg*, 756 F.2d 949, (2d Cir. 1985)...................................................... 5, 11

*United States* v. *Gomez*, 2018 WL 501607, (S.D.N.Y. Jan. 19, 2018)....................................... 51

*United States* v. *Henry*, 861 F. Supp. 1190, (S.D.N.Y. 1994) .......................................... 23, 25, 26

*United States* v. *Hernandez*, 980 F.2d 868, (2d Cir. 1992)........................................................ 7

*United States* v. *Kahale*, 789 F. Supp. 2d 359, (E.D.N.Y. 2009) .......................................... 39, 40

*United States* v. *Kazarian*, No. 10 Cr. 895, 2012 WL 1810214, (S.D.N.Y. May 18, 2012) .. 22, 24

*United States* v. *Leonelli*, 428 F. Supp. 880, (S.D.N.Y. 1977) .............................................. 24, 41

*United States* v. *Levy*, No. S5 11 Cr. 62 (PAC), 2013 WL 664712, (S.D.N.Y. 2013) ................ 24

*United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015) ................................................................ 8

*United States* v. *Longo*, 70 F. Supp. 2d 225, (W.D.N.Y. 1999).................................................. 45

*United States* v. *Mahabub*, No. 13 Cr. 908 (AJN), 2014 WL 4243657, (S.D.N.Y. 2014) ..... 22, 23

*United States* v. *Mandell*, 710 F. Supp. 2d 368, (S.D.N.Y. 2010).......................................... 24, 28

*United States* v. *McDow*, 206 F. Supp. 3d 829, (S.D.N.Y. 2016) ............................................. 51

*United States* v. *Middendorf*, 18 Cr. 36 (JPO), 2018 WL 3956494, (S.D.N.Y. Aug. 17, 2018) . 53, 56

*United States* v. *Mitlof*, 165 F. Supp. 2d 558, (S.D.N.Y. 2001) ...................................... 24, 25, 41

*United States* v. *Monserrate*, No. 10 Cr. 965 (CM), 2011 WL 3480957, (S.D.N.Y. 2011)......... 22

*United States* v. *Mosca*, 475 F.2d 1052, (2d Cir. 1973) ........................................................... 47

*United States* v. *Nachamie*, 91 F. Supp. 2d 565, (S.D.N.Y. 2000)....................................... 23, 39

*United States* v. *Perez*, 940 F. Supp. 540, (S.D.N.Y. 1996)...................................................... 52

*United States* v. *Rajaratnam*, No. 09 CR. 1184 (RJH), 2010 WL 2788168, (S.D.N.Y. July 13, 2010).......................................................................................................................... 38

*United States v. Rigas*, 490 F.3d 208, (2d Cir. 2007) ............................................................... 21

*United States v. Rigas*, 583 F.3d 108, (2d Cir. 2009) ............................................................... 52

*United States* v. *Rigas*, No. 02 Cr. 1236 (LBS), 2008 WL 144824, (S.D.N.Y. Jan. 15, 2008)... 52, 54, 56

*United States* v. *Rittweger*, 259 F. Supp. 2d 275, (S.D.N.Y. 2003)........................................... 25

*United States* v. *Rosner*, 485 F.2d 1213, (2d Cir. 1973)........................................................... 48

*United States* v. *Samsonov*, No. 07 Cr. 1198 (CM), 2009 WL 176721, (S.D.N.Y. 2009) 23, 26, 42

*United States* v. *Stavroulakis*, 952 F.2d 686, (2d Cir. 1992) ............................................. 6, 7, 11

*United States* v. *Torres*, 901 F.2d 205, (2d Cir. 1990) ....................................................... 22, 25

*United States* v. *Tramunti*, 513 F.2d 1087, (2d Cir. 1975) ............................................................. 6
*United States* v. *Trippe*, 171 F. Supp. 2d 230, (S.D.N.Y. 2001) ................................................... 23
*United States* v. *Tuzman*, 301 F. Supp. 3d 430, (S.D.N.Y. 2017) ............................................... 38
*United States* v. *Vaid*, No. 16 CR. 763 (LGS), 2017 WL 3891695, (S.D.N.Y. Sept. 5, 2017) .... 29
*United States* v. *Vasquez*, 675 F.2d 16, (2d Cir. 1982) ................................................................ 46
*United States* v. *Walters*, No. 16 Cr. 339 (PKC), (S.D.N.Y. Dec. 13, 2016), (ECF No. 51) ....... 38
*United States* v. *Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651, (S.D.N.Y. Jan. 18, 2017) ........ 36
*United States* v. *Yannotti*, 541 F.3d 112, (2d Cir. 2008) ................................................................ 7
*Weatherford* v. *Bursey*, 429 U.S. 545, 558 (1977)………………………………………… .42,44
*Wong Tai v. United States*, 273 U.S. 77, (1927) ....................................................................... 21

**Rules**

Fed. R. Crim. P. 29 ....................................................................................................................... 5
Fed. R. Crim. P. 7(c) ..................................................................................................................... 6

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the pretrial motions of defendants Michael Carroll and Michael Pappagallo (1) to dismiss Indictment 19 Cr. 545 (CM) (the "Indictment"), (2) for a bill of particulars, (3) for the compelled early production of certain materials regarding a government witness, and (4) to require the Government to review its files from an unrelated criminal case that was tried publicly in this district in 2017 and the U.S. Securities and Exchange Commission's ("SEC") files in the separate, parallel civil investigation of Brixmor.  For the reasons that follow, each of these motions is meritless and should be denied.

First, Carroll and Pappagallo both move to dismiss the Indictment, claiming that the misstatements of Same Store Net Operating Income Growth ("SS-NOI Growth") alleged therein are immaterial as a matter of law.  This contention is baseless.  At its core, the defendants ask the Court to usurp from the jury an intensely fact-bound inquiry that, under well settled law, falls within the province of the jury as factfinder, and not the Court.  In aid of their effort to improperly wrest the question of materiality from a jury, the defendants misapply a relevant calculus that, done correctly, demonstrates that the SS-NOI Growth misstatements cited in the Indictment were both quantitatively and qualitatively material.

Second, the defendants move for a bill of particulars, seeking evidentiary detail regarding every accounting journal entry used by the conspirators as part of the fraud.  The defendants are already more than sufficiently informed of the charges against them under the governing law, and they are not entitled to the extraordinarily granular detail they seek.

Third, Carroll seeks an order compelling discovery regarding Steven Splain, a cooperating witness in the case, including all notes related to interviews with him, so as to pursue a dead-end

claim that the Government improperly had a "spy in the camp" with respect to Carroll's defense team.  The accusations are baseless, and the extreme remedy sought is unwarranted.

Fourth and finally, Carroll moves for an order compelling the Government to review (1) its files from an entirely separate accounting fraud case publicly tried in this District and (2) all of the SEC's files in its parallel investigation of this case, "including files related to the SEC's evaluation process," for disclosable exculpatory material under *Brady* v. *Maryland*, 373 U.S. 83 (1963). Because the materials sought either (1) are public, (2) are not in the possession or control of the Government, and/or (3) are not, in fact, actual *Brady* material, this motion is likewise without merit.

Accordingly, defendants' pretrial motions should be denied in their entirety.

## FACTUAL BACKGROUND

On July 30, 2019, the Indictment in this matter was unsealed, charging defendants Michael Carroll and Michael Pappagallo in six counts.  The allegations in the Indictment relate to an accounting fraud scheme involving Carroll, Pappagallo, and others to fraudulently manipulate certain financial metrics contained in the public filings of Brixmor Property Group Inc. ("Brixmor"), a publicly-traded real estate investment trust ("REIT").

Specifically, Count One of the Indictment charges Carroll and Pappagallo with participating in a conspiracy to commit securities fraud, and to make false filings with the SEC, in violation of Title 18, United States Code, Section 371.  Count Two charges both defendants with the substantive crime of securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2. Counts Three and Four charge Carroll and Pappagallo with the substantive crime of making false statements in specific filings with the SEC – Brixmor's Form 10-Q filing for the Third Quarter of 2014 and its Form 10-Q filing for the Second Quarter of 2015, respectively – in violation of Title 15,

United States Code, Sections 78m(a) and 78ff, Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-13 and Title 18, United States Code, Section 2.  Counts Five and Six charge Carroll and Pappagallo with filing false certifications of disclosure with the SEC related to the 10-Q disclosures at issue in Counts Three and Four, respectively, in violation of Title 15, United States Code, Sections 78m(a) and 78ff, Title 17, Code of Federal Regulations, Section 240.13a-14, and Title 18, United States Code, Section 2.

As set forth in the Indictment, Brixmor, as a REIT, generated profit and shareholder returns based on the performance of underlying real estate assets.  Like other publicly-traded REITs, Brixmor measured its performance through metrics besides, or in addition to, traditional GAAP measurements of company performance.  (Indictment ¶ 9).  One such non-GAAP metric was Same Store Net Operating Income ("SS-NOI"), which measured net operating income solely with respect to properties owned by the REIT in both the current reporting period and the same period during the prior year, hence the terminology of "Same Store."  (Indictment ¶ 10).  That way, the company could track performance without the distorting effects of properties that had been acquired or sold during the relevant period, developments that affect income across the company but may have little to do with how well Brixmor's properties are performing.  SS-NOI can be expressed as an absolute number, but it can be and often is expressed as a percentage that compares the relative increase or decrease between the current reporting period and the prior reporting period.  This metric is referred to herein as SS-NOI Growth, and as set forth below, it was one that Brixmor chose to emphasize in its public filings and messages to the investing public.  (Indictment ¶¶ 10, 16-17).

Although REITs like Brixmor are not required to calculate or report SS-NOI or SS-NOI Growth, Brixmor and other REITs nevertheless reported SS-NOI Growth in its periodic filings with

the SEC and in related public disclosures.  (Indictment ¶ 12).  As alleged in the Indictment, Brixmor described SS-NOI Growth as "a key metric used by analysts and investors to evaluate a REIT's financial performance," including Brixmor's specifically.  (*Id.*).  Brixmor also released to the investing public forward-looking forecasts of its expected annual SS-NOI Growth for each calendar year.  Each of Brixmor's 10-Qs and 10-K financial disclosures during the period of time relevant to the Indictment included a definition regarding how Brixmor calculated SS-NOI (and thus SS-NOI Growth) – a definition that specifically excluded from the calculation "lease termination income" or "lease settlement income" ("LSI"), one-time payments made by a tenant for early termination of a lease.  (Indictment ¶ 11).

During the time period relevant to the charges alleged in the Indictment, Carroll served as Brixmor's Chief Executive Officer and Pappagallo as its Chief Financial Officer.  (Indictment ¶¶ 1-3).  As alleged in the Indictment, Carroll and Pappagallo, along with Chief Accounting Officer Steven Splain and others, participated in a scheme in which they caused Brixmor to report fraudulently "smoothed" SS-NOI Growth numbers – that is, falsely inflated and deflated so as to present a pattern of steady and consistent growth from quarter to quarter that consistently fell within the year's forecasted range for SS-NOI Growth, rather than the actual more volatile activity.  (Indictment ¶ 15).  On a quarterly basis, the defendants and their co-conspirators manipulated the reported SS-NOI Growth in three principle ways: (1) engaging in "cookie jar" accounting by illicitly storing certain income when it should have been immediately recognized, (2) including LSI in the SS-NOI calculations despite the company's representations that LSI was excluded, and (3) fraudulently removing income and/or properties from SS-NOI in the prior relevant comparison period so as to selectively make the current period's growth appear larger.  (Indictment ¶ 21).

All the while, as alleged in the Indictment, Brixmor's representatives – including the defendants – touted Brixmor's consistent quarter-to-quarter SS-NOI Growth performance results.  In industry events and on investor calls, Carroll and Pappagallo regularly promoted Brixmor as an investment opportunity based on its pattern of smooth, steady growth, typically illustrated through use of the SS-NOI Growth metric and its quarterly conformity to the firm's annual projections. (Indictment ¶ 11).

The fraudulent scheme led to Brixmor's reporting fraudulent SS-NOI Growth numbers to the SEC and the investing public in all but one of the nine quarterly periods implicated over the duration of the conspiracy, representing alterations to SS-NOI Growth Numbers that were significant.  (*See* Indictment ¶ 33 (chart)).

## ARGUMENT

### I.   DEFENDANTS' MOTION TO DISMISS THE INDICTMENT SHOULD BE DENIED

#### A.   Applicable Law

##### 1. *Legal Sufficiency of Indictments*

On a pretrial motion to dismiss pursuant to Fed. R. Crim. 12(b), the allegations of the indictment must be taken as true.  *See Boyce Motor Lines, Inc.* v. *United States*, 342 U.S. 337, 343 n.16 (1952); *United States* v. *Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).  It is well settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charges on the merits."  *Costello* v. *United States*, 350 U.S. 359, 365 (1956).  A defendant must wait until after the close of the Government's case-in-chief at trial or after the jury's verdict before contesting the sufficiency of the evidence.  *See* Fed. R. Crim. P. 29; *see also United States* v. *Elson*, 968 F. Supp. 900, 905 (S.D.N.Y. 1997); *United States* v. *Gambino*, 809 F.

Supp. 1061, 1079 (S.D.N.Y. 1992).

Rule 7(c) of the Federal Rules of Criminal Procedure provides that the indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c).  In general, to satisfy the pleading requirements, "'an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'"  *United States* v. *Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (quoting *United States* v. *Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975)); *see also United States* v. *Diallo*, No. 09 Cr. 858 (SHS), 2009 WL 4277163, at *2 n.10 (S.D.N.Y. Nov. 24, 2009) ("[A]fter the Supreme Court's . . . landmark decisions in [*Bell Atl. Co.* v.] *Twombly* [, 550 U.S. 544, 555 (2007)] and *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937 (2009), a civil plaintiff's burden to survive a motion to dismiss appears to be higher than the government's burden to survive a motion to dismiss a criminal indictment.").  "An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events."  *United States* v. *Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (quoting *United States* v. *Stavroulakis*, 952 F.2d at 693) (internal quotation marks omitted).  The dismissal of an indictment is an "'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights."  *United States* v. *De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (citation omitted).  When determining whether or not a count sufficiently alleges a violation, the indictment should be read "in its entirety."  *United States* v. *Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992).

2. *Materiality*

The standard governing the assessment of materiality in securities fraud cases is set forth in two Supreme Court cases, *TSC Industries, Inc.* v. *Northway, Inc.,* 426 U.S. 438 (1976), and *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988). Together, these cases stand for the proposition that a fact is material if it "is one that would have been significant to a reasonable investor's investment decision." Materiality determinations are an "inherently fact-specific finding." *Basic* v. *Levinson*, 485 U.S. at 236. "Materiality" is the same in both the civil and criminal context. *See United States* v. *Gleason*, 616 F.2d 2, 28 (2d Cir. 1979) ("It is also settled that the same standards apply to civil and criminal liability under the securities law."); *United States* v. *Causey*, No. CRIM. H-04-025-SS, 2005 WL 2647976, at *2 (S.D. Tex. Oct. 17, 2005) ("The definition and scope of 'materiality' are the same in both civil and criminal contexts.").

Materiality determinations are mixed questions of law and fact that are particularly well suited for jury resolution. *See United States* v. *Litvak*, 808 F.3d 160, 175 (2d Cir. 2015) ("Determination of materiality under the securities laws is a mixed question of law and fact that the Supreme Court has identified as especially 'well suited for jury determination.'" (quoting *United States* v. *Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991)). Indeed, "only [w]here the misstatements are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance,'" may a court find "the misstatements immaterial as a matter of law." *Litvak*, 808 F.3d at 175 (citation omitted); *see also Menaldi* v. *Och-Ziff Capital Mgmt. Group LLC*, 164 F. Supp. 3d 568, 585 (S.D.N.Y. 2016) ("The Second Circuit has repeatedly stated that 'materiality is a mixed question of law and fact,' which should not be decided on a motion to dismiss

unless the alleged misstatements or omissions are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" (citations omitted)).

Courts have repeatedly emphasized that quantitative materiality thresholds are merely a starting point for materiality analysis, and that both qualitative and quantitative factors must be considered to properly assess materiality. *See Ganino* v. *Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000) ("[W]e have consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation."); *Litwin* v. *Blackstone Group, L.P.*, 634 F.3d 706, 717 (2d Cir. 2011) ("[A] court must consider both quantitative and qualitative factors in assessing an item's materiality and that consideration should be undertaken in an integrative manner.") (internal citation and quotation marks omitted).

The Second Circuit has endorsed the use of the SEC's Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150 (1999) ("SAB 99"), issued on August 12, 1999, as persuasive authority in determining materiality. *See Ganino*, 228 F.3d at 163-64 ("[B]ecause SEC staff accounting bulletins 'constitute a body of experience and informed judgment,' and SAB No. 99 is thoroughly reasoned and consistent with existing law – its non-exhaustive list of factors is simply an application of the well-established *Basic* analysis to misrepresentations of financial results – we find it persuasive guidance for evaluating the materiality of an alleged misrepresentation." (internal citation omitted)). In SAB 99, the SEC's accounting staff stated that the "use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that – without considering all relevant circumstances – a deviation less than the specific percentage with respect to a particular item on the registrant's financial statements is unlikely to be material." 1999 WL 1123073, at *2. However, "the magnitude of a misstatement is only the beginning of an analysis of materiality." *Id.*

8

Analyses of percentages "cannot appropriately be used as a substitute for a full analysis of all relevant considerations." *Id.* Instead, materiality assessments require consideration not just of the size of the misstatement, but also the "factual context in which the user of financial statement would view the financial statement item." *Id.* In other words, materiality assessments require consideration of both "quantitative" and "qualitative" factors. *Id.*

In that regard, SAB 99 goes on to note that "a registrant and the auditors of its financial statements should not assume that even small *intentional* misstatements in financial statements, for example those pursuant to actions to 'manage' earnings, are immaterial." *Id.* at *4 (emphasis added). And, although management intent does not necessarily render a misstatement material, "it may provide significant evidence of materiality. The evidence may be particularly compelling where management has intentionally misstated items in the financial statements to 'manage' reported earnings." *Id.* In those instances, management has "presumably" misstated its reported earnings "believing that the resulting amounts and trends would be significant to users of the registrant's financial statements." *Id.*

In SAB 99, the SEC staff stated that "there are numerous circumstances in which misstatements below 5% could well be material" and that "[q]ualitative factors may cause misstatements of quantitatively small amount to be material." *Id.* at *3. SAB 99 provides a non-exhaustive list of qualitative factors that may impact the materiality assessment of quantitatively small misstatements, including "whether the misstatement masks a change in earnings or other trends," "whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise," and "whether the misstatement has the effect of increasing management's compensation." *Id.* Additionally, "the demonstrated volatility of the price of a registrant's securities

in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material." *Id.* Market reaction alone is "too blunt an instrument to be depended on," but when management expects "that a known misstatement may result in a significant positive or negative market reaction, that expected reaction should be taken into account when considering whether a misstatement is material." *Id.*

### B.    Discussion

#### 1.    The Indictment Is Legally Sufficient and Materiality Is a Jury Issue

As a threshold matter, the Indictment easily satisfies the minimal requirements necessary to survive a motion to dismiss. The Indictment "track[s] the languages of the statute[s] charged" and "state[s] the time and place (in approximate terms) of the alleged crime." *Stavroulakis*, 952 F.2d at 693 (quotation marks and citation omitted). That is all that is required for an indictment to be legally valid. *See United States* v. *Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) ("It is well settled that an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." (internal quotation marks and citation omitted)).

Despite the Indictment's meeting the basic standard for pleading sufficiency, defendants nevertheless contend that the Indictment is defective in that the alleged misstatements were not material as a matter of law, both qualitatively and quantitatively. This argument is both meritless and directed to the wrong audience. Defendants attempt to show that the alleged misstatements were not greater than 5 percent of the true figure. (Carroll MTD Br. 4-7). The Government disagrees with the methodology and assumptions utilized by defendants in their calculations and are prepared to prove at trial the allegations set forth in the Indictment on this issue. Although we engage the

10

calculations and the claims of immateriality as a matter of law *infra*, we note that this dispute is truly a subject best suited for litigation at trial, not for pre-trial motions practice, where the allegations in the Indictment must be assumed true. *See, e.g.*, *Boyce Motor Lines, Inc.* v. *United States*, 342 U.S. at 343 n.16; *Goldberg*, 756 F.2d at 950.

As Judge Oetken noted in a similar case, confronted with a similar motion, "[a]t this stage, in order to dismiss the Indictment due to a failure to allege materiality, the Court would have to conclude that the alleged misstatements are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *United States* v. *Block*, 16 Cr. 595 (JPO), 2017 WL 1608905 (Apr. 28, 2017), at *4 (*quoting Litvak*, 808 F.3d at 175). As set forth below, defendants cannot possibly make that showing here.

### 2.   *The SS-NOI Growth Misrepresentations Are Not Immaterial as a Matter of Law*

Carroll and Pappagallo bemoan what they term the Government's use of a "percentages-of-percentages" theory of materiality. (Carroll MTD Br. 8, Pappagallo MTD Br. 2). Of course, the Government did not choose that metric. The defendants did – both in their distortions of the inputs into SS-NOI Growth as alleged and in their documented touting of the SS-NOI Growth metric that they were manipulating and promoting. That measuring the deviations in SS-NOI Growth that resulted from the scheme involves taking a "percentage of a percentage" is not a function of the Government's whim, nor is it a remotely exotic or creative methodology. It is a necessity tethered to the facts of this case.

Defendants attempt to cast the Government's straightforward determination of the relative degree of deviation as "mathematical sleight of hand" by engaging in some of their own. They do so in two ways. First, defendants repeatedly attempt to shift the analytical framework of the materiality

11

issue, casting it in terms of absolute SS-NOI figures rather than SS-NOI Growth.  Carroll, for

example, repeatedly points to purportedly immaterial changes in SS-NOI over the period covered by

the Indictment, and contends that the Government seeks to overcome these and "gin up the

impression of materiality" by looking at the percentage change in SS-NOI Growth as compared to

the same quarter in prior years, a "strategy" that "wildly inflates the alleged errors."  (Carroll MTD

Br. 8).  But the "alleged errors" in Brixmor's own public filings cited in the Indictment are not only

errors in SS-NOI absolute values, but in SS-NOI Growth, a metric emphasized by Brixmor itself.[1]

Unfortunately for Carroll and Pappagallo, SS-NOI Growth is the metric they chose to manipulate

and the appropriate starting point for calculating the magnitude of any misstatement thereof.  And

the Indictment alleges facts that spell out a specific and deliberate conspiracy to manipulate that

metric.  The defendants cannot simply substitute SS-NOI absolute value as the focal point of the

inquiry in order to avoid the straightforward calculation of how significantly the reported quarter-

over-quarter SS-NOI Growth figure deviates from the actual one.

      Then, in taking on that calculation, the defendants commit a more risible error: hiding behind

the percentage format of the metric at issue in an effort to mask true measures of materiality.  For

---

[1] Carroll's argument that Brixmor did not report in its public filings the relative difference, as opposed to absolute difference, of other expressed-as-percentage metrics is inapposite.  (Carroll BOP Br. 12 n. 10).  Carroll cites Brixmor's reporting the year-over-year change of occupancy rate metrics in absolute terms (i.e., Brixmor reporting a 90% occupancy rate to 89% occupancy rate change as a 1 percentage point decline).  But the question here is how the jury should view the materiality of a *misstatement*, not a year-over-year decline in a metric.  When the question is how important was the defendants' misstatement, it makes perfect sense to care about the relative size of the misstatement versus the correct statement, even when the underlying metric, like SS-NOI Growth, is expressed as a percentage itself.  By discussing "financial statements . . . misstated by more than 5%,"—i.e., the fraction of the correct statement the misstatement represents—SAB 99 is inherently referring to the relative change.  SAB 99 has no exception that excludes misstatements that are themselves expressed as percentages from this analysis.

example, pointing to Q3 2013, Carroll states that the correction for these errors would have lowered quarterly SS-NOI Growth by 1.3 percent – the difference between the reported SS-NOI Growth (3.9 percent) and the alleged actual SS-NOI Growth (2.6 percent).  (Carroll MTD Br. 8).  But then, rather than determining how significant that difference is by determining the percentage of the correct metric that the difference represents – as one would do with virtually any metric[2] – Carroll asserts that 1.3 percent, the absolute difference between the two metrics, is the amount that should be used in determining materiality.  This is clearly error, and not an accurate way of determining the size and significance of the departure.  Put a different way, if a prolific and consistent salesman were paid a 6 percent commission on all his sales for many years, and then his company abruptly determined to only give him 3 percent commission on his sales one year, Carroll's methodology would have him shrugging off an imagined 3 percent loss as potentially immaterial, merely because there are percentages involved in the way the underlying metric is expressed.  In the real world, in which materiality reflects the degree of deviation from a prior number as measured by the percentage of the value of the initial figure, the same salesman would rightly wonder why the company took *half* of his bonus.

The defendants' efforts to justify their inapposite math through case law are also unavailing. Carroll points to two Southern District cases in which courts "reject invitations to adopt relative rather than absolute change as the appropriate yardstick under SAB No. 99."  (Carroll MTD Br. 12 (*citing In re Ply Gem Holdings, Inc. Sec. Litig.*, 135 F. Supp. 3d 145, 153 (S.D.N.Y. 2015) and *Dekalb Cty. Emps.' Ret. Sys.* v. *Controladora Vuela Compaña*, 15 Civ. 1337 (WHP), 2016 WL 3685089 (S.D.N.Y. July 6, 2016))).  Neither case is applicable.  The court in *In re Ply Gems* did not

---

[2] Indeed, SAB 99 itself utilizes percentage of overstatement of the relevant metric when discussing quantitative materiality.

reject the adoption of relative rather than absolute percentage change for SAB 99 materiality purposes as a categorical matter, but rather faulted plaintiffs for failing to demonstrate why showing the effects of a purported fraud on gross profit margin should make that metric the operative measure of materiality.  *See In re Ply Gems*, 135 F. Supp. 3d at 153.  Moreover, in a subsequent opinion addressing a second amended complaint, the *Ply Gems* court found that the loss at issue was material, looking at quantitative and qualitative factors.  *See In re Ply Gem Holdings, Inc.*, No. 14-CV-3577 (JPO), 2016 WL 5339541, at *3 (S.D.N.Y. Sept. 23, 2016) ("Plaintiff also claims that these costs together accounted for a 29.77% impact on gross profit in the Windows and Doors segment.").  *Dekalb Cty* is likewise misleadingly deployed – the court in that case rejected the use of a cherry-picked denominator that represented a subset rather than a total measure of the operative metric in that case.  Neither case concerned a straightforward metric akin to SS-NOI, nor did either case come close to categorically rejecting relative change in favor of "absolute percentage change."

What remains after the defendants' sleight of hand are quarterly differences between reported SS-NOI Growth and actual SS-NOI Growth over the life of the scheme that represented, for various quarters, 50 percent, 39.3 percent, 18.8 percent, and 18.6 percent departures from the correct number.  They easily clear the Second Circuit's 5 percent materiality threshold, and vindicate the readily apparent materiality of the misstatements when the deviations are viewed graphically:





(Indictment ¶ 23).

Even if the defendants' version of the math were correct and the quantitative impact was less than 5 percent, quantitative materiality is but one factor used to assess the materiality of an alleged misstatement.  *Litwin*, 634 F.3d at 717 ("Accordingly, a court must consider both quantitative and qualitative factors in assessing an item's materiality and that consideration should be undertaken in an integrative manner.").  As Carroll recognizes, SAB 99 provides persuasive guidance to courts making materiality assessments, but contrary to defendants' assertions, whether the 5 percent quantitative materiality threshold is met in a particular case is not, standing alone, determinative of whether materiality has been established.

In fact, SAB recognizes that "there are numerous circumstances in which misstatements below 5% could well be material" and that "[q]ualitative factors may cause misstatements of quantitatively small amount to be material."  *Id.* at *3.  SAB 99 provides a non-exhaustive list of qualitative factors that may impact the materiality assessment of quantitatively small misstatements, including "whether the misstatement masks a change in earnings or other trends," "whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise," and "whether the misstatement has the effect of increasing management's compensation."  *Id.* Additionally, "the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material."  Here, factors cited in SAB 99 – which are inherently fact-specific – are present and suggest that the alleged intentional misstatements are material.

Notably, SAB 99 indicates that the intent of management may evidence materiality where misstatements were made to manipulate reported earnings, and expressly notes that "investors generally would regard as significant a management practice to over- or under-state earnings up to

an amount just short of a percentage threshold in order to 'manage' earnings."  *See* 1999 WL

1123073, at *4.   Civil cases have expressly relied on allegations of smoothing in denying motions to

dismiss for lack of materiality.  *S.E.C.* v. *Escala Group, Inc.*, No. 09 Civ. 2646 (DLC), 2009 WL

2365548, at *9 (S.D.N.Y. July 31, 2009) (holding that evidence of materiality "may be particularly

compelling where management has intentionally misstated items in the financial statements to

'manage' reported earnings") (quoting SAB 99); *S.E.C.* v. *Leslie*, No. 5:07-CV-03444-JF PSG, 2012

WL 116562, at *6–7 (N.D. Cal. Jan. 13, 2012) ("Thus, it is possible that a reasonable finder of fact

could conclude that Lonchar's 'smoothing' of the reported data relevant to these indicators was

qualitatively material even if the numbers in question were quantitatively small."); *Takara Tr.* v.

*Molex Inc.*, 429 F. Supp. 2d 960, 979 (N.D. Ill. 2006) (holding that, among others, the allegation that

the "[d]efendants committed numerous additional GAAP violations in a further attempt to smooth

over Molex's earnings and maintain income and earnings per share in accordance with

expectations," demonstrated the materiality of the defendants' alleged misstatements).

Further, Brixmor's having advertised the smooth, steady nature of its SS-NOI Growth across

quarters militates in favor of qualitative materiality.  In *Ganino*, the company, Citizens Utilities

("Citizens"), had a long history of consistent growth, which it repeatedly touted.  In the first and

second quarters of 1996, however, Citizens experienced losses.  228 F.3d at 154.  Rather than report

these quarterly losses, Citizens "stored" approximately $10 million of income from 1995 and

recognized it in the first two quarters of 1996 in order to cover up the losses.  The $10 million itself

represented approximately 1.7 percent of Citizens total annual income.  But as a result of this

manipulation relating to the timing of revenue recognition, Citizens reported an increase of 10

percent for the first two quarters of 1996 combined as compared to the comparable period in the

17

prior year.  The facts of *Ganino* are thus similar to the facts here.  In both cases the fraud related to the timing of income recognition, but not to the legitimacy of the income itself.  In both cases, the fraud covered up the companies' failure to meets its touted consistent results.  In both cases the fraud related to quarterly, but not annual reporting.  And in both cases the manipulated amounts were relatively modest compared to the companies' total income, but had a significant effect on a particular reported metric.

In *Ganino*, the Second Circuit reversed the dismissal of a civil complaint on materiality grounds, in part for quantitative reasons (the district court considered the misstatement as a percentage of revenue, while the Court of Appeals assessed the misstatement as a percentage of net income), but also on qualitative grounds because the misstatement was alleged to have been undertaken to manage earnings and mask the fact that analysts' expectations were missed.  228 F.3d at 161-68.  In *Ganino*, the Court noted particularly the importance of earnings reports in driving investors' decision-making: "Misstatements of income could be material because earnings reports are among the pieces of data that investors find most relevant to their investment decisions."  *Id.* at 164; *see also New Orleans Employees Retirement Systems* v. *Celestica, Inc.*, 455 F. App'x 10, 16 (2d Cir. 2011) (reversing dismissal of a complaint alleging misstatements in inventory valuation that were "minuscule in comparison to Celestica's global assets and annual revenues" because they concealed a failure to meet analyst expectations and because of the precipitous drop in Celestica's stock price following disclosure of the true value of the inventory); *Strougo* v. *Barclays PLC*, No. 14-cv-5797 (SAS), 2015 WL 1883201, at *10 (S.D.N.Y. Apr. 24, 2015) (refusing to dismiss on materiality grounds a complaint alleging fraud in connection with Barclay's dark pool operation whose revenue in relation to Barclay's overall revenue was "far below the five percent threshold"

18

because Barclay's had staked its long term performance on restoration of its integrity and the omissions called into question the integrity of the company as a whole); *In re BioScrip Inc. Sec. Litig.*, No. 13-cv-6922 (AJN), 2015 WL 1501620 (S.D.N.Y. Mar. 31, 2015) (refusing to dismiss on materiality grounds a complaint alleging fraud in connection with failure to disclose the loss of a customer representing 4.7 percent of quarterly revenue because the business segment in which the losses occurred was a "particularly noteworthy segment of BioScrip's overall business"). As noted above, the Indictment alleges a sustained effort on the part of Brixmor and its management, and the defendants specifically, to focus on smooth SS-NOI Growth performance in its communications with the investing public. Given that focus, as reflected in its disclosures, the defendants cannot demonstrate that the alleged SS-NOI Growth misstatements are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance" so as to warrant dismissal of this properly-pled Indictment.

Because the misrepresentations alleged are – by any reasonable, non-contorted reckoning – above the non-binding quantitative materiality threshold, and because an examination of relevant qualitative factors only furthers the conclusion that the misrepresentations mattered, the motion should be denied.

## II.    THE MOTIONS FOR A BILL OF PARTICULARS SHOULD BE DENIED

The defendants request a bill of particulars: 1) listing all accounting entries used by the conspirators in furtherance of the fraudulent scheme; 2) listing all accounting entries discussed by the conspirators in furtherance of the scheme; 3) explaining the Government's theory for why each accounting entry was incorrect (Pappagallo only); and 4) providing early notice of all accounting entries the Government intends to reference at trial (Carroll only). The defendants make these requests despite the lengthy speaking Indictment, the Government's comprehensive, but manageable

19

and organized discovery production, the Government's directing the defendants to a subset of particular documents that detail the accounting adjustments at issue (which they have had since August 2019), and the Government's offer, so far ignored by the defendants with respect to the particulars of the accounting materials, to answer any questions about any discovery items. The defendants' requests amount to nothing more than a reach for a preview of the Government's evidence at trial, a tactical advantage to which they are not entitled, and their motions should be denied.

### A.    Applicable Law

A motion for a bill of particulars should be granted only where necessary (1) to inform the accused of the charges against him with sufficient precision to enable him to prepare his defense and avoid surprise; and (2) to enable the accused to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense. *See Wong Tai v. United States*, 273 U.S. 77, 82 (1927); *United States v. Rigas*, 490 F.3d 208, 237 (2d Cir. 2007). A bill of particulars "is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial." *United States* v. *Kazarian*, No. 10 Cr. 895, 2012 WL 1810214, at *24-*26 (S.D.N.Y. May 18, 2012). Instead, a "bill of particulars is 'required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" *United States* v. *Torres*, 901 F.2d 205, 234 (2d Cir. 1990); *see also United States* v. *Gibson*, 175 F. Supp. 2d 532, 536 (S.D.N.Y. 2001) ("[A] bill of particulars is not a matter of right.").

In exercising its broad discretion to determine whether the charges are "so general" that they require supplementing, this Court should consider not just the text of the Indictment, but also discovery and other information supplied to the defendants to date. *See United States* v. *Bortnovsky*,

20

820 F.2d 572, 574 (2d Cir. 1987); *see also, e.g.*, *Torres*, 901 F.2d at 234 (affirming denial of request for bill of particulars where defendants had "'been provided with a wealth of evidentiary detail from the discovery to date, including electronic intercepts, search evidence and exhaustive supporting affidavits'"(quoting district court)); *United States* v. *Monserrate*, No. 10 Cr. 965 (CM), 2011 WL 3480957, at *4 (S.D.N.Y. 2011) (denying request for bill of particulars where discovery materials and indictment were "sufficient to apprise the defendant of the charge against him" and to allow him to prepare for trial); *United States* v. *Cuti*, No. 08 Cr. 972 (DAB), 2009 WL 3154310, at *3-4 (S.D.N.Y. 2009) (denying request for bill of particulars listing fraudulent transactions, payments, and statements in accounting fraud case where Government provided comprehensive discovery and a list of certain transactions); *United States* v. *Samsonov*, No. 07 Cr. 1198 (CM), 2009 WL 176721, at *4 (S.D.N.Y. 2009) (denying bill of particulars request where indictment, discovery letters, and discovery materials gave defendant adequate information to prepare for trial); *United States* v. *Earls*, No. 03 Cr. 364 (NRB), 2004 WL 350725, at *4-5 (S.D.N.Y. 2004) (denying motion for bill of particulars in fraud case where, among other things, Government had "furnished the defendant with voluminous discovery"); *United States* v. *Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) (denying bill of particulars request in stock fraud case where indictment was 15-pages long and substantial discovery had been provided); *United States* v. *Henry*, 861 F. Supp. 1190, 1198 (S.D.N.Y. 1994) ("In determining whether to grant a motion requesting a bill of particulars, the Court must ascertain whether the information sought has been provided elsewhere, such as through pre-trial discovery, voluntary disclosure by the government, or the indictment itself.").

Although the Government's provision of "mountains of documents to defense counsel who [a]re left unguided as to which documents" are relevant to the charges does not substitute for a bill of

21

particulars where one would otherwise be required, *see Bortnovsky*, 820 F.2d at 575; *United States* v. *Nachamie*, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000), the provision of voluminous discovery in combination with some guidance about what is most relevant can vitiate a need for further particulars, *see, e.g.*, *Kazarian*, 2012 WL 1810214, at *25; *United States* v. *Mandell*, 710 F. Supp. 2d 368, 385 (S.D.N.Y. 2010) (denying request for particularization of alleged misrepresentations where the indictment was 34-pages long and Government had provided voluminous, organized discovery).  In no event should the volume of discovery alone warrant a bill of particulars; "[w]hile [a] [c]ourt may sympathize with counsel's task of reviewing a large quantity of materials that continue to be produced," that concern is addressed by granting the defense sufficient time in which to conduct the review in advance of trial.  *See United States* v. *Levy*, No. S5 11 Cr. 62 (PAC), 2013 WL 664712, at *13 (S.D.N.Y. 2013).

Bills of particulars would undoubtedly be helpful to the defense, and save defense resources in preparing for trial, in any case.  But "the law does not impose upon the Government an obligation to preview its case or expose its legal theories," *United States* v. *Leonelli*, 428 F. Supp. 880, 882 (S.D.N.Y. 1977), and therefore "[t]he ultimate test must be whether the information sought is necessary, not whether it is helpful," *United States* v. *Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001); *United States* v. *Mahabub*, No. 13 Cr. 908 (AJN), 2014 WL 4243657, at *2 (S.D.N.Y. 2014) ("The purpose of a bill of particulars is to ensure that a defendant has the information necessary to prepare a defense, not to turn over all information that would aid the defendant."); *United States* v. *Rittweger*, 259 F. Supp. 2d 275, 292-93 (S.D.N.Y. 2003) (denying bill of particulars request as "an impermissible attempt to compel the Government to provide the evidentiary details of its case" (citation and quotation marks omitted)).

A bill of particulars should not be misused to compel the Government to disclose "the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crime charged, or a preview of the Government's evidence or legal theories." *Mitlof*, 165 F. Supp. 2d at 569; *see also Torres*, 901 F.2d at 234 ("'Acquisition of evidentiary detail is not the function of the bill of particulars.'" (quoting *Hemphill* v. *United States*, 392 F.2d 45, 49 (8th Cir. 1968))).  The "'wheres, whens and with whoms'" are "beyond the scope of a bill of particulars." *Mitlof*, 165 F. Supp. 2d at 569 (citing *Torres*, 901 F.2d at 233-34); *see also, e.g.*, *United States* v. *D'Amico*, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010) ("'A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial.'" (quoting *United States* v. *Gibson*, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001))); *United States* v. *Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory."); *Henry*, 861 F. Supp. at 1197 ("This instrument should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense.").

There are good reasons why bills of particulars are warranted only where the allegations in the indictment, as supplemented by discovery and otherwise, are so general and vague as to render it impossible to prepare a defense.  Because "a bill of particulars confines the Government's proof to particulars furnished," it can "restrict unduly the Government's ability to present its case." *Id.*; *see also Mahabub*, 2014 WL 4243657, at *2 (recognizing that "care must be taken" in deciding whether

23

to order a bill of particulars because "[t]he government's presentation of evidence at trial is limited to the particulars contained in the bill"); *Samsonov*, 2009 WL 176721, at *3 ("The vehicle of a bill of particulars serves to inform a defendant of the nature of the charge, when he is otherwise insufficiently informed, and must not be misused to compel disclosure of how much the Government can prove, nor to foreclose the Government from using proof it may develop as the trial approaches.").  Moreover, the Government's provision of particulars tantamount to an itemized preview of its proof creates the very real danger that a defendant will "tailor [his] testimony to explain away the Government's case."  *Henry*, 861 F. Supp. at 1197.  These concerns animate the rule that "if the defendant has been given adequate notice of the charges against [him] and can prepare fully for trial with reasonably diligent efforts, the Government cannot be required to disclose additional details about its case."  *Id.*

### B.    Discussion

#### 1.  *The Indictment, Discovery, and Accounting Work Papers Provide Sufficient Particularity*

There is no basis for a bill of particulars in this case.  The charges against the defendants are explained in detail in the lengthy speaking Indictment.  As the Indictment describes and as recounted above, Carroll and Pappagallo participated in an accounting fraud scheme in which they and their co-conspirators caused Brixmor to report false SS-NOI Growth numbers in public quarterly filings from the third quarter of 2013 to the third quarter of 2015.  (Indictment ¶¶ 15-35).  The defendants caused Brixmor to falsely inflate and deflate these quarterly SS-NOI Growth figures in order to ensure that they were consistent on a quarterly basis with Brixmor's publicly announced annual guidance for SS-NOI Growth and to mislead shareholders and the investing public into believing that Brixmor achieved smooth growth from quarter to quarter.  (Indictment ¶ 41).

24

The Indictment sets forth, in great detail: 1) an explanation of the accounting metric at issue (¶¶ 9-14); 2) the particular public filings in which Brixmor falsely reported the metric (¶¶ 15-17); 3) the defendants' role in touting the importance of that metric to the investing public (¶¶ 18-19); 4) the three particular accounting means by which the defendants and others (including two identified co-conspirators) manipulated that metric (¶¶ 22-32); 5) particular examples of the defendants and co-conspirators discussing and using specific accounting items as part of the fraud (*E.g.*, ¶¶ 25-27, 29(a), 31); and 6) a description of the effect of the defendants' fraud on the reported metric (¶¶ 33-35).  Thus, the Indictment itself, which is 32-pages long and contains an extraordinarily detailed explanation of the factual basis underlying the charged crimes, provides a sufficient basis to deny the defendants' motions.  *See, e.g.*, *United States* v. *Ferrarini*, 9 F Supp. 2d 284, 299 (S.D.N.Y. 1998) (denying bill of particulars where "indictment alone . . . discloses sufficient information to inform the defendants adequately of the charges against them").  Indeed, based on the Indictment alone, it would be absurd for the defendants to suggest that they would not be able to assert a double jeopardy defense if they were charged again for falsely smoothing quarterly SS-NOI Growth at Brixmor from the third quarter of 2013 to the third quarter of 2015.

But that is not all.  The Government has, beginning in August 2019, provided the defendants with comprehensive, electronically-searchable discovery.  The defendants complain that the materials total approximately 535,000 pages; but while large, that is a manageable amount of discovery that is not unusual in fraud cases.  The Government has produced the discovery together with cover letters outlining the organization of the materials.  It has also spent hours answering questions from the defendants about the discovery materials in general (although not the particulars of the accounting work papers) and has provided additional information at the defendants' request.

25

The defendants try to use the size of the discovery as both a sword and a shield—complaining that they have too little detail but also that the discovery is too voluminous to allow them to find the information they seek.  (Carroll Bill of Particulars ("BOP") Br. 5, 10; Pappagallo BOP Br. 2, 8). However, given the detailed nature of the Indictment, the amount of discovery alone does not entitle the defendants to a bill of particulars.  "Given the specificity of the allegations in the Indictment, which fully apprise [the defendants] of the crimes with which [they are] charged, the amount of discovery is of little import."  *United States* v. *Mandell*, 710 F. Supp. 2d 368, 385 (S.D.N.Y. 2010). That is particularly the case here where the defendants have had the materials for months, providing them with ample opportunity for a thorough and careful review.  Moreover, unsurprisingly, the sophisticated CEO and CFO defendants—both represented by sophisticated, international law firms—have sought to hire accounting experts to assist their defense and their review of these materials.  Put simply, the defendants have had sufficient time and resources to review the accounting issues that form the charges in this case.

This case is a far cry—particularly in light of the Government's direction of the defendants to a small subset of discovery materials (as discussed below)—from *United States* v. *Connolly*, No. S1 16-CR-00370 (CM), 2017 WL 2537808 (S.D.N.Y. May 24, 2017).  In that case, the defendants were faced with a "massive amount of data" involving "literally millions of transactions" that extended over a period of seven years.  *Id.* at *5.  Given the huge amount of data and upcoming trial date, the Court "stretched" the "usual rules on bills of particulars" to require the Government to narrow the list of trades impacted by the defendants' market manipulation scheme that would be presented at trial.  *Id.* at *4 (noting "[i]n the ordinary course—in the ordinary case—the answer" to the defendants' request for a bill of particulars "would be no").  This case does not present the same

problems because the size of the data is much smaller and the defendants will have adequate time

before trial to review the material.[3]   The defendants' citation to *United States* v. *Vaid*, No. 16 CR.

763 (LGS), 2017 WL 3891695, at *11 (S.D.N.Y. Sept. 5, 2017), which involved 500,000 fraudulent

Medicare claims is inapposite for the same reason.

In addition to the Indictment and the discovery, the Government has also pointed the

defendants to a detailed roadmap of the accounting fraud.   In August 2019, the Government

provided the defendants with the work papers that supported a forensic accounting investigation

conducted by Brixmor's audit committee review team (the "Audit Committee") with the assistance

of the Alvarez & Marsal firm and another firm (the "Work Papers").   The Work Papers were

accompanied by a master summary spreadsheet totaling the effect of the fraud on Brixmor's quarter-

by-quarter SS-NOI Growth (the "Summary Spreadsheet," produced in discovery as WB00452584,

Tab "NOI Adjustments Summary_All").   The Summary Spreadsheet also presented the Audit

Committee's findings of the effect of the fraud on a more granular level, identifying, for example,

the effect of the fraud, quarter by quarter, on each of several subaccounts of the "cookie jar" account

of Brixmor's general ledger (the "2617 Account").   (Summary Spreadsheet, Tab "AC Adj").   The

Summary Spreadsheet also provided, in detail, all of the adjustments found necessary as a result of a

review of the conspirators' improper use of lease settlement income ("LSI").   (Summary

---

[3] The defendants' Rule 17 subpoena requests of which the Government is aware certainly do not
suggest an aversion by the defendants to reviewing voluminous materials.   Among other things,
Carroll sought all documents in his email account for a five-year period, and Pappagallo sought all
emails from two co-conspirators' email accounts and emails referencing eight broad subject areas
from numerous other Brixmor employees' email accounts.   (*See* Court's Order dated Jan. 9, 2020,
ECF Docket No. 62).   Moreover, the defendants' other motions suggest they are familiar with the
discovery materials already (*see, e.g.*, Carroll MTD Br. 4, 7-8 (citing several specific items in the
discovery)).

Spreadsheet, Tabs "LSI Review Adj," "ADF AJEs," "Bankruptcy AJEs," and "StopBill AJEs").  For

example, the LSI-related tabs of the Summary Spreadsheet list by shopping center, then by tenant

name, then by quarter, then by category of adjustment, each LSI adjustment, along with an

explanation: e.g., "to adjust for improper deferral of LSI income . . . amount to reverse in Q3 LSI:

$41,674.86."  The Work Papers, in turn, contain the forensic accounting work that resulted in the

Summary Spreadsheet.  For example, there are specific spreadsheets that relate to the subaccounts of

the 2617 Account, and they show what the Audit Committee found with respect to those subaccounts

and how they found it, including in many cases citations to the general ledgers containing the

original accounting journal entries at issue.  The Government has attached hereto an appendix listing

spreadsheets in the Work Papers that primarily relate to each of the 2617 subaccounts (the

"Appendix").

Consisting of just 6,186 Bates numbered pages,[4] the Work Papers show the Audit

Committee's work in determining the effect of the fraud on Brixmor's books.  The defendants' fraud

was indeed carried out through likely thousands of accounting entries that had the cumulative effect

of fraudulently smoothing Brixmor's SS-NOI Growth.  Neither the Audit Committee nor the

Government purports to know every single accounting journal entry or other means the defendants

used to carry out the fraud.  But the Work Papers reflect the Audit Committee's best effort to

understand and memorialize the full scope and detail of the fraud.  There is simply no information

available to the Government that is more specific or helpful than the Work Papers in understanding

---

[4] It is true that the Work Papers contain spreadsheets identified by just one Bates number each, but
the spreadsheets are an efficient and understandable way to present the relevant data.  Several of the
spreadsheets contain only summaries or relatively little data. Where the spreadsheets do contain
many rows of data, it is typically because they are specifying—as the defendants request—all of the
journal entries that make up certain accounting adjustments found necessary as a result of the fraud.

the fraud.  In response to their request for a bill of particulars, the Government first specifically directed the defendants to these Work Papers on September 27, 2019, and has repeatedly offered to answer any questions they may have about the discovery—which was met with silence from the defendants as to the specifics of the Work Papers.  (Govt. Ex. A (Sept. 27, 2019 Letter from the Government to Defense Counsel; *see also* Carroll BOP Mot. Ex. G (Oct. 16, 2019 Letter from the Government to Defense Counsel)).  Accordingly, in light of the Indictment, the discovery, and the Work Papers and Summary Spreadsheet, it is difficult to take seriously the defendants' claim that they have been "left to comb through the tens of thousands of documents the government produced to try to identify the accounting matters at issue."  (Pappagallo BOP Br. 3).  The defendants well know the matters at issue and have ample time and resources to fully examine them.

In their motions, the defendants complain that the Work Papers and Summary Spreadsheet are insufficient.  *First,* the defendants complain the Work Papers and Summary Spreadsheet are over-inclusive.  They are not.  Contrary to the defendants' assumption in their motions, the Government does in fact allege that all of the adjustments reflected in the Work Papers and Summary Spreadsheet were made necessary as a result of the defendants' fraud.  The defendants' only argument for why the Work Papers and Summary Spreadsheet must be over-inclusive is based on one $1.48 adjustment found necessary as a result of the fraud and the defendants' claim that it is not material.  (Carroll BOP Br. 14-15).  As an initial matter, this case does not charge individual accounting adjustments or entries as the unit of fraud, nor does it allege that each relevant adjustment or entry is material standing alone; it charges a cumulative fraud that had a material effect on Brixmor's reported quarter-by-quarter SS-NOI Growth.  The fact that one adjustment is small does not mean it was not caused by the fraud.  More importantly, the adjustment the

defendants complain about only shows the level of detail available to them in the Work Papers. The $1.48 adjustment was necessary to reverse a particular deferred liability (*see* Summary Spreadsheet, Tab "ADF AJEs," Row 231), that along with other entries, made up a $4,387.22 liability that should have been recorded earlier. (Summary Spreadsheet, Tab "ADF AJEs," Rows 224 to 232). The Work Papers spreadsheet supporting those adjustments was produced in discovery as WB00458682.

*Second*, without asking the Government for assistance, the defendants complain they cannot find certain items in the Work Papers and Summary Spreadsheet. (Carroll BOP Br. 12-13). Their arguments reflect in some instances simply failing to ask for help if they—with the assistance of their own experts—could not find what they were looking for. For example, both defendants complain about the lack of detail with respect to two large adjustments to the 2617 Account in the third and fourth quarters of 2013. (Carroll BOP Br. 13, Pappagallo BOP Br. 10-11). The third quarter adjustment, for example, is reflected in the Summary Spreadsheet in row 4 of the "AC Adj" tab: a decrease of $2,055,598 in the "main" subaccount of the 2617 Account. The Work Papers spreadsheet supporting these adjustments was produced in discovery as WB00453226. It lists a decrease of $2,055,597.96 necessary as a result of unvouched, stale purchase orders from prior quarters (cells J17 and J22 of the "Summary" tab of that spreadsheet) that were improperly taken into income in the third quarter of 2013 in the 2617 Account. The formulas in that spreadsheet show that the total number at issue is derived from certain specifically cited accounting journal entries. (See WB00453226, "Transactions" Tab, cell J1477). These complaints only echo the defendants' attempts to make similar arguments at the pre-trial conference in November 2019 about the Work Papers being "impossible" to read or comprehend. On that occasion, the Court was easily able to look at the entry singled out by the defendants for attack, and conclude that it referred to a

30

reclassification of income from current to deferred.  (11/05/2019 Tr. at 34-37).  The Court was able

to do that without all the time and resources that the defendants are able to devote to a review of the

discovery in this case.[5]

Other complaints by the defendants reflect a misimpression of the proof necessary here.

Their complaints about the $950,000 of "boosts" available in the third quarter of 2014 and the

$263,000 of collected prior-year common area maintenance ("PYCM") fees available for the fourth

quarter of 2015 (including an $81,000 common area maintenance fee) all relate directly to emails or

budget forecasts cited in the Indictment—itself evidence of the fraud—not accounting journal entries

or adjustments relied on by the Government.  (Carroll BOP Br. 12-13).  With respect to the $950,000

"boost," Brixmor's "July Recast" circulated to Pappagallo and others and cited in the Indictment (¶

23) is available to the defendants in discovery as WB00013801.  It shows a tab labeled "boost

notes," which lists $950,000 of "Same Store Adjustments-'Boost'" that are included in the third

quarter "recast."  The Government does not profess to be aware of every single adjustment that was

required as a result of those "boosts" or whether the Audit Committee's work even uncovered all of

them.  (*See infra* n.6).  If the defendants wish to argue that those "boosts" did not exist, or did not

result in any necessary adjustments, they are free and well-equipped to do so at trial; that is not a

reason for a bill of particulars.  With respect to the accumulated fourth quarter 2015 PYCM fees, a

Brixmor employee's own summary of the fees is available in an email produced in discovery at

BRX-AC_00000275.  It notes that a particular store, at a particular shopping center, is responsible

for "$81,210.03" of "PYCM collected but Income was never recognized."  The relevant part of

---

[5] It should be noted that the defendants had little trouble using the Work Papers in writing their motions seeking to dismiss the Indictment on materiality grounds.  Carroll even cites, and asks the Court to rely on, the Summary Spreadsheet in deciding his motion.  (Carroll MTD Br. 6 n.6).

Audit Committee's Work Papers (available at WB00453236) outlines the adjustments found

necessary to the PYCM subaccount of the 2617 Account, and contains entries (sortable by that

particular store's name) that show all PYCM fees (at least those recorded in the ledger) paid by that

store in 2013, 2014, and 2015.  The defendants are again free, and well-equipped, to make whatever

trial arguments they wish about the import of this email, the ledger, and the adjustments; no bill of

particulars is necessary.

At bottom, the defendants' complaints about the over- or under-inclusiveness of the Work

Papers go too far.  The defendants are not entitled to a bill of particulars in this case because in view

of the Indictment, the discovery, and the roadmap provided by the Work Papers, they well

understand, in specificity, the nature of the charges against them.  The Work Papers do not profess to

be a list of every single accounting journal entry and every other tool used by the conspirators as part

of the scheme, but that only means all of the defendants' fraud may not have been uncovered, not

that they are missing particularity about the fraud alleged.[6]  In any event, even if the Work Papers

---

[6] The Audit Committee used various methodologies to review the various subaccounts of the 2617
Account.  All of the Audit Committees' work is available in the Work Papers.  (*See*
Appendix).  Some subaccounts, which were used across the board in ways that violated generally
accepted accounting principles, such as the "late fee" 2617 subaccount, did not require an item-by-
item analysis.  The Audit Committee only needed to review the late fee cash receipts against the
amount recognized on a category basis.  Other subaccounts, like the PYCM subaccount, required the
forensic accountants to look at and identify every relevant line item, all of which are available to the
defendants in the Work Papers.  *Id.*  For other subaccounts, such as the UC-tenant deposits, "main,"
and "adj." subaccounts, the Audit Committee's review was not designed to, and did not identify
every possible fraudulent journal entry.  Instead, the Audit Committee examined only certain line
items, and only included as adjustments the discrepancies it found.  The spreadsheets documenting
what was tested, the results, and the percentage of the reported net change in the accounting category
at issue covered by those tests are available in the Work Papers.  *Id.* For these subaccounts, the Work
Papers are only "under-inclusive" in the sense that they may not have discovered all of the
defendants' fraud; it is not that they do not list fraud they found.  For one subaccount, UC-tenant
credits, the Audit Committee manually reviewed individually significant items and used statistical
analysis with random sampling to analyze other entries.  Again, all of the forensic accounting work

did not include certain items used in furtherance of the fraud as alleged, the defendants are not

entitled to such a list of every "means by which it is claimed they performed acts in furtherance of

the conspiracy nor the evidence which the Government intends to adduce to prove their criminal

acts." *United States* v. *Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987).  But the Work Papers do

provide the defendants, in very substantial detail, with the specific ways that accounting journal

entries were used to carry out this fraud.  If the defendants wish to argue that the Work Papers do not

support the adjustments found necessary, or to otherwise contest the forensic accountants'

methodology, that is an argument for trial, not a reason for a bill of particulars.  The Work Papers are

the most particularized information the Government is aware of, and the Government has already

provided it to the defendants.  The Government cannot create new particularity that does not exist.

Finally, the defendants' complaint that the Work Papers do not contain "accounting entries

that were considered but not made" (Carroll BOP Br. 15) only highlights the overreach of the

defendants' requests.  A request for "considered" accounting entries is in truth a request for a list of

the topics of coconspirators' conversations in furtherance of the scheme, i.e., overt acts, to which the

defendants are plainly not entitled.  *See United States* v. *Wey*, No. 15 Cr. 611 (AJN), 2017 WL

237651, at *20 (S.D.N.Y. Jan. 18, 2017) ("Wey's conspiracy-related demands—which seek, for

example, a description of each alleged overt act committed in furtherance of the charged

conspiracy—would essentially require[ ] the Government to lay out its proof . . . months before trial

. . . That is a requirement that courts have consistently declined to impose." (internal quotations

---

is available in the Work Papers.  *Id.*  For two subaccounts, CAM and real estate taxes, the Audit
Committee employed a methodology that involved moving 50% of the recognized amounts to a prior
month.  The methodology is explained in narrative form in a document cited in the Appendix and is
reflected in the relevant spreadsheets identified in the Appendix.

omitted)); s*ee also United States* v. *Carroll*, 510 F.2d 507, 509 (2d Cir. 1975) (affirming denial of

bill of particulars, holding that there is no requirement that Government disclose "overt acts it will

prove in establishing a conspiracy charge").  Anticipating this obvious response, the defendants

attempt to deflect it by citing their restraint in not "asking the government to identify all of the

dozens of acts that might be involved in a single proposed accounting entry."  (Carroll BOP Br. 16).

The defendants' self-control in not seeking further minutiae to which they are not entitled offers zero

support for what they do seek: the identification of overt acts in furtherance of the conspiracy.  There

is no analytical difference between the levels of specificity the defendants' attempt to distinguish—

accounting journal entries, but not the documents and calculations that underlie those entries.  The

defendants have simply picked the level of specification that suits them, but it is "turtles all the way

down."[7]

### 2.   *The Case Law Provides No Support for the Defendants' Requests*

In the face of the detailed speaking Indictment, the comprehensive discovery, the

Government's specification of the Work Papers, and the Government's offer to answer any questions

the defendants have regarding the Work Papers, the law provides no support for the defendants'

requests.  Indeed, the defendants have failed to present one example of an accounting fraud case

where a court granted a bill of particulars requiring a list of every accounting entry used, or

considered to be used, as part of the fraud.  To the contrary, courts have rejected bills of particulars

---

[7] *See Rapanos* v. *United States*, 547 U.S. 715, 754 n.14 (2006) ("The allusion is to a classic story . . .
an Eastern guru affirms that the earth is supported on the back of a tiger. When asked what supports
the tiger, he says it stands upon an elephant; and when asked what supports the elephant he says it is
a giant turtle. When asked, finally, what supports the giant turtle, he is briefly taken aback, but
quickly replies 'Ah, after that it is turtles all the way down.'").

in accounting fraud cases.  *See United States* v. *Block*, No. 16-CR-595 (JPO), 2017 WL 1608905, at

*6 (S.D.N.Y. Apr. 28, 2017) ("Block next argues that he is entitled to particulars regarding the

alleged fraud.  However, such requests are routinely denied." (citation omitted)); *Cuti*, 2009 WL

3154310, at *3-4 (denying request for bill of particulars listing fraudulent transactions, payments,

and statements in accounting fraud case where Government provided comprehensive discovery and a

list of certain transactions); *see also United States* v. *Bonventre*, 646 F. App'x 73, 78–79 (2d Cir.

2016) (upholding denial of bill of particulars "as to the records alleged to be false, why they were

false, and how Bonventre knew of their falsity" in case charging Bernie Madoff employee with

falsely reporting payments and transactions in company's general ledgers).

Seeking to mask this lack of support in the case law, the defendants claim that courts have

required bills of particulars in cases alleging "transaction-based fraud."  (Carroll BOP Br. 7).  But all

fraud is "transaction-based," and the defendants' attempt to blur the distinctions in the cases with

this catch-all term is unpersuasive.  In truth, the fraud cases where courts have sometimes granted

bills of particulars are those where particular isolated activity, often the tip of inside information, is

the foundation of the crime.  For example, in insider trading cases, like *United States* v. *Walters*, No.

16 Cr. 339 (PKC) (S.D.N.Y. Dec. 13, 2016) (ECF No. 51), *United States* v. *Rajaratnam*, No. 09 CR.

1184 (RJH), 2010 WL 2788168, at *3 (S.D.N.Y. July 13, 2010), and *United States* v. *Contorinis*, 09

Cr. 1083 (RJS), 2010 U.S. Dist. LEXIS 74739, at *2 (S.D.N.Y. May 5, 2010), relied on by the

defendants (Carroll BOP Br. 7-9, Pappagallo BOP Br. 6-7), the charges necessarily centered on the

substance and timing of particular alleged tips.  By contrast, accounting fraud charges like the ones

brought here center not on any particular conveyance of information at a certain time, but instead on

concerted action taken over a long period that accumulates to create the false numbers the

35

defendants reported to the public.  In cases like this, alleging a long-running fraud scheme based on the cumulative effect of many acts, courts have denied bills of particulars.  *See United States* v. *Tuzman*, 301 F. Supp. 3d 430, 453 (S.D.N.Y. 2017) (denying bill of particulars seeking list of every fraudulent trade in market manipulation case); *Block*, 2017 WL 1608905, at *6; *Cuti*, 2009 WL 3154310, at *3-4.  Moreover, while the defendants may *wish* to defend against the broad-based charges here by focusing on and "disprove[ing]" isolated accounting entries (Carroll BOP Br. 8), the defendants' preferred trial strategy is not a reason they *need* a bill of particulars.  The Government is not required here, unlike in a certain insider trading cases, to prove any particular fraudulent conveyance of information, or any particular fraudulent accounting entry; the question for the jury will be whether a scheme existed—carried out through any number of means—to falsely report SS-NOI Growth.  The insider trading cases, therefore, do not support the defendants' motions.

This case also does not raise the concerns that motivated the decisions to grant bills of particulars in *Bortnovsky*, 820 F.2d at 572, and *United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000), relied upon by the defendants.  Both *Bortnovsky* (where the Government refused to specify to defense counsel who had four days to prepare for trial which of 12 burglaries it alleged were staged) and *Nachamie* (where the Government failed to specify which of 2,000 Medicare claims were false) presented the defendants with a "'needle in a haystack' problem . . . [of] sifting through thousands of legitimate transactions in an attempt to discover which transactions the government sought to prove were fraudulent."  *United States* v. *Kahale*, 789 F. Supp. 2d 359, 376 (E.D.N.Y. 2009) (denying bill of particulars in part).  This is not one of those rare cases.  The defendants here should have no trouble looking through the entirely manageable set of 6,186 pages

of Work Papers.  They need not sift through piles of legitimate entries because the Work Papers provide guidance on the matters actually at issue.

The defendants' attempt to cite *Kahale* as supporting their requested bill of particulars on the grounds that "the acts which form the basis of the charges may outwardly appear to be legitimate business communications" should likewise be rejected.  789 F. Supp. 2d at 373.  *Kahale* discussed outwardly apparent "legitimate business communications" in the context of granting a bill of particulars identifying co-conspirators, a very different request from the one the defendants make here (and need not make here, because the Indictment identifies co-conspirators).  *Id.*  In fact, *Kahale* supports denying the defendants' request.  The court in that case involving fraudulent investment solicitations rejected a request for a bill of particulars seeking a list of "the unlawful transactions, representations, and misappropriations alleged," noting that "as a general rule, the defendant does not 'need' detailed evidence about the conspiracy in order to prepare for trial properly for it is well settled that defendants need not know the means by which it is claimed they performed acts in furtherance of the conspiracy nor the evidence which the government intends to adduce to prove their criminal acts."  *Id.* at 375 (alterations and quotations omitted).

### 3.  *Pappagallo's Request for the Government's Theories Should Be Denied*

Pappagallo's request for the Government's accounting "rationale" and the "facts upon which it relies to support its conclusion" that any particular accounting entry was false is wholly unjustified.  (Pappagallo BOP Br. 2).  The Government's theory of the fraudulent accounting in this case is straightforward and is spelled out in the Indictment:  the defendants used the 2617 Account as a "cookie jar," included lease settlement income in SS-NOI Growth when they had said they would not, and removed income and/or properties from SS-NOI in the prior relevant comparison period, all

in order to fraudulently smooth Brixmor's SS-NOI Growth quarter over quarter.  Granting

Pappagallo's request as to each particular accounting entry would be tantamount to the Government

previewing its legal theories, its trial evidence in all of its detail, and its witness testimony, which it

is not required to do.  *See Mitlof*, 165 F. Supp. 2d at 569 ("The Government may not be compelled to

provide a bill of particulars disclosing . . . a preview of the Government's evidence or legal

theories."); *United States* v. *Leonelli*, 428 F. Supp. 880, 882 (S.D.N.Y. 1977) ("[T]he law does not

impose upon the Government an obligation to preview its case or expose its legal theories.").  That is

why courts routinely deny such requests.  *See e.g.*, *Bonventre*, 646 F. App'x at 78–79 (upholding

denial of bill of particulars "as to the records alleged to be false, why they were false, and how

Bonventre knew of their falsity"); *United States* v. *Gall*, No. 95 Cr. 98 (AHN), 1996 WL 684404, at

*7 (D. Conn. Aug. 12, 1996) (denying bill of particulars request demanding "the manner in which

the financial statements [the defendant] submitted to insurance companies and state agencies were

false").  Pappagallo apparently believes that some accounting adjustments (related to transactions

about which he professes no knowledge) were not actually required, i.e., that the original accounting

was correct.  (Pappagallo BOP Br. 10-11).  He is free and well-equipped—based on the Work

Papers, the rest of the discovery, and his own accounting knowledge and that of any experts he

retains—to make that argument at trial.  He is not entitled, before his own "accounting analyses

can[] be performed" and his own "expert reports can[] be written" (Pappagallo BOP Br. 12), to have

a full presentation of the Government's case so that he can tailor those items to explain it away.

Pappagallo's request for the Government's accounting theories should be denied.

####    4.   *Carroll's Request for the Government to Preview and Limit Its Trial Evidence Should Be Denied*

Finally, Carroll seeks a list of all false accounting entries the Government plans to reference at trial.  (Carroll BOP Br. 17).  This request only underlines why all of the defendants' requests should be denied.  Carroll—in tension with his attempts elsewhere to paint this as a case about one-off accounting entries (Carroll BOP Br. 3)—acknowledges that the charges are broad and involve many, sometimes small, accounting entries (having cumulative effect).  (Carroll BOP Br. 17). Recognizing, then, that a bill of particulars would do nothing to limit or specify the information he already has and would only cause the Government to repeat the information in the Work Papers, Carroll is forced to outright ask that the Government be forced to artificially limit its own case at trial.  Carroll cites no case law in support of this request because nothing would justify it here.  The only effect of requiring the Government to submit such a list would be to "restrict unduly the Government's ability to present its case," *Feola*, 651 F. Supp. at 1132, including its ability to respond to defense arguments or evidence presented during trial, and "to foreclose the Government from using proof it may develop as the trial approaches," *Samsonov*, 2009 WL 176721, at *3. Carroll's only professed reason for this list—to save defense resources—is plainly insufficient under the case law, particularly in view of the entirely manageable discovery and the fact the Government will produce exhibits and 3500 material prior to trial.  *Henry*, 861 F. Supp. at 1197 ("It is simply insufficient that the requested information would be *useful* to the defendant rather than *necessary* to her defense.").  Put simply, the defendants should not be able to use a bill of particulars motion to force the Government to produce a binding exhibit list far in advance of trial.  Carroll's motion should be denied.

In sum, in view of the detailed Indictment, the comprehensive discovery, and the Government's specification of the most particularized information available, the defendants' motions for a bill of particulars should be denied.

## III.   CARROLL'S MOTION FOR INFORMATION CONCERNING GOVERNMENT WITNESS STEVEN SPLAIN SHOULD BE DENIED

Defendant Carroll also moves for the production of all notes and summaries of interviews with Splain in order to determine whether the Government has improperly invaded Carroll's confidential communications with his counsel.  (Dkt. No. 44 (the "Discovery Motion")).  Carroll claims this information is necessary based on the fact that Carroll called Splain twice while Splain was cooperating with the Government's investigation.  Splain reported these calls to the Government in February of 2019 and neither of them involved anything even remotely approaching the sharing of "confidential defense communications."  (*Id.* at 1).  Accordingly, there is no need for further discovery or any other relief in this area.  This motion – like the defendants' previously discussed motion for a bill of particulars – is simply an imaginative attempt to gain a tactical advantage, in this instance to gather early 3500 materials, and it should be denied.

### A.   Background

On September 27, 2019, consistent with a broad interpretation of its obligations under Federal Rule of Criminal Procedure 16 and other authorities, the Government disclosed the substance of three brief conversations between Carroll and Splain toward the end of, and following, the charged scheme.  First, in a letter to counsel, the Government disclosed that following the whistleblower's allegations about the scheme at the end of 2015, Carroll made a few comments to Splain about the alleged conduct, including, in sum and substance, that it was Pappagallo's fault based on Pappagallo's emails and spreading a culture of jokes and looseness.  (*See* Dkt. No. 45-1 at

4).  Years later, after Splain began meeting with the Government to provide information about the

scheme as part of his efforts to cooperate, in or about February 2019, Carroll contacted Steven

Splain on two occasions and asked, in sum and substance, whether Splain had any information about

the Government's investigation.  (the "Carroll Calls," *see* Dkt. No. 45-2 at 2).

Based on the disclosure of the Carroll Calls, defendant Carroll requested that the Government

provide all notes of interviews with Splain so that counsel could assess "whether Mr. Splain was

given appropriate cautionary instructions and whether Mr. Splain shared any other information that

would further taint the government's investigation."  (Dkt. No. 45-4 at 4).  In response, the

Government provided additional details and explained that the Carroll Calls were both initiated by

Carroll and there was no substantive discussion of the case on either call.  (Dkt. No. 45-3 at 3).  The

Government also provided notes of its conversation with Splain's attorney on February 21, 2019

during which the Carroll Calls were discussed with the Government.  (*Id.* at Appendix C).  As

indicated in those notes, the first of the Carroll Calls took place on February 4, 2019, when Carroll

called Splain and stated, in sum and substance, that he couldn't believe he had not heard anything

about the investigation.  (*Id.*).  Splain responded, in sum and substance, that maybe the Government

was busy.  Splain did not engage in any substantive conversation about the case, conversations with

counsel, or legal strategy.  (*Id.*).  The second of the Carroll Calls took place on February 11, 2019,

when Carroll called Splain and stated, in sum and substance, that he had a feeling they would get

contacted soon in connection with the investigation.  (*Id.*).  Splain responded that he did not know.

Again, Splain did not engage in any substantive conversation about the case, conversations with

counsel, or legal strategy.  (*Id.*).  After these calls were reported to the Government on February 21,

2019, the Government instructed Splain, in sum and substance, that if he were contacted by Carroll

again, he should take care not inquire about Carroll's conversations with his attorneys and he should

make no effort to interfere with, influence, or undermine in any way Carroll's relationship with his

attorneys.  The Government is not aware of any further contact between Carroll and Splain since the

Carroll Calls.

    B.    **Discussion**

Defendant Carroll has not identified anything remotely approaching the invasion of

confidential attorney-client communications nor has he shown the need for any kind of relief based

on the Carroll Calls.  It is well established that in order to demonstrate a Sixth Amendment violation,

a defendant must "establish that privileged information had been passed to the government or that

the government had intentionally invaded the attorney client relationship, and resulting prejudice."

*United States* v. *Dien*, 609 F.2d 1038, 1043 (2d Cir. 1979) (citing *Weatherford* v. *Bursey*, 429 U.S.

545, 558 (1977)); *see also United States* v. *Ginsberg*, 758 F.2d 823, 833 (2d Cir. 1985) (explaining

that a defendant bears the burden of "alleg[ing] specific facts that indicate communication of

privileged information to the prosecutor and prejudice resulting therefrom.").  Indeed, even the

"presence of a government agent, informant, or cooperating witness at conferences between

defendant and counsel does not violate the sixth amendment," as long as the Government has not

"deliberately interfered" with the attorney-client relationship.  *United States v. Longo*, 70 F. Supp.

2d 225, 266 (W.D.N.Y. 1999).  Critically, "there can be no violation of the sixth amendment without

some communication of valuable information derived from the intrusion to the government: absent

such communication, there exists no realistic possibility of either prejudice to the defense or benefit

to the government."  *Ginsberg*, 758 F.2d at 833.  "For a Sixth Amendment right to counsel to attach,

adversarial proceedings must have commenced against an individual, whether by way of formal

charge, preliminary hearing, indictment, information, or arraignment." *United States* v. *Vasquez*, 675 F.2d 16, 16–17 (2d Cir. 1982) (quotation marks omitted).

Defendant Carroll comes nowhere close to showing deliberate governmental interference with his attorney-client relationship or alleging specific facts to show that the prosecution has received any privileged information.  As an initial matter, the Carroll Calls were initiated by Carroll and without any deliberate attempt by the Government to do anything, let alone interfere with Carroll and his attorney.  Moreover, the brief conversations that occurred on the Carroll Calls did not veer into anything that can remotely be described as discussions of attorney communications or legal strategy.  As reflected in the notes and the disclosures to counsel, the conversations involved Carroll's asking whether Splain had any updates about the status of the investigation, and Splain effectively shutting down the conversation by speculating that the U.S. Attorney's Office was busy or that he did not know how those things worked.  To the extent that Carroll suggests that the Carroll Calls "likely invited further discussion about the criminal investigation" (Discovery Motion at 5), that suggestion has no basis and is factually incorrect.  Finally, the Carroll Calls took place before any criminal proceedings commenced against Carroll, and accordingly his Sixth Amendment rights had not attached.  *See Vasquez*, 675 F.2d at 16–17 (rejecting defendant's "argument that the tape recording [made by a Government informant] was made in violation of his Sixth Amendment right to counsel. While the government's investigation of Vasquez may have commenced when he was called before the grand jury for the first time, the fact that a person is the subject of an investigation is not enough to trigger his Sixth Amendment right to counsel."); *see also Powers* v. *Coe*, 728 F.2d 97, 106 (2d Cir. 1984) ("Under *Vasquez*, then, even though Powers was a target of the grand jury

and had retained counsel, the allegedly illegal wiretaps do not form the basis for an action under

section 1983 alleging violations of his Sixth Amendment rights.").

Under these circumstances, nothing in any of the cases cited by the defendant even remotely

supports a potential violation here or any need for remedy.  The handful of cases cited by defendant

Carroll are not on point and deal with "the proposition that a surreptitious invasion by a government

agent into the legal camp of the defense" may violate the Sixth Amendment, at least where the

invasion is sufficiently "pervasive and pernicious." *United States* v. *Mosca*, 475 F.2d 1052, 1060

(2d Cir. 1973); *see also Weatherford*, 429 U.S. at 558 (indicating that there may be a Sixth

Amendment violation where there is "tainted evidence" presented in the case, "communication of

defense strategy to the prosecution," and "purposeful intrusion by the Government").  Given the lack

of discussion of anything related to legal discussion or strategy, the Carroll Calls come nowhere

close to invasion of Carroll's "legal camp," let along a pervasive and pernicious attempt to do so.

Put simply, there has been no violation of the Sixth Amendment and there is no remedy to speak of.

Moreover, defendant Carroll has not identified any failure by the Government to properly

warn Splain in any way in connection with his cooperation.  (Discovery Motion at 5-6).  The

Government began meeting with Splain in or about December 2018.  The Carroll Calls took place in

February 2019.  Throughout that period, neither Carroll nor Splain were charged defendants in a

criminal case and the Government had no reason to know whether Splain had participated in any

conversations with Carroll's counsel about legal defenses concerning a potential criminal case.

Accordingly, the Government had no reason to warn Splain about communicating about that topic.

In that respect, this case differs markedly from *United States* v. *Rosner*, 485 F.2d 1213, 1225 (2d

Cir. 1973), upon which defendant Carroll seems to rely.  That case involved a tangled web of

44

defendants, some of whom had been charged in multiple criminal cases, and some of whom had already been engaging in on-and-off cooperation with the Government.  In that circumstance, the Court noted that a witness should have been warned "not to go near legal conferences of the defense."  *Rosner*, 485 F.2d at 1225.  By contrast, the Government here had no reason to think that Splain, who has been represented by counsel throughout his pre-indictment cooperation, was in any way involved with Carroll's lawyers.  Moreover, even if Splain had been warned about not going "near the legal conferences of the defense," it would have made no difference because Splain acted even more carefully than he was required to.  After Carroll called him, Splain did not discuss any privileged matters, and did not discuss anything substantive at all (even though there would have been no particular prohibition on it) and shut the conversations down.

The fact that Splain told the Government about Carroll blaming Pappagallo after the whistleblower allegations came to light is also of no moment.  (Discovery Motion at 6).  The Government disclosed that statement by Carroll to Splain along with numerous other excerpts of interview notes of statements made by Splain in an abundance of caution and under a broad reading of its *Brady* obligations.  Carroll made those comments to Splain in the weeks following the whistleblower complaint concerning the charged scheme, and the comments have absolutely nothing to do with confidential communications with lawyers or legal strategy.  In fact, the Government understands those comments to have been made before the filing of the civil case in March 2016, and thus before any party was represented by counsel in connection with any court proceeding (and well before Splain began to cooperate with the Government).  And even if Carroll was represented at any point when such comments were made, defendant Carroll has cited no case for the proposition that attorney communications are invaded simply because two individuals discussed matters that fall

"within the scope" of a common interest agreement notwithstanding the fact that conversation does not touch on communications with lawyers or legal strategy. Instead, as the cases cited by Carroll make clear, a Sixth Amendment violation could only arise if "privileged information was passed to the government and prejudice resulted." (Discovery Motion at 7 (citing *United States* v. *Baslan*, No. 13 Cr. 220 (RJD), 2014 WL 3490682 at *3 (E.D.N.Y. July 11, 2014)). In this case, there has been absolutely no showing that privileged information was passed. Carroll's novel position would allow all potential defendants to shield themselves from any statements to co-conspirators—even volunteered statements that have nothing to do with privileged communications—ever being used against them by simply entering into a common-interest agreement with their co-conspirators. Common interest agreements exist to protect *privileged* information, not to shield a defendant from having ill-advised statements to co-conspirators used against them.

Finally, even if defendant Carroll had made out some shadow of a reason to think that his Sixth Amendment rights had been violated, which had not even attached – and he has not – his proposed remedy is far too broad. By statute, the defendants are not entitled to any, let alone all of, a potential witness's 3500 materials at this stage of the proceeding. The Government has confirmed that Splain has had no contact with Carroll concerning this case other than the Carroll Calls for years prior to the filing of this criminal case, and there thus is no need for further discovery in this regard.

## IV.   CARROLL'S MOTIONS FOR PURPORTED *BRADY* MATERIALS SHOULD BE DENIED

Carroll asks the Court for an order compelling the Government to commence two reviews for possible exculpatory material pursuant to *Brady* v. *Maryland*, 373 U.S. 83 (1963). First, he seeks the compelled review of the SEC's internal files related to its parallel investigation of Brixmor – specifically, files pertaining to the SEC's internal deliberative processes for evaluating the case.

Second, he seeks any documentary evidence in the Government's possession from another case that Adjusted Funds From Operations ("AFFO"), a metric wholly separate from SS-NOI and SS-NOI Growth, is "the single most important financial measure" used by REITs.  Both motions should be rejected.

### A.      The Request for Review of SEC Files

####      *1.  Factual Background*

The Indictment in this case came at the conclusion of parallel investigations into the accounting at Brixmor by the Government and the SEC's New York Regional Office.  On the day that the Indictment in this case was unsealed, the SEC announced the filing of an enforcement action in this District against Pappagallo, Carroll, Splain, and Michael Mortimer, another former Brixmor employee and participant in the scheme.  *See Securities and Exchange Commission* v. *Michael Carroll*, 19 Civ. 7199 (AT).

####      *2.  Law Applicable to the* Brady *Requests*

"The basic rule of *Brady* is that the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment."  *United States* v. *Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) (quoting *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963)).  "Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness."  *Id*.  "With respect to when the prosecution must make a disclosure required by *Brady* . . . *Brady* material must be disclosed in time for its effective use at trial or at a plea proceeding."  *United States* v. *Douglas*, 525 F.3d 225, 245 (2d Cir. 2008) (*quoting Coppa*, 267 F.3d at 135) (emphasis in original).  "[A]s a general rule, *Brady* and its progeny do not require immediate disclosure of all exculpatory and impeachment material upon request by a defendant."  *Coppa*, 267 F.3d at 146; *see*

*also United States* v. *Gomez*, 2018 WL 501607, at *4 (S.D.N.Y. Jan. 19, 2018) (holding that impeachment material may be produced at the same time as *Jencks* Act material); *United States* v. *McDow*, 206 F. Supp. 3d 829, 858 (S.D.N.Y. 2016) (denying pretrial motion for production of exculpatory and impeachment material, and allowing Government to produce impeachment material two weeks before trial).

Courts in this Circuit routinely deny requests that the Government be required to immediately produce *Brady* material where the Government has made a good-faith representation to the court and defense counsel that it recognizes and has complied with its disclosure obligations under *Brady*. *See, e.g.*, *McDow*, 206 F. Supp. 3d at 858 (denying motion for *Brady* material, where "[t]he Government has acknowledged its obligation and has indicated it 'will continue to provide timely disclosure of *Brady* material if and when any such material comes to light'"); *United States* v. *Davis*, 2018 WL 4373998, at *10 (S.D.N.Y. Sept. 13, 2018) ("The Government's good faith representation of its continuing compliance with its *Brady* obligations is sufficient."); *United States* v. *Gallo*, 1999 WL 9848, at *8 (S.D.N.Y. Jan. 11, 1999) (denying defendant's motion to compel production of purported *Brady* material based on Government's representations that "it is aware of its obligations under *Brady* . . . and will produce any *Brady* material to the defense well before trial"); *United States* v. *Perez*, 940 F. Supp. 540, 553 (S.D.N.Y. 1996) (same). Indeed, this Court already pre-emptively denied this application at the most recent pretrial conference in light of this representation. (*See* Nov. 5, 2019 Pre-trial Hearing Transcript at 13-14).

A prosecutor's duty to review files for *Brady* material extends to reviewing information in the possession, custody, or control of another agency only where the Government conducts a "joint investigation" with that agency. *United States* v. *Rigas*, No. 02 Cr. 1236 (LBS), 2008 WL 144824,

48

at *2 (S.D.N.Y. Jan. 15, 2008), *aff'd*, *United States* v. *Rigas*, 583 F.3d 108 (2d Cir. 2009) (holding

that there was "no joint investigation with the SEC" and therefore the Government did not need to

produce documents in the custody of the SEC); *United States* v. *Finnerty*, 411 F. Supp. 2d 428, 433

(S.D.N.Y. 2006) (Chin, J.) (holding that the Government and the NYSE, even if it were a state actor,

did not conduct a joint investigation related to the policies of the NYSE).  Parallel investigations, in

which the SEC and the Government share information and conduct joint witness interviews, support

the "[e]ffective enforcement of the securities laws." *S.E.C.* v. *Dresser Industries*, Inc., 628 F.2d

1368, 1377 (D.C. Cir. 1980) (en banc) ("If the SEC suspects that a company has violated the

securities laws, it must be able to respond quickly: it must be able to obtain relevant information

concerning the alleged violation and to seek prompt judicial redress if necessary. Similarly, Justice

must act quickly if it suspects that the laws have been broken. Grand jury investigations take time, as

do criminal prosecutions."). Although the Second Circuit has not spoken directly to the question, the

majority of district courts have concluded that, standing alone, joint fact gathering is not sufficient to

trigger an extension of the Government's *Brady* obligations.[8]  Instead, "[a] number of factors are

relevant in determining whether the prosecution conducted a 'joint investigation,' including whether

the other agency: (1) participated in the prosecution's witness interviews, (2) was involved in

---

[8] In two cases, judges in this District have concluded that certain types of joint fact gathering may trigger a limited obligation on the Government to review the files of another agency. In *United States* v. *Gupta*, 848 F. Supp. 2d 491 (S.D.N.Y. 2012), Judge Rakoff ordered the Government to review for *Brady* SEC documents memorializing witness interviews that were conducted jointly by the SEC and the Government. In so doing, however, Judge Rakoff made clear that his finding did "not mean that all of the documents the SEC prepared and accumulated in its investigation are part of the joint investigation" such that they would need to be reviewed for *Brady*. *Id*. at 495.  In *United States* v. *Martoma*, 990 F. Supp. 2d 458 (S.D.N.Y. 2014), Judge Gardephe ordered the Government to review a narrow subset of SEC memoranda relating to cooperating witnesses.  *Id*. at 462.  In neither case did the court conclude that joint fact gathering would give rise to an obligation by the Government to review the SEC's entire investigative file.

presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with

the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied

the prosecution to court proceedings." *United States* v. *Middendorf*, 18 Cr. 36 (JPO), 2018 WL

3956494, at *4 (S.D.N.Y. Aug. 17, 2018) (*citing United States* v. *Blaszczak*, 308 F.Supp.3d 736,

741-42 (S.D.N.Y. 2018)); *see also United States* v. *Collins*, 409 F. Supp. 3d 228, 241 (S.D.N.Y.

2019) (finding no joint investigation where SEC and Government participated in some joint

interviews); *United States* v. *Chow*, No. 17 Cr. 667 (GHW), ECF No. 69, at 87 (S.D.N.Y. Feb. 9,

2018) (finding no joint investigation where agencies shared information but made their own

determinations regarding what documents to obtain and what facts to ask a witness); *accord S.E.C.*

v. *Stanard*, No. 06 Civ. 7736 (GEL), 2007 WL 1834709, at *3 (S.D.N.Y. June 26, 2007) (FBI and

SEC did not conduct a joint investigation despite participating in joint interviews during which only

FBI took notes); *Rigas*, 2008 WL 144824, at *2 (finding that parallel civil and criminal

investigations were not "joint").

### 3.  Discussion

Notwithstanding his gratuitous recitation of his past complaints about the discovery in this

case, Carroll concedes that the Government has made serious and successful efforts to resolve any of

his concerns, including requesting, obtaining, and reviewing documents, notes of interviews, records

of presentations and other specific materials from the SEC.[9]  Indeed, despite having conducted its

own parallel investigation, the Government has voluntarily agreed to review various categories of

SEC documents for *Brady* that is no way required by any case law, including reviewing SEC

---

[9] The Government is continuing its voluntary review of the documents in the SEC's files identified in
its December 6, 2019 letter to Carroll and will provide any resulting necessary disclosures to the
defendants.

interview memoranda for interviews that were conducted by the SEC alone and likewise reviewing various materials supplied to the SEC by third-parties in connection with its investigation. (Carroll Disclosure Br. at 6.). As Carroll concedes, the instant motion only pertains to one further requested review: that of internal SEC deliberative documents pertaining to "the SEC's evaluation process" of its own, separate case. (Carroll Disclosure Br. at 12.). Although the Government is not familiar with the contents of the entire investigative file of the SEC and does not have custody of the files, the Government understands that Carroll is interested in potential memoranda outlining SEC attorneys' opinions at various points in the investigation concerning the strengths and weaknesses of its own case.

The SEC's internal deliberative documents – regarding its own, independent investigation – are not in the Government's possession, custody, or control. The request for them assumes that the parallel investigations conducted were, in fact, one joint investigation. They were not. But the Government respectfully submits that, for the purposes of resolving this motion, the Court need not resolve whether the investigation is properly considered one or two, *i.e.*, joint or parallel. The Government has voluntarily agreed to undertake reviews of various items in custody of the SEC, should such items exist – specifically, testimony, proffers, witness statements, affidavits, declarations, transcripts, recordings, and presentations made or supplied to the SEC in connection with its investigation into this matter. The SEC has represented to the Government, and we convey here, that to the extent there are SEC-generated deliberative materials of the sort Carroll seeks, they would not be the source of facts not otherwise identified in the materials the Government has already reviewed for potential *Brady*. Moreover, the SEC has not, and has represented to the Government that it would not, share the deliberative portions of any SEC memoranda with the Government.

51

Carroll appears to acknowledge the breadth of the review the Government has agreed to undertake and that the only additional items he seeks is the SEC's deliberate documents containing SEC attorneys' opinions and attorney work product. He therefore attempts to convert the SEC's reactions to the factual record into "exculpatory facts" in their own right. The thoughts and impressions of SEC staff concerning its case and investigation, drawn from the facts that give rise to them, do not generate *Brady* material. The evidence that matters is not an attorney's opinion, but the underlying facts, and, set forth above, the Government has voluntarily agreed to conduct a broad review of the factual record for any *Brady*. The motion should be denied – as the Court indicated it would do at the pretrial conference – for that reason.

Should the Court determine it necessary to resolve the question of whether the two investigations were parallel, it should find that they were. Carroll leans heavily on the Government's having done most (but not all) of its interviews jointly with the SEC. Although the Government and the SEC did conduct joint interviews, this reflects only typical coordination that promotes efficiency and reduces costs for all parties involved in an investigation, including the witness. In part for this reason, several judges in this District have held that such practices are indicative of parallel as opposed to joint investigations. *See United States* v. *Goffer*, No. 10 Cr. 56 (RJS) (S.D.N.Y. July 29, 2010) (Dkt. No. 90); *Rigas*, 2008 WL 144824, at *2; *Stanard*, 2007 WL 1834709, at *3.

While the fact of joint interviews can be one factor in support of a finding of joint investigations, the balance of the *Blaszczak* and *Middendorf* factors cut against the defendants' argument. As Judge Kaplan explained in *Blaszczak*:

> Although [the SEC] interviewed witnesses and gathered facts alongside the
> USAO, it was not present at some prosecution contacts and interviews, did not

> review documents gathered only by the prosecution,[10] and did not 'develop[]
> prosecutorial strategy.'  Representatives of the SEC have not accompanied the
> USAO the court proceedings in this case. Neither the Commission nor the USAO
> recommended action to the other or had any role in the other's decision making
> process. The USAO has not even seen the SEC's action memorandum.

308 F. Supp. 3d at 742 (quoting *United States* v. *Stewart*, 433 F.3d 273, 298 (2d Cir. 2006)).  This

case presents highly similar facts which  compel a similar outcome.  The Government and the SEC

made independent decisions about what charges/claims they intended to bring and which defendants

they would charge or sue, as the case may have been.  Nor did the Government or the SEC direct one

another to take any particular investigative actions.  Instead, each agency took the appropriate

respective prosecutorial and regulatory enforcement action it deemed necessary.  *See also United*

*States* v. *Collins*, 409 F.Supp.3d 228, 241-43 (denying a request for a *Brady* review of SEC materials

where, as here and among other things, the SEC did not take notes during interviews in which both

agencies participated and did not comment on draft interview reports, each agency made its own

charging decisions and neither directed the other, the SEC did not attend sessions of the grand jury,

grand jury transcripts were not shared with the SEC, and the Government did not share any of the

prosecution memoranda used to make the criminal charging decision).  Put simply, the SEC and the

Government did not conduct a joint investigation.

### B.    Request for Materials from the Separate *United States* v. *Block* Case

#### 1.  *Factual Background*

In September 2016, Brian Block, the former Chief Financial Officer of American Realty

Capital Partners ("ARCP"), a REIT, was arrested on a host of charges, including securities fraud,

---

[10] Notably, Judge Kaplan's concern was not with whether the U.S. Attorney's Office received
documents from the SEC, a practice sufficiently common to be of little moment in determining
whether the SEC acted as an arm of the prosecution team.  His concern, instead, was the opposite.

relating to his fraudulent inflation of AFFO, a non-GAAP metric used to evaluate the financial performance of publicly traded REITs that was included in ARCP's public filings.  Underscoring the importance of these metrics to ARCP and the investing public, ARCP not only reported AFFO in its public filings, but also released to the investing public forward-looking forecasts of its expected AFFO and AFFO per share for future time periods, known as guidance.  (Block Indictment ¶ 8).  The Indictment did not mention SS-NOI or any related metrics, nor did it indicate that any one metric represented the sole source of useful information about REIT performance to anyone in the REIT industry.  Block was found guilty of numerous federal criminal offenses in June 2017 after a three-week trial before Judge Oetken.  During the public trial, multiple witnesses from the investing public described AFFO as important to their consideration of a REIT's performance and prospects for future success.

The Indictment in the instant case does not make reference to AFFO.  Critically, it also does not suggest that the importance of SS-NOI Growth or SS-NOI come at the expense of any other metric, or that SS-NOI and/or SS-NOI Growth were the sole or even dominant metrics used by REITs or analysts or investors following REITs.  In its strongest formulation, the Indictment contains language indicating that "SS-NOI Growth was a key metric used by analysts and investors to evaluate a REIT's financial performance, including Brixmor's performance specifically." (Indictment ¶ 12).

   2. *Discussion*

AFFO is simply irrelevant.  The mere existence of another popular REIT metric does nothing to disprove the Government's contention that SS-NOI Growth was itself a key metric.  The Government's theory does not depend on SS-NOI and related quantities being the exclusive or even

dominant measure of REIT performance, or there being any zero-sum relationship between and among the various metrics the REIT community employs, or even on every REIT in the industry making use of SS-NOI and related measures in assessing its results.  To be clear, the Government, in following this Court's explicit instructions to think expansively about the potential scope of *Brady*, and in an abundance of caution, did disclose its awareness of the existence of certain investors whose investment patterns were not principally driven by SS-NOI.  But the notion that the mere existence of any other metric of potential interest to the REIT investment community constitutes *Brady per se* for this case is incorrect.

Consider the absurd and potentially limitless implications of Carroll's argument.  Under his logic, the universe of *Brady* disclosures in virtually every accounting fraud case would include the existence of evidence that investors traded upon any other measure of performance besides the one whose potential misrepresentation or manipulation is at issue.  This leap would, in turn, require the Government to scour the files of every litigated or investigated instance in which those measures of performance were ever shown to be material.  In reality, Carroll cannot, and has not shown that the mere existence of AFFO presents a fact that would tend to exculpate him by disproving materiality. The motion should be denied.

Moreover, the existence of AFFO as another non-GAAP metric utilized in the REIT space is certainly public knowledge and the transcript of the *Block* trial, including any references to AFFO, are a matter of public record.  In sum, the defendant is well on notice of this issue and no further internal review or disclosure is necessitated.  Put simply, any arguments made in *Block* about the role or import of AFFO were based on the public records in that case which are readily and easily accessible to Carroll.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court deny the

defendants' pretrial motions.

Respectfully submitted,
AUDREY STRAUSS
Attorney for the United States, Acting Under
Authority Conferred by 28 U.S.C. § 515


By:     /s/ _____

Dated: New York, New York     Martin S. Bell
       January 24, 2020        Drew Skinner
                            Daniel Tracer
                            Assistant United States Attorneys